

FILED BY _CH_ D.C.

JAN 14 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>the States of Arkansas, California,<br>Colorado, Connecticut, Delaware, Florida,<br>Georgia, Illinois, Indiana, Iowa, Louisiana,<br>Maryland, the Commonwealth of<br>Massachusetts, Michigan, Minnesota,<br>Missouri, Montana, Nevada,<br>New Jersey, New Mexico,<br>New York, North Carolina, Oklahoma,<br>Rhode Island, Tennessee, Texas, Vermont,<br>the Commonwealth of Virginia, Washington,<br>and the District of Columbia,<br>*Ex rel.* JANE DOE,<br><br>                   Plaintiffs,<br>v.<br><br>VIRTUOX, INC.,<br><br>                   Defendant. | Case No. 19-CV-61084-ALTMAN/HUNT<br><br><br>**FILED UNDER SEAL**<br><br>**FIRST AMENDED<br>COMPLAINT FOR VIOLATIONS OF<br>THE FALSE CLAIMS ACT 31 U.S.C.<br>§ 3729,** *et. seq.*<br><br><br>**DEMAND FOR JURY TRIAL** |

Qui tam plaintiff/relator Jane Doe ("Relator"), through her attorneys Burr Forman, LLP,

on behalf of the United States of America, the State of Arkansas, the State of California, the State

of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of

Georgia, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana, the

State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of

Minnesota, the State of Missouri, the State of Montana, the State of Nevada, the State of New

Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of

Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the State of

Vermont, the Commonwealth of Virginia, the State of Washington, and the District of Columbia,

(collectively "the States and the District of Columbia")[1], for her Qui Tam Complaint against defendant VirtuOx, Inc. ("VirtuOx"), based upon her direct and personal knowledge, alleges as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America, the States, and the District of Columbia, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendant, and/or its agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended ("the FCA" or "the Act") and its state-law counterparts: the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq*.; California False Claim Act, Cal. Gov. Code § 12650 *et seq*.; the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-303.5 *et seq*.; the Connecticut False Claims Act, Conn. Gen. Stat. Ann. § 4-274 *et seq*.; the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*.; the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq*.; the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. §23-3-120 *et seq*.; the Illinois False Claims Act, 740 Ill. Comp. Stat.§ 175/1-8; the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5- 1 *et seq*.; the Iowa False Claims Act, I.C.A. § 685.3 *et seq*.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq*.; the Maryland False Health Claims Act; MD Code 2-601 *et seq*.; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq*.; the Michigan Medicaid False Claim Act M.C.L. §400.601 *et seq*.; the Minnesota False Claims Act, Minn. Stat. Ann. §

---

[1] The State of New Hampshire has been removed as a Plaintiff at the request of the State. Based on the State's False Claims Act, a relator can only bring a case on behalf of the State of New Hampshire if the defendant has its principal place of business within the state. The defendant does not have its principal place of business in New Hampshire.

15C.01 *et seq.*; the Missouri Health Care Fraud and Abuse Act, V.A.M.S. § 191.905 *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann.§ 2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.; the New York False Claims Act, N.Y. State Fin. Law§ 187 *et seq.*; the North Carolina False Claims Act, N.C.G.S.A. §1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. 63 §5053. 1 *et seq.*; the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; the Tennessee False Claims Act, T.C.A. § 71-5-182(a) *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; the Vermont False Claims Act, VT. Stat. Ann. 32 § 7-630 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; the Washington Medicaid Fraud False Claims Act, RCWA 74.66.005 *et seq.*; and the District of Columbia False Claims Act, D.C. Code Ann.§ 2-381.01 *et seq*.

2.     Upon information and belief, Defendant has, since at least approximately 2011, conducted several unlawful schemes which resulted in false claims being submitted to government payors for reimbursement.

3.     The first scheme involved VirtuOx falsely identifying the location of its services so that Medicare and other payors would give them a higher allowable and accordingly a higher payment for their services.

4.     Upon information and belief, this scheme involved submitting claims to Medicare and other payors with a location of service as San Francisco, California, despite the fact that their true location of services is Florida.

5.     The second scheme involves VirtuOx performing and billing for unnecessary services.  For purposes of determining whether a patient qualifies for home oxygen therapy, the

appropriate test is the **overnight** measurement of oxygen saturation in blood.  This is a service whereby a patient's oxygen levels and heart rate are recorded the entire night.  However, there is an additional service called a "spot check", which checks oxygen and heart rate levels for a brief moment.

6.      There is no reason to perform a spot check at the same time as an overnight study. The overnight study would encompass what would be learned from a spot check.  VirtuOx provides the prescription forms to be used by the prescribing physicians.  These forms are printed in a way so that the physician is misled into prescribing both a spot check as well as an overnight test. (Exhibit 1).  As such, a physician who intends to order one service or the other, is misled into ordering both, and an unnecessary service is being performed resulting in a false claim.

7.       The third scheme involves VirtuOx marketing and otherwise promoting a capnograph that tests oximetry and carbon dioxide levels, **without clinical supervision**, that has not been FDA approved for that use.

8.      The fourth scheme involves VirtuOx giving free, or heavily discounted, pulse oximeter devices to durable medical equipment companies, to induce them to refer the overnight oxygen test data interpretation work to VirtuOx.

9.      As a direct result of Defendant's improper practices, federal and state health insurance programs including, but not limited to, Medicare, Medicaid, MediCal, TennCare, CHAMPUS/TRICARE, CHAMPVA and the Federal Employee Health Benefits Program ("FEHBP") have been caused to pay false or fraudulent claims for Defendant's services.

10.     The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in

4

federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.

11.     Congress intended that the amendments to the False Claims Act create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

12.     The Act provides that any person who knowingly submits, or causes the submission of a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $22,363 for each such claim, plus three times the amount of the damages sustained by the Government, plus attorneys' fees and costs.  31 U.S.C. §§ 3729.  Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

13.     The Act allows any person (known as a "Relator") having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery.

14.     Based on these provisions, qui tam Plaintiff seeks through this action to recover on behalf of the United States and those States, all of which authorize similar qui tam actions, damages and civil penalties arising from the named Defendant's making or causing to be made false or fraudulent records, statements and/or claims.

15.     Defendant directly submitted, and/or caused to be submitted, claims for Independent Diagnostic Testing Facility ("IDTF") services, and other services and products, to federal and state health insurance programs, it knew, and/or reasonably foresaw, were false and fraudulent, and not eligible for program reimbursement.

16.     Defendant is therefore liable under the federal False Claims Act, the Federal Anti-Kickback Statute, and analogous state False Claims Acts for causing the submission of thousands of claims for VirtuOx's Independent Diagnostic Testing Facility services, and other services and products, that were not eligible for reimbursement.

## II. PARTIES

### A.     Relator.

17.     Plaintiff/Relator is a resident of Kansas and a citizen of the United States.  Relator is the owner of an IDTF, who through Relator's employment has gained direct and personal knowledge of the illegal and false claims alleged herein.  Relator brings this action on behalf of the United States of America pursuant to the Qui Tam provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

### B.     Defendant VirtuOx, Inc.

18.     Upon information and belief, Defendant VirtuOx is a corporation organized under the laws of Florida, with its principal place of business located at 5850 Coral Ridge Drive, Suite 304, Coral Springs, FL 33076.   Upon information and belief, Defendant VirtuOx regularly transacts business in this federal district.

19.     Upon information and belief, Defendant VirtuOx provides Independent Diagnostic Testing Facility services to patients and durable medical equipment ("DME") companies throughout the United States.

20.     VirtuOx provides these services to patients, and to DME companies who provide home oxygen equipment and supplies to patients pursuant to a prescription.

## III. JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28

6

U.S.C. § 1331, 28 U.S.C. § 1367, 28 U.S.C. § 1345, 42 U.S.C. §1320-7b(b), and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3720.   In accordance with 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.   None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relator has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based.   In accordance with 31 U.S.C. § 3730(e)(4)(B), Relator is an original source with direct and independent knowledge of the allegations contained herein.

22.     The Court has subject matter jurisdiction over Defendant's violations of the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.; the California False Claim Act, Cal. Gov. Code § 12650 et seq.; the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-303.5 et seq.; the Connecticut False Claims Act, Conn. Gen. Stat. Ann. § 17b-301 et seq.; the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 et seq.; the Florida False Claims Act, Fla. Stat. Ann. § 68.081, et seq.; the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. §23-3-120 et seq.; the Illinois False Claims Act, 740 Ill. Comp. Stat.§ 175/1-8; the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5- 1 et seq.; the Iowa False Claims Act, I.C.A. § 685.3 et seq.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 et seq.; the Maryland False Health Claims Act; MD Code 2-601 et seq.; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A et seq.; the Michigan Medicaid False Claim Act M.C.L. §400.601 et seq.; the Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01 et seq.; the Missouri Health Care Fraud and Abuse Act, V.A.M.S. § 191.905 et seq.; the

Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 et seq.; the New Jersey False Claims Act, N.J. Stat. Ann.§ 2A:32C-1 et seq.; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.; the New York False Claims Act, N.Y. State Fin. Law§ 187 et seq.; the North Carolina False Claims Act, N.C.G.S.A. §1-605 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. 63 §5053. 1 et seq.; the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq.; the Tennessee False Claims Act, T.C.A. § 71-5-182(a) et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 et seq.; the Vermont False Claims Act, VT. Stat. Ann. 32 § 7-630 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.; the Washington Medicaid Fraud False Claims Act, RCWA 74.66.005 et seq.; and the District of Columbia False Claims Act, D.C. Code Ann.§ 2-381.01 et seq., pursuant to 31 U.S.C. § 3732(b) because Defendant's violations of the State False Claims Acts and the federal FCA arise out of a common nucleus of operative fact. See also 31 U.S.C. § 3732(b) (granting district court's jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a state if the action arises from the same transaction or occurrence as an action brought under the federal FCA).

23.    This Court has personal jurisdiction and venue over the Defendant pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because the Defendant can be found in, resides, and transacts business in and throughout the Southern District of Florida.

24.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because the Defendant can be found in, resides, and transact business in the Southern District of Florida.  At all times relevant to this Qui Tam Complaint, the Defendant regularly conducted substantial business within the Southern District of Florida, maintained employees and

8

offices in the Southern District of Florida, and made significant sales within the Southern District of Florida.

## IV.  BACKGROUND ON FEDERAL & STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A.  Medicare Program

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

26.     Medicare now has three parts: Part A; Part B, and Part D Programs.

27.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

28.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A including HME equipment and supplies.  Part B also helps pay for covered health services and supplies when they are medically necessary.

29.     Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

30.     Payments from the Medicare Program come from a trust fund - known as the Medicare Trust Fund - which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled

9

the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

31.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

32.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

33.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by the Health Care Financing Administration ("HCFA").

34.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

35.     Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

36.     The principal function of both intermediaries and carriers is to make payments for Medicare services, and to audit claims for those services, to assure that federal funds are spent properly.

42790039 v1

37.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for that prevention, diagnosis, or treatment of a specific illness or injury.

**B.     Medicaid Program**

38.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

39.     Medicaid is a cooperative federal-state public assistance program which is administered by the states.

40.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, the federal government provides approximately 60% of the funding for Florida Medicaid, the remaining 40% of funds is received from the state.

41.     Title XIX of the Social Security Act allows considerable flexibility within the states' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

42.     However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient

11

and outpatient hospital services.

## C. Other Federal Health Care Programs

43.     In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription medication, equipment, and supplies under several other federal health care: programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the: Federal Employees Health Benefit Program.

44.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

## V. APPLICABLE LAW

## A. Federal False Claims Act

45.     The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.

46.     Congress intended that the amendments to the False Claims Act create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal

resources to prosecuting fraud on the Government's behalf.

47.     The Act provides that any person who knowingly submits, or causes the submission of a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $22,363 for each such claim, plus three times the amount of the damages sustained by the Government, plus attorneys' fees and costs.  31 U.S.C. §§ 3729, et seq.  Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

48.     The Act allows any person (known as a "Relator") having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery.

49.     Based on these provisions, qui tam Plaintiff seeks through this action to recover on behalf of the United States and those States, all of which authorize similar qui tam actions, damages and civil penalties arising from the named Defendant's making or causing to be made false or fraudulent records, statements and/or claims.

50.     As a prerequisite to participating in federally-funded health care programs, providers must certify (expressly or, through their participation in a federally-funded health care program, impliedly) their compliance with the Federal False Claims Act.

51.     IDTF's, DME companies, sleep labs, physicians, hospitals, and pharmacies enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program.  As part of that agreement, without which IDTF's, DME companies, sleep labs, physicians, hospitals and pharmacies may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certifications:

> I agree to abide by the Medicare laws, regulations and program, instructions that apply to this supplier. The Medicare laws, regulations, and program

> instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application, Form CMS-855-B. (Certification Statement). Further, the

Provider certifies that:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.*

52. Even in the absence of an express certification of Compliance, a party that submits

a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is

properly payable.

**B.     Federal Food, Drug, and Cosmetic Act**

53. Each person who wants to market in the U.S., a Class I, II, and III device intended

for human use, for which a Premarket Approval application (PMA) is not required, must submit a

510(k) to FDA unless the device is exempt from 510(k) requirements of the Federal Food, Drug,

and Cosmetic Act (the FD&C Act).

54. A 510(k) is a premarket submission made to FDA to demonstrate that the device to

be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed

device (21 CFR 807.92(a)(3)) that is not subject to PMA. Submitters must compare their device to

one or more similar legally marketed devices and make and support their substantial equivalence

claims.

55. The legally marketed device(s) to which equivalence is drawn is commonly known

as the "predicate."

14

56.     Until the submitter receives an order declaring a device SE, the submitter may not proceed to market the device. Once the device is determined to be SE, it can then be marketed in the U.S.

57.     A 510(k) requires demonstration of substantial equivalence to another legally U.S. marketed device. Substantial equivalence means that the new device is at least as safe and effective as the predicate.

58.     A 510(k) is not required if the device is made outside the U.S. and you are an importer of the foreign made medical device. A 510(k) is not required if a 510(k) has been submitted by the foreign manufacturer and received marketing clearance. Once the foreign manufacturer has received 510(k) clearance for the device, the foreign manufacturer may export his device to any U.S. importer.

59.     The FD&C Act and the 510(k) regulation (21 CFR 807) do not specify who must submit a 510(k). Instead, they specify which actions, such as introducing a device to the U.S. market, require a 510(k) submission.

60.     Repackagers or relabelers may be required to submit a 510(k) if they significantly change the labeling or otherwise affect any condition of the device. Significant labeling changes may include modification of manuals, such as adding a new intended use, deleting or adding warnings, contraindications, etc.

61.     A 510(k) is required when there are changes or modifications to an existing device, where the modifications could significantly affect the safety or effectiveness of the device or the device is to be marketed for a new or different intended use.

62.     The FDA regulates drugs and devices based on the "intended uses" for such products. Before marketing and selling a medical device, a manufacturer must demonstrate to the

FDA that the product is safe and effective for each intended use. 21 U.S.C. §331(d).

63.     The FDA prohibits medical device manufacturers from marketing or promoting medical devices for uses, i.e., "indications" not approved by the FDA. "Off-label" refers to the marketing of an FDA approved device for uses that have non undergone FDA scrutiny and approval, i.e., for purposes not approved by the FDA.

64.     Sales and marketing for uses other than that approved by the FDA is considered off-label marketing or "misbranding" proscribed by the FDA. See 21 U.S.C. §331(a)-(b).

65.     Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process, and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product, and accordingly, the medical necessity for its use.

66.     The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding." 21 U.S.C. § 321(n). Labeling includes, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material. 21 C.F.R. § 202.1 (1)(2).

67.     Medical device marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a device in violation of the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371, 21 C.F.R. § 202.1(e)(6), (e)(7), 21 C.F.R. § 1.21.

68.     Such violations exist where promotional and marketing materials and presentations for an FDA approved device, reference "off-label" uses of the device — *i.e.,* those uses which are not indicated by the FDA, or contain representations or suggestions, not approved or permitted in the labeling, that is not demonstrated by substantial evidence or substantial clinical experience.

16

C.  **Federal Anti-Kickback Statute**

69.  Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

70.  When a company pays kickbacks to a medical equipment provider, such as an HME, in order to induce the provider to use the company's products, it fundamentally compromises the integrity of the provider/patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon health care providers to decide what treatment and/or medical equipment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program. As a condition of its reimbursement, government healthcare programs require that individuals and companies must render their services without the conflict of receipt of a kickback.

71.  Many states, including those States identified as Plaintiffs herein, have enacted similar prohibitions against illegal inducements to health care decision-makers.

72.  The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

(1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

(2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a Federal health care program.

42 U.S.C. §1320a-7b(b)(l) and (2).

73.  The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U .S.C. § 1320a-7b(b)(1 ).

74.  Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. §1320a-7b(b)(l).

17

75.     The federal Anti-Kickback Statute has been interpreted by the United States Court of Appeals for the Third Circuit, as well as other federal courts, to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. See *United States v. Greber*, 760 F.2d 68 (3d Cir.), cert denied, 474 U.S. 988 (1985).

76.     Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.

77.     In addition to the various laws and regulations all pharmaceutical and medical device companies are required to follow, the Government also offers industry guidance in an effort to police the marketing activities of the pharmaceutical industry.

78.     For instance, the Office of the Inspector General of the Department of Health and Human Services ("HHS-OIG"), in May 2003, issued its Compliance Program Guidance for Pharmaceutical Manufacturers, a document meant to provide an overview of the fundamental elements of a pharmaceutical manufacturer compliance plan, and identifies and discusses specific risk areas. (Exhibit 1).

79.     HHS-OIG has stated that "anti-kickback statute ultimately turns on a party's intent, it is possible to identify arrangements or practices that may present a significant potential for abuse. Initially, a manufacturer should identify any remunerative relationship between itself (or its representatives) and persons or entities in a position to generate federal health care business for the manufacturer directly or indirectly.  Persons or entities in a position to generate federal health care business include, for example, purchasers, benefit managers, formulary committee members, group purchasing organizations (GPOs), physicians and certain allied health care professionals, and pharmacists. The next step is to determine whether any one purpose of the remuneration may

18

be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program." HHS-OIG Guidance to Pharmaceutical Manufacturers, issued May 2003, p. 23734 (Exhibit 1).

80.     The HHS-OIG raised an issue directly on point with the illegal activity of the Defendant herein: "Product Support Services. Pharmaceutical manufacturers sometimes offer purchasers certain support services in connection with the sale of their products. These services may include billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to support of the purchased product. Standing alone, services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute. However, if a manufacturer provides a service having no independent value (such as limited reimbursement support services in connection with its own products) in tandem with another service or program that confers a benefit on a referring provider (such as a reimbursement guarantee that eliminates normal financial risks), the arrangement would raise kickback concerns." HHS-OIG Guidance to Pharmaceutical Manufacturers, issued May 2003, p. 23735 (Exhibit 1).

81.     A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. A party convicted under the federal Anti-Kickback Statute may be excluded (i.e., not allowed to bill for any services rendered) from Federal health care programs. 42 U.S.C. § 1320a-7(a).

82.     In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320a-7a(a).

19

83.     HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See 42 C.F.R. § 1001.952.  However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection.  None of the practices at issue here meet these safe harbor regulations.

84.     Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

85.     Claims that arise from a kickback scheme violate the False Claims Act for two separate and distinct reasons: (1) claims seeking payment for services or prescriptions tainted by kickbacks are "factually false" because compliance with the Anti-Kickback Statute is a condition of payment; and (2) health care providers must certify in their provider enrollment agreement that they will comply with the Anti-Kickback Statute as a condition of payment.

86.     Claims that result from a kickback scheme are per se false because the Anti-Kickback Statute prohibits the government from paying for services or pharmaceuticals tainted by kickbacks.  No further express or implied false statement is required to render such infected claims false, and none can render the claim legitimate.

87.     The False Claims Act imposes liability where a defendant knowingly causes such tainted claims to be presented to the Medicare, Medicaid, or other government funded healthcare programs.

88.     Second, as a prerequisite to participating in federally-funded health care programs, providers must certify (expressly or, through their participation in a federally-funded health care program, impliedly) their compliance with the federal Anti-Kickback Statute.

89.     HME companies, Physicians, hospitals, and pharmacies enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program.   As part of that agreement, without which HME companies, physicians, hospitals and pharmacies may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program, instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855-S (for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) Suppliers) (Exhibit 2).

90.     Moreover, as a prerequisite to participating in the various state Medicaid programs, providers must certify (expressly or, through their participation in the state-funded health care program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.

91.     Even in the absence of an express certification of Compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.

92.     Consequently, if a party pays a kickback to induce the provision of a particular CPAP machine and supplies, it renders false the submitter's implied or express certification of compliance that the resulting claim complies with the requirements of the Anti-kickback Statute.

93.     On March 23, 2010, as part of the Affordable Healthcare for America Act, the Anti-Kickback Statute was amended to clarify that all claims resulting from a violation of the Anti-

Kickback Statute are a violation of the federal False Claims Act. 42 U.S.C. § 1320a-7(b)(g). The amendment to the Anti-Kickback Statute codified the long standing law within the Federal Circuit Courts of Appeals that a violation of the Anti-Kickback Statute renders a claim false under the federal False Claims Act. See e.g., *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004).

## VI.  FRAUD ALLEGATIONS

### A.    VirtuOx falsely represents to Federal and State Payors that its Location of Services for its IDTF services is San Francisco, California rather than their actual location in South Florida.

#### 1.    Overview of VirtuOx's Scheme.

94.    Patients that need to be tested to determine their need for home oxygen therapy, or Non-invasive Ventilation, are prescribed at home testing to determine if the treatment is appropriate.

95.    The patient obtains the device, a pulse oximeter, or a capnograph, from either a DME company, or having it mailed to them directly from an IDTF.

96.    Pursuant to CMS Pub. 100-3 Section 240.2 (2005), the DME, which will ultimately be filling the patient's need for home oxygen therapy should the condition exist, cannot interpret the data. (Exhibit 2). This is due in part to the government's concern with the potential conflict of interest in having the DME interpret the data, and then subsequently providing the oxygen equipment and supplies.

97.    As such, the data collected by the DME is transmitted electronically to an IDTF, which serves as the independent third party reviewer.

98.    The IDTF analyzes the data and provides a report to the ordering physician and DME provider.

22

99.    The applicable billing codes are: 94760 (Measurement of oxygen saturation in blood using ear or finger device); 94762 (Overnight measurement of oxygen saturation in blood using ear or finger device) (Exhibit 3); and G0399 (Home sleep test with type iii portable monitor, unattended). (Exhibit 4).   Additionally, upon information and belief, Defendant is billing Medicare for testing associated with determining if a patient qualifies for non-invasive ventilation.   There are multiple codes that Defendant could be using.

100.    Medicare has varying allowable rates based on where the IDTF services are located.   For example, the Medicare allowable for code 94762 (Overnight measurement of oxygen saturation in blood using ear or finger device) for 2018 for Florida is $25.78, whereas, the Medicare allowable for San Francisco, California is $33.06.   (Exhibits 5 and 6).

101.    The Medicare allowable for code 94760 (Measurement of oxygen saturation in blood using ear or finger device) for 2018 for Florida is $3.20, whereas, the Medicare allowable for San Francisco, California is $3.49.   (Exhibits 7 and 8).

102.    The Medicare allowable for code G0399 (Home sleep test with type iii portable monitor, unattended) for 2018 for Florida is $154.19, whereas, the Medicare allowable for San Francisco, California is $290.06 (Exhibits 9 and 10).

103.    Medicare pays 80% of the allowable, with the patient or secondary insurance being liable for the remainder.   Since April 1, 2013, Medicare also applies a further deduction to its payment, called a sequestration reduction, of 2%.   (Exhibit 11).

104.    Upon information and belief, VirtuOx's location of the IDTF services it provides is Coral Springs, Florida.   This is their corporate office, and principal place of business.

105.    Upon information and belief, it is at this office that patient calls, and patient health care inquiries, are handled, as well as insurance billing activities.

106.    Upon information and belief, on or about 2010, VirtuOx bought an IDTF located in Stockton, California named Oxytech.  This company had employees, and equipment providing IDTF services in Stockton, California.

107.    Upon information and belief, within approximately one year, VirtuOx closed the Stockton office and opened a San Francisco office.  Shortly thereafter, all of the Oxytech employees were ultimately terminated.

108.    Upon information and belief, VirtuOx's initial San Francisco office was a "virtual" office.  Ultimately, VirtuOx leased a small space located at 150 Executive Park Blvd., Suite 3210, San Francisco, CA 94134.  Their entire office staff consists of a receptionist and an office manager.

109.    Upon information and belief, virtually no IDTF services are being performed out of that San Francisco, California location.

110.    Medicare requires that an IDTF maintain a phone line for patients to call to discuss their test.  (Exhibit 12).  The Medicare requirements for an IDTF state that it must:

> Maintain a primary business phone under the name of the designated business. The primary business phone must be located at the designated site of the business, or within the home office of the mobile IDTF units. The telephone number or toll free numbers must be available in a local directory and through directory assistance. IDTFs may not use "call forwarding" or an answering service as their primary method of receiving calls from beneficiaries during posted operating hours.

111.    The phone number Medicare has to give to its beneficiaries to contact VirtuOx was (415) 508 – 1240.  This is a San Francisco phone number.  Calls to that number yield only a busy signal.

112.    The only VirtuOx phone number that gets answered is the one for the Florida office. This further establishes that VirtuOx's San Francisco office is simply a front for purpose of billing Medicare for the higher allowable.

113.    Additionally, upon information and belief, all order forms for IDTF services are

24

faxed to VirtuOx's Florida office. VirtuOx's location of services is, and should be listed on its claims to Medicare or other payers, as Florida.

114. However, VirtuOx is falsely representing to Medicare and other Payors that the location of services for reimbursement purposes is this San Francisco location. This is despite the fact that the actual location of services is their primary location in Coral Springs, Florida.

115. Using 2016 as a sample year, by making such false claims, VirtuOx has been obtaining an additional approximately $6.48 per test for code 94762. In 2016 VirtuOx submitted 131,803 claims to Medicare for billing code 94762. (Exhibit 13). The 2016 Medicare allowable for San Francisco, California, for 94762 was $33.96 (Medicare would pay approximately $26.62 of this[2]). (Exhibit 14). The 2016 Medicare allowable for Ft. Lauderdale, Florida, for 94762 was $25.69 (Medicare would pay approximately $20.14 of this[3]). (Exhibit 15). As such, due to this fraud, Medicare was made to pay $6.48 more for each test in 2016 than it should have, with a total amount of overpayments of approximately $854,083.44 (131,803 x $6.48 = $854,083.44).

116. Further, VirtuOx has been obtaining an additional approximately $0.45 per test for code 94760. In 2016 VirtuOx submitted 20,855 claims to Medicare for billing code 94760. (Exhibit 13). The 2016 Medicare allowable for San Francisco, California, for 94760 was $4.14 (Medicare would pay approximately $3.24 of this[4]). (Exhibit 16). The 2016 Medicare allowable for Ft. Lauderdale, Florida, for 94760 was $3.56 (Medicare would pay approximately $2.79 of this[5]). (Exhibit 17). As such, due to this fraud, Medicare was made to pay $0.45 more for each test in 2016 than it should have, with a total amount of overpayments of approximately $9,384.75

---

[2] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

[3] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

[4] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

[5] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

(20,855 x $0.45 = $9,384.75).

117.    However, the damages related to code 94760 are not just the amount of the overpayment.  As explained in further herein, this spot check was an unnecessary service and should never have been performed or billed.  As such the damages are the full amount of the payment of $3.24 (San Francisco rate).  Therefore the damages for just 2016 are $67,570.20 (20,855 x $3.24 = $67,570.20).

118.    Additionally, VirtuOx has been obtaining an additional approximately $106.00 per test for code G0399.  In 2016 VirtuOx submitted 4,458 claims to Medicare for billing code G0399. (Exhibit 13).  The Medicare allowable for 2016 for this code is unavailable as Medicare has removed them from its website.  Further, the 2017 numbers of how many claims Defendant submitted for this code have not been released by Medicare yet.  To determine the overpayment for 2017, it will be presumed that the usage is the same as the 2016 number of claims submitted to Medicare, which was 4,458.  The 2017 Medicare allowable for San Francisco, California, for G0399 was $288.62 (Medicare would pay approximately $226.28 of this[6]). (Exhibit 18).  The 2017 Medicare allowable for Ft. Lauderdale, Florida, for G0399 was $153.42 (Medicare would pay approximately $120.28 of this[7]). (Exhibit 19).  As such, due to this fraud, Medicare was made to pay $106.00 more for each test in 2017 than it should have, with a total amount of overpayments of approximately $472,548.00 (4,458 x $106.00 = $472,548.00))

119.    Upon information and belief, in 2018, VirtuOx purchased an IDTF called Instant Diagnostic Systems, ("IDS") which in 2016 performed approximately 50,000 tests per year on Medicare patients with billing code 94762 (Overnight measurement of oxygen saturation in blood

---

[6] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.
[7] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

42790039 v1

using ear or finger device).  (Exhibits 20 and 21).  This acquisition means that Virtuox is now performing approximately 200,000 tests per year on Medicare patients with billing code 94762 (Overnight measurement of oxygen saturation in blood using ear or finger device).  This would result in an overpayment of approximately $1,142,000.00.  The 2018 Medicare allowable for San Francisco, California, for 94762 was $33.06 (Medicare would pay approximately $25.92 of this[8]). (Exhibit 6).  The 2018 Medicare allowable for Ft. Lauderdale, Florida, for 94762 was $25.78 (Medicare would pay approximately $20.21 of this[9]). (Exhibit 5).  As such, due to this fraud, Medicare was made to pay approximately $5.71 more for each test in 2018 than it should have, with a total amount of overpayments of approximately $1,142,000.00 (200,000 x $5.71 = $1,142,000.00).

120.    Additionally, with this acquisition, VirtuOx is now submitting approximately 9,236 claims to Medicare for billing code G0399.  (This is based on 2016 numbers of 4,458 claims submitted by VirtuOx, and 4,778 claims submitted by IDS.  (Exhibits 13 and 21).  The actual current numbers would be higher.  The 2018 Medicare allowable for San Francisco, California, for G0399 was $290.06 (Medicare would pay approximately $227.40 of this[10]). (Exhibit 10).  The 2018 Medicare allowable for Ft. Lauderdale, Florida, for G0399 was $154.19 (Medicare would pay approximately $120.88 of this[11]). (Exhibit 9).  As such, due to this fraud, Medicare was made to pay $106.52 more for each test in 2018 than it should have, with a total amount of overpayments of approximately $983,818.72 (9,236 x $106.52 = $983,818.72).

121.    Defendant falsely claims its location of IDTF services is San Francisco, California,

---

[8] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.
[9] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.
[10] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.
[11] Medicare pays 80% of its allowable, and then applies a sequestration reduction of an additional 2%.

with the accomplished goal of obtaining a higher reimbursement for its services in violation of the federal False Claims Act, as well as similar state statutes.

122.    Upon information and belief, VirtuOx has been engaging in this fraudulent practice since at least 2011.

**B.    VirtuOx is Billing Code 94760 Concurrently With Billing Code 94762 To Inappropriately Obtain an Additionally Payment for the Same Service.**

123.    The billing code for overnight measurement of oxygen saturation in blood using ear or finger device is 94762.  This is a service whereby a patient's oxygen levels and heart rate are recorded the entire night.

124.    There is an additional code, 94760, for performing a separate service, termed a "spot check".  This involves placing a pulse oximeter on a patient's finger to check oxygen and heart rate levels for a brief moment.

125.    There is no reason to perform a spot check at the same time as an overnight study. The overnight study would encompass what would be learned from a spot check.

126.    VirtuOx provides the prescription forms to be used by the prescribing physicians. These forms are printed in a way so that the physician is misled into prescribing both a spot check (94760) as well as an overnight test (94762).  (Exhibit 1).

127.    The prescription form provided by VirtuOx is the VirtuOx "Overnight Oximetry Order Form".  Under the "Diagnostic Orders" section, it is prefilled by VirtuOx with the following language:

> **"Awake Oximetry CPT 94760 & Overnight Oximetry CPT 94762: Immediately and repeat in 30/60/90 other: _____ to validate oxygen settings."**

128.    As can be seen, there is no place for the physician to check either 94760 **or** 94762. As such, a physician who intends to order one or the other is forced to order both.

129.    Once the physician checks the box, VirtuOx can then provide both the overnight service and the "spot check", and bill the government for both.  By billing the spot check as well as the overnight test, Defendant is falsely billing the government, and generating an additional payment.

130.    For 2016 that additional payment would be $3.24 per claim. ($4.14 Medicare allowable for San Francisco paid at 80%. Additional sequestration reduction of 2% = $3.24).

131.    In 2016 alone, Defendant billed Medicare this spot check code (94760) 20,855 times. (Exhibit 13).  Code 94760 was always billed concurrently with 94762, and as such there should not have been a claim submitted for 94760.  Those claims would all be false claims.

132.    Thus, in 2016 alone, Medicare paid $67,570.20 ($3.24 x 20,855 = $67,570.20) for unnecessary testing.

**C.    VirtuOx is Marketing and Selling a Medical Device For an Off-Label Use While Falsely Claiming The Device is Approved by the Federal Food and Drug Administration.**

133.    Under the Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer of medical devices classified in Class II or III of its three-tiered risk classification system must generally obtain FDA marketing clearance or approval before introducing a new medical device into the market.  Any modification to a device that could significantly affect a devices' safety or effectiveness, including a significant change in its intended use, requires that the manufacturer obtain a new or expanded clearance or approval.

134.    VirtuOx is marketing and otherwise promoting a capnograph that tests oximetry and carbon dioxide levels, **without clinical supervision**, that has not been FDA approved for that use, which is therefore an off-label use.

135.    On its website, VirtuOx sells a device called the VPOD CapOx.  They state that it

29

is FDA approved.  (Exhibit 22).

136.    The on-line patient video shows patient how to use the device at their home.  There are also on-line patient instructions for how to use the device at home entitled "VPOD CapOx Patient Self-Administered Overnight Oximetry and Capnography Instructions on Room Air". (Exhibit 23 and 24).  Clearly VirtuOx is promoting this device for at home use **without clinical supervision**, which is an off-label use.

137.    Upon information and belief, the VirtuOx VPOD CapOx is manufactured in China by Shenzhen Creative Industry Co., Ltd..  This device's FDA 510(K) number is K093016.  The indications for use of this device states: "The Vital Signs Monitor is adaptable to adult and pediatric usage in a **hospital environment**.  It is intended to be used **only** under regular supervision of clinical personnel." (Emphasis added). (Exhibit 25).

138.    Upon information and belief, VirtuOx does not have, nor has it sought, FDA clearance for the use of its VPOD CapOx device for at home use without supervision of clinical personnel.

139.    The data recorded by VirtuOx's VPOD CapOx can only be interpreted by VirtuOx using proprietary software.

140.    As such, VirtuOx is marketing and selling a device to DME companies, and promoting it for the overnight measurement of oxygen and carbon dioxide saturation in blood by patients at home.

141.    At the conclusion of the overnight testing performed by the patient with no supervision by clinical personnel, the DME then transmits the data to be interpreted by VirtuOx.

142.    VirtuOx interprets the data, that it knows was collected on a device not FDA approved for home use without supervision of clinical personnel, and then submits a claim to

Medicare for that interpretation.

143.    This data is being interpreted for the purpose of determining whether a patient qualifies for home oxygen therapy or non-invasive ventilation.  These are very costly, and are a potentially dangerous therapy.  It is critical that only patients that truly qualify for the treatment be approved for it.

144.    By using medical devices that are not FDA approved for at home testing without clinical supervision, VirtuOx put patients at risk of being incorrectly "qualified" for home oxygen therapy or non-invasive ventilation, based on potentially erroneous results.

145.    Medicare is then in the position of not only paying for the interpretation of the data collected by these non-FDA approved devices, but also of paying for home oxygen therapy or non-invasive ventilation for patients that were qualified in error by the non-FDA approved devices. Medicare reimburses the DME company approximately $1,099.00 per month for noninvasive ventilation. (HCPCS code E0466) (Rate varies regionally, but is $1,099.00 in Florida). (Exhibit 26).

146.    Patients that are prescribed home oxygen therapy generally require this treatment for the remainder of their lives.  This is very costly to Medicare.

147.    By submitting a claim under these circumstances, VirtuOx is knowingly submitting a false claim to Medicare for the interpretation of the data.

148.    Additionally, VirtuOx is causing DME companies to submit claims to Medicare for non-invasive ventilation, for patients that were qualified on a non-FDA approved medical device, who perhaps are not true candidates for non-invasive ventilation.

149.    All such claims are false claims under the Federal False Claims Act.

**D. VirtuOx Is Giving DME Companies Pulse Oximeters For Free, Or At A Greatly Reduced Cost, As An Inducement To Refer Business to VirtuOx.**

150.    When a patient's physician needs to determine if a patient requires overnight oxygen therapy, an overnight pulse oximetry study is required.

151.    A physician will write a prescription for an overnight pulse oximetry study.

152.    This physician will then generally fax the prescription to a DME, which will provide the patient with the pulse oximeter needed for the study.

153.    The pulse oximeter is generally owned by the DME.

154.    The patient then takes the pulse oximeter home, and wears it overnight.  Following that overnight study, the patient will return the pulse oximeter to the DME.

155.    The DME then downloads the information off the pulse oximeter, and transmits it electronically to the IDTF of its choosing.

156.    The IDTF then interprets the data, and determines if the patient qualifies for overnight oxygen therapy.

157.    The IDTF is paid a fee by Medicare, or other payors, to perform this service.

158.    It is the DME that determines which IDTF it will use to interpret the pulse oximeter test data.

159.    Despite the fact that the DME has incurred the cost of purchasing the pulse oximeter, the DME does not get paid a fee for providing the patient with the device.

160.    The DME generates its revenue once it is determined that a patient qualifies for overnight oxygen therapy.

161.    Once that determination is made, the DME will provide the oxygen and supplies needed by a qualified patient, and is reimbursed by Medicare, or other payors, for these items and

services.

162.    By giving free pulse oximeters to DME's, VirtuOx is offsetting a large cost to the DME, and giving them a large financial benefit.

163.    VirtuOx is providing this financial inducement in exchange for the DME's referring the data interpretation work to VirtuOx.

164.    This is a clear kickback, that results in Medicare and other Federal payors reimbursing VirtuOx for services that were illegally referred and induced.

## VII.  RELATOR'S KNOWLEDGE OF THE FALSE CLAIMS SCHEMES

165.    From 2005 to the present, Relator has been the owner of an IDTF.

166.    On or about 2017, Relator became aware that Defendant was being reimbursed in excess of the Medicare allowable for Florida.  This was based in part on her research of the CMS publications of allowable rates based on locations.

167.    Relators research from Data.CMS.gov for 2016, shows that VirtuOx submitted 20,855 claims to Medicare for billing code 94760, and 131,803 claims for billing code 94762. (Exhibit 13).

168.    VirtuOx, as a Florida company, should have had a 2016 "Average Medicare Allowed Amount" for code 94762 of $23.84, with an "Average Medicare Payment" of approximately $18.69, based on data from other South Florida IDTF's.  (Exhibits 27 and 28, Data.CMS.gov report for Florida IDTFs TestSmarter, Inc., and Diagnostic Medical Testing, Inc.).

169.    However, the Data.CMS.gov report for VirtuOx shows them having a 2016 "Average Medicare Allowed Amount" for code 94762 of $31.29, with an "Average Medicare Payment Amount" of approximately $23.66.[12] (Exhibit 13).  It is clear that Defendant is not using

---

[12] The Data.CMS.gov reports do not correlate exactly with the Medicare Fee Schedules as it takes into account various factors which can affect the "average" allowable and payment amounts.

South Florida as their location of service.

170.     Relator confirmed that VirtuOx is using San Francisco as its "Location of Service" for purposes of billing payors, when a family friend, in 2018, was prescribed an overnight oxygen study by her physician.

171.     The physician used VirtuOx's pre-printed prescription form, that automatically results in the physician ordering both a spot check (94760) as well as an overnight study (94762). As stated above, the "Diagnostic Orders" section is prefilled to state: "Awake Oximetry CPT 94760 & Overnight Oximetry CPT 94762: Immediately and repeat in 30/60/90 other: ____ to validate oxygen settings."  (Exhibit 29).

172.     The data from her overnight study was transmitted to VirtuOx to be analyzed.

173.     Following the receipt of the test results, Relator, on behalf of her friend, contacted Medicare to see how much VirtuOx had been paid for the service, and what place of service VirtuOx had identified in its claim to Medicare.

174.     Relator was told by the Medicare representative that the place of service had been listed as San Francisco, California.

175.     Relator was told that VirtuOx had billed two codes of service, 94760 ("spot check") and 94762 (overnight study).

176.     Relator was told that VirtuOx was paid $28.65 for codes 94760 and 94762.

177.     The amount paid for 94760 is based on Medicare's allowable for San Francisco, California, of $3.49. (See Exhibit 8, CMS fee schedule for San Francisco). Medicare pays 80% of that, or $2.79.  However, Medicare also takes a further deduction of 2% for "sequestration".  So they actually pay $2.73.

178.     The amount paid for 94762 is based on Medicare's allowable for San Francisco,

California, of $33.06. (See Exhibit 6, CMS fee schedule for San Francisco). Medicare pays 80% of that, or $26.45. However, Medicare takes a further deduction of 2% for "sequestration", so they actually pay $25.92.

179.     $2.73 (for the 94760 code) plus $25.92 (for the 94762) code equals $28.65, which is the amount VirtuOx was paid by Medicare for Relator's friend's testing. This further confirms that VirtuOx, a Florida corporation, is billing its location of service as San Francisco, California, and being paid in accordance with the Medicare fee schedule for San Francisco.

180.     Based on Relator's work in the industry, and Relator's research into the issues, Relator determined that VirtuOx was billing the spot test code (94760) and the overnight sleep study code (94762) concurrently.

181.     Additionally, based on her work in the industry, and her research into the issues, Relator determined that VirtuOx is marketing and selling a medical device they are incorrectly claiming is FDA approved for home use, for off-label purposes. Further, that VirtuOx is billing Medicare and other Federal payers for studies performed on medical devices they know are not FDA approved for home use. Further, that VirtuOx is causing DME companies to submit claims to Medicare for non-invasive ventilation, for patients that were qualified on a non-FDA approved medical device, who perhaps are not true candidates for non-invasive ventilation.

182.     In 2016, Relator was communicating with the Medical Sales Manager of a large DME, with approximately fifty locations. Relator asked whether his DME was being told by VirtuOx that it will receive free pulse oximeters in exchange for his DME switching IDTF services to VirtuOx. That individual responded that Relator's IDTF would need to offer that free equipment if they wanted to compete with VirtuOx. He stated that some of his branches are utilizing VirtuOx. Shortly thereafter, the DME switched virtually all of its IDTF work to VirtuOx due to receiving

free pulse oximeters.

183.     In 2019, Relator's company's National Account Manager spoke with the owner of a DME in Oklahoma. The owner stated that VirtuOx had contacted him and was told that VirtuOx would give him free pulse oximeters if he switched to VirtuOx from his present IDTF.

184.     In 2018, Relator spoke with the owner of another IDTF who stated that a large DME's representative had stated the DME would switch to his IDTF services if he gave them free pulse oximeters, because that was what VirtuOx was offering. He refused to do so since he deemed that an illegal practice.

185.     In 2019, Relator was in communication with employees at a company that manufactures pulse oximeters. These employees were attempting to sell this product to a very large DME company. These employees had been informed through an employee of the DME that since the DME uses VirtuOx exclusively for interpreting their patients' data, that VirtuOx sells them their pulse oximeters for $1.00. These devices generally sell for approximately $30.00.

## VIII.   VIRTUOX SUBMITTED OR CAUSED TO BE SUBMITTED FALSE FRAUDULENT CLAIMS TO FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

186.     As described above, Defendant, since at least 2011, knowingly violated the Federal False Claims Act and the Federal Anti-Kickback Statute and similar state anti-kickback laws.

187.     Defendant falsely claims its location of IDTF services is San Francisco, California, with the accomplished goal of obtaining a higher reimbursement for its services in violation of the federal False Claims Act, as well as similar state statutes.

188.     Defendant submitted claims to the Federal and State payors with this false statement, and resultantly received a higher level of reimbursement for its services.

189.     Defendant falsely submitted claims for "spot check" services it did not perform, to Federal and State payors.

36

190.   Defendant caused DME companies to submit claims to Federal and State payors for non-invasive ventilation, for patients that were qualified on a non-FDA approved medical device, sold to them by Defendant.

191.   Defendant intentionally decided to employ illegal kickbacks to induce DME companies to refer Defendant business.   Defendant knew or should have known that it would routinely and necessarily file false and fraudulent claims with the federal government and state governments when it sought federal and state reimbursement for its IDTF services.

192.   Medicaid and Medicare claims for the payment of VirtuOx's IDTF services induced by illegal kickbacks are submitted to the United States and/or the States by the Defendant.  Because such claims are not eligible for federal or state reimbursement, submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729, and the States' analogous false claims statutes. And, those who knowingly cause such false or fraudulent claims to be filed, as the Defendant has through its illegal kickback practices, are liable under the federal False Claims Act, 31 U.S.C. § 3729, and the States' analogous false claims statutes.

193.   Defendant knew that claims resulting from kickbacks were not eligible for federal and state health care program reimbursement. Notwithstanding its knowledge that claims for its IDTF services, induced by kickbacks, were not eligible for federal and state reimbursement, Defendant knowingly undertook such illegal kickback practices through giving free or low cost pulse oximeters to DME companies in exchange for referring Defendant their IDTF business.

194.   Defendant's illegal kickbacks caused the submission of false or fraudulent claims to federal and state health insurance plans.

195.   Defendant substantially benefitted from all of the false and fraudulent claims

described herein.

196.    Each claim for reimbursement for Defendant's IDTF services resulting from Defendant's illegal inducements, that were submitted to a federal health insurance program represents a false or fraudulent claim for payment, in violation of the Federal False Claims Act and analogous State False Claims statutes.

197.    Claims that arise from Defendant's kickback scheme are false, and violate the False Claims Act, because they are the result of a kickback - no further express or implied false statement is required to render such infected or tainted claims false, and none can render the claim legitimate.

198.    Although no express or implied false statement is required, claims infected or tainted by Defendant's illegal kickbacks do contain false statements of compliance with the Anti-Kickback statute.  In particular, a party that submits a claim for payment to Medicare or Medicaid impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.  As discussed above, a condition of payment of any claim submitted to Medicare or Medicaid is that the claim did not result from a financial transaction that violated the Anti-Kickback Statute. Consequently, Defendant's kickbacks to induce DME companies to refer their IDTF business to Defendant, renders false the submitter's implied or express certification of compliance that resulting claim complies with the requirements of the Anti-Kickback Statute.

199.    The submission of false claims was not only foreseeable, but an intended result of Defendant's illegal kickbacks.

## COUNT I

### Federal False Claims Act, 31 U.S. C. §§ 3729(a)(l) and (a)(2)

200.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 199 of this Complaint.

42790039 v1

201. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S. C. § 3729, et seq., as amended.

202. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

203. By virtue of the acts described above, Defendant knowingly made or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve or pay such false and fraudulent claims.

204. Defendant provided illegal remuneration to DME companies to induce improper referral of the DME companies' overnight oxygen test data interpretation work, for beneficiaries of federally funded health care programs, to Defendant, in violation of the federal Anti-Kickback Statute.

205. Claims that arise from Defendant's kickback scheme are false, and violate the False Claims Act, because they are the result of a kickback, no further express or implied false statement is required to render such infected claims false, and none can render the claim legitimate.

206. Defendant's violations of the federal Anti-kickback Statute give rise to liability under the federal False Claims Act.

207. Defendant violated the federal False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that those claims were ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration provided to DME companies.

208. Each provision of IDTF services that occurred as a result of the Defendant's illegal inducements represents a false or fraudulent record or statement.

42790039 v1

209.    Each claim for reimbursement for Defendant's IDTF services submitted to a federal health insurance program resulting from illegal inducements represents a false or fraudulent claim for payment.

210.    Each claim for reimbursement submitted to a federal health insurance program by DME companies for non-invasive ventilation services and equipment, that resulted from patients who were qualified for non-invasive ventilation on misbranded devices sold by Defendant, represents a false or fraudulent claim for payment.

211.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by many separate entities, across the United States, and over many years.  Relators have no control over, or dealings with, such entities and have no access to the records in their possession.

212.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that are non-payable, and therefore false under this federal FCA.

213.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Federal health insurance programs have paid many thousands of claims, amounting to many millions of dollars, due to the Defendant's fraudulent actions described above.

214.    All of the Defendant's conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

## COUNT II

### Arkansas Medicaid Fraud False Claims Act
### A.C.A. § 20-77-901 et seq.

215.    Relator realleges and incorporates by reference the allegations contained in

40

paragraphs 1 through 214 of this Qui Tam Complaint.

216.     This is a claim for treble damages and penalties under the Arkansas Medicaid False Claims Act, A.C.A. § 20-77-901 et seq.

217.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Arkansas State Government for payment or approval.

218.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Arkansas State Government to approve or pay such false and fraudulent claims.

219.     By virtue of the acts described above, the Defendant has violated and continues to violate Arkansas laws prohibiting the payment or receipt of bribes or kickbacks, namely Arkansas Medicaid False Claims Act, A.C.A. § 20-77-901 et seq.

220.     From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

221.     Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

222.     The Arkansas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

223.     By reason of the Defendant's acts, the State of Arkansas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

224.     The State of Arkansas is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used,

presented or caused to be made, used or presented by Defendant.

## COUNT III

### California False Claims Act
### Cal Govt Code§ 12651 et seq.

225.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 224 of this Qui Tam Complaint.

226.    This is a claim for treble damages and penalties under the California False Claims Act, Cal. Govt. Code § 12651 et seq.

227.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

228.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the California State Government to approve or pay such false and fraudulent claims.

229.    By virtue of the acts described above, the Defendant has violated and continues to violate California laws prohibiting the payment or receipt of bribes or kickbacks, namely Cal Bus. & Prof. Code § 650, Cal. Welfare & inst. Code § 14107.2, and Cal. Health & Safety Code § 445.

230.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

231.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

232.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

233.    By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

234.    The State of California is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT IV**

**Colorado Medicaid False Claims Act**
**C.R.S.A. § 25.5-4-303.5 et seq.**

235.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 234 of this Qui Tam Complaint.

236.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-303.5 et seq.

237.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

238.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Colorado State Government to approve or pay such false and fraudulent claims.

239.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

240.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

241.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and

43

continue to pay the claims that are non-payable.

242. By reason of the Defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

243. The State of Colorado is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT V

### Connecticut False Claims Act
### Conn. Gen. Stat. Ann. § 4-274 et seq.

244. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 243 of this Qui Tam Complaint.

245. This is a claim for treble damages and penalties under the Connecticut False Claims Act, Conn. Gen. Stat. Ann. § 4-274 et seq.

246. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

247. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Connecticut State Government to approve or pay such false and fraudulent claims.

248. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

249. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

250. The Connecticut State Government, unaware of the falsity of the records,

44

statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

251.    By reason of the Defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

252.    The State of Connecticut is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT VI

### Delaware False Claims and Reporting Act
### 6 Del C. § 1201(a)(l) and (2)

253.    Relator realleges and incorporates by reference the allegations contained in paragraphs l through 252 of this Qui Tam Complaint.

254.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act, 6 Del C. § 1201(a)(l) and (2).

255.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

256.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve or pay such false and fraudulent claims.

257.    By virtue of the acts described above, the Defendant has violated and continues to violate Delaware laws prohibiting the payment or receipt of bribes or kickbacks, namely Del. Code Ann. Tit. 31 § 1005 et seq.

258.    From at least 2011 to present, Defendant offered kickbacks to DME companies to

45

induce them to refer their patients to Defendant for IDTF services.

259.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

260.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continued to pay the claims that are non-payable.

261.    By reason of the Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

262.    The State of Delaware is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT VII

### Florida False Claims Act
### Fla. Stat. Ann. § 68.082 et seq.

263.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 262 of this Qui Tam Complaint.

264.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.082 et seq.

265.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

266.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

267.    By virtue of the acts described above, the Defendant has violated and continues to

46

violate Florida laws prohibiting the payment or receipt of bribes or kickbacks, namely Fla. Stat. § 456.054 and Fla. Stat. § 409.920.

268.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

269.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

270.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable.

271.    By reason of the Defendant's acts, the State of Florida has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

272.    The State of Florida is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT VIII

### Georgia Taxpayer Protection and False Claims Act
### O.C.G.A. § 23-3-120 et seq.

273.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 272 of this Qui Tam Complaint.

274.    This is a claim for treble damages and penalties under the Georgia Taxpayer Protection and False Claims Act, O.C.G.A. § 23-3-120 et seq.

275.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

276.    By virtue of the acts described above, Defendant knowingly made, used or caused

47

to be made or uses false records and statements, and omitted material facts, to induce the Georgia State Government to approve or pay such false and fraudulent claims.

277. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

278. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

279. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

280. By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

281. The State of Georgia is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT IX

### Illinois False Claims Act
### 740 I.L.C.S. § 175/1 et seq.

282. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 281 of this Qui Tam Complaint.

283. This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 I.L.C.S. § 175/1 et seq.

284. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

285. By virtue of the acts described above, Defendant knowingly made, used or caused

48

to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve or pay such false and fraudulent claims.

286. By virtue of the acts described above, the Defendant has violated and continues to violate Illinois laws prohibiting the payment or receipt of bribes or kickbacks, namely 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks).

287. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

288. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

289. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable.

290. By reason of the Defendant's acts, the State of Illinois has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

291. The State of Illinois is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT X

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(l) et seq.

292. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 291 of this Qui Tam Complaint.

293. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(l) et seq.

49

294. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

295. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Indiana State Government to approve or pay such false and fraudulent claims.

296. By virtue of the acts described above, Defendant knowingly caused or induced another person to perform an act described in IC 5-1 l-5.5-2(b)(l) and/or (2).

297. By virtue of the acts described above, the Defendant has violated and continues to violate Indiana laws prohibiting the payment or receipt of bribes or kickbacks, namely Ind. Code § 12-15-24-2.

298. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

299. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

300. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by defendant, paid and continues to pay the claims that are non-payable.

301. By reason of the Defendant's acts, the State of Indiana has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

302. The State of Indiana is entitled to treble damages, and the minimum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

42790039 v1

## COUNT XI

### Iowa  False Claims Act
### I.C.A. § 685.1 et seq.

303.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 2302of this Qui Tam Complaint.

304.    This is a claim for treble damages and penalties under the Iowa False Claims Act, I.C.A. § 685.1 et seq.

305.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

306.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Iowa State Government to approve or pay such false and fraudulent claims.

307.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

308.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

309.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

310.    By reason of the Defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

311.    The State of Iowa is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

42790039 v1

## COUNT XII

### Louisiana Medical Assistance Programs Integrity Law
### La. R.S. § 46:439.1 et seq.

312.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 311 of this Qui Tam Complaint.

313.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law, La. R.S. § 46:439.1 et seq.

314.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

315.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Louisiana State Government to approve or pay such false and fraudulent claims.

316.    By virtue of the acts described above, the Defendant has violated and continues to violate Louisiana laws prohibiting the payment or receipt of bribes or kickbacks, namely LSA-R.S. § 46:438.1 et seq.

317.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

318.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

319.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

320.    By reason of the Defendant's acts, the State of Louisiana has been damaged, and

52

continues to be damaged, in a substantial amount to be determined at trial.

321. The State of Louisiana is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XIII

### Maryland False Claims Act
### MD Health-General Code Ann. § 2-601 et seq.

322. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 321 of this Qui Tam Complaint.

323. This is a claim for treble damages and penalties under the Maryland False Claims Act, MD Health-General Code Ann. § 2-601 et seq.

324. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

325. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Maryland State Government to approve or pay such false and fraudulent claims.

326. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

327. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

328. The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

53

329.     By reason of the Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

330.     The State of Maryland is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XIV

### Massachusetts False Claims Act
### ALM GL ch. 12 § 5A et seq.

331.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 330 of this Qui Tam Complaint.

332.     This is a claim for treble damages and penalties under the Massachusetts False Claims Act, ALM GL ch. 12 § 5A et seq.

333.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

334.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve or pay such false and fraudulent claims.

335.     By virtue of the acts described above, the Defendant has violated and continues to violate Massachusetts laws prohibiting the payment or receipt of bribes or kickbacks, namely ALM GL ch. 118E § 41.

336.     From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

337.     Defendant knowingly presented claims for IDTF services resulting from kickbacks,

54

thereby causing the Medicaid program to reimburse ineligible claims.

338.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

339.    By reason of the Defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

340.    The State of Massachusetts is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XV

### Michigan Medicaid False Claim Act
### M.C.L.S. §400.601 et seq.

341.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 340 of this Qui Tam Complaint.

342.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claim Act.

343.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

344.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Michigan State Government to approve or pay such false and fraudulent claims.

345.    By virtue of the acts described above, the Defendant has violated and continues to violate Michigan laws prohibiting the payment or receipt of bribes or kickbacks, namely M.C.L.S.

42790039 v1

§ 400.604.

346.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

347.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

348.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable.

349.    By reason of the Defendant's acts, the State of Michigan has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

350.    The State of Michigan is entitled to treble damages, and the maximum penalty as

to be made or uses false records and statements, and omitted material facts, to induce the Minnesota State Government to approve or pay such false and fraudulent claims.

355.    By virtue of the acts described above, the Defendant has violated and continues to violate Minnesota laws prohibiting the payment or receipt of bribes or kickbacks, namely Minn. Stat. Ann. § 15C.01 et seq., and Minn. Stat. Ann. 62J.23.

356.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

357.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

358.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

359.    By reason of the Defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

360.    The State of Minnesota is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XVII

### Missouri False Claims Act
### Mo. Rev. Stat. § 191.900 et seq.

361.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 360 of this Qui Tam Complaint.

362.    This is a claim for treble damages and penalties under the Missouri False Claims Act, Mo. Rev. Stat. § 191.900 et seq.

363.     By virtue of the acts described above, Defendant knowingly presented or caused to
be presented, false or fraudulent claims to the Missouri State Government for payment or approval.

364.     By virtue of the acts described above, Defendant knowingly made, used or caused
to be made or uses false records and statements, and omitted material facts, to induce the Missouri
State Government to approve or pay such false and fraudulent claims.

365.     By virtue of the acts described above, the Defendant has violated and continues to
violate Missouri laws prohibiting the payment or receipt of bribes or kickbacks, namely Mo. Rev.
Stat. § 191.900 et seq.

366.     From at least 2011 to present, Defendant offered kickbacks to DME companies to
induce them to refer their patients to Defendant for IDTF services.

367.     Defendant knowingly presented claims for IDTF services resulting from kickbacks,
thereby causing the Medicaid program to reimburse ineligible claims.

368.     The Missouri State Government, unaware of the falsity of the records, statements
and claims made, used, presented or caused to be made, used or presented by Defendant, paid and
continue to pay the claims that are non-payable.

369.     By reason of the Defendant's acts, the State of Missouri has been damaged, and
continues to be damaged, in a substantial amount to be determined at trial.

370.     The State of Missouri is entitled to treble damages, and the maximum penalty as
provided by statute, for each and every false or fraudulent claim, record or statement made, used,
presented or caused to be made, used or presented by Defendant.

### COUNT XVII

### Montana  False Claims Act
### Mont. Code Ann. § 17-8-401 et seq.

371.     Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 370 of this Qui Tam Complaint.

372.    This is a claim for treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.

373.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

374.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Montana State Government to approve or pay such false and fraudulent claims.

375.    By virtue of the acts described above, the Defendant has violated and continues to violate Montana laws prohibiting the payment or receipt of bribes or kickbacks, namely Mont. Code Ann. § 45-6-313 et seq.

376.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

377.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

378.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

379.    By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

380.    The State of Montana is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XVIII

### Nevada  False Claims Act
### Nev. Rev. Stat. Ann. § 357.010 et seq.

381.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 380 of this Qui Tam Complaint.

382.    This is a claim for treble damages and penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 et seq.

383.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

384.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Nevada State Government to approve or pay such false and fraudulent claims.

385.    By virtue of the acts described above, the Defendant has violated and continues to violate Nevada laws prohibiting the payment or receipt of bribes or kickbacks, namely Nev. Rev. Stat. Ann. § 422.560 et seq.

386.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

387.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

388.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

389.    By reason of the Defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

42790039 v1

390. The State of Nevada is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XIX

### New Jersey False Claims Act
### N.J. Stat. Ann. § 2A:32C-1 et seq.

391. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 390 of this Qui Tam Complaint.

392. This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 et seq.

393. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

394. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the New Jersey State Government to approve or pay such false and fraudulent claims.

395. By virtue of the acts described above, the Defendant has violated and continues to violate New Jersey laws prohibiting the payment or receipt of bribes or kickbacks, namely N.J. Stat. Ann. § 30:4D-17 et seq.

396. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

397. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

398. The New Jersey State Government, unaware of the falsity of the records, statements

61

and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

399. By reason of the Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

400. The State of New Jersey is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XX

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann.§ 27-14-1 et seq.

401. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 400 of this Qui Tam Complaint.

402. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann.§ 27-14-1 et seq.

403. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

404. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the New Mexico State Government to approve or pay such false and fraudulent claims.

405. By virtue of the acts described above, the Defendant has violated and continues to violate New Mexico laws prohibiting the payment or receipt of bribes or kickbacks, namely N.M. Stat. Ann.§ 30-44-7.

406. From at least 2011 to present, Defendant offered kickbacks to DME companies to

62

induce them to refer their patients to Defendant for IDTF services.

407.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

408.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by defendant, paid and continues to pay the claims that are non-payable.

409.    By reason of the Defendant's acts, the State of New Mexico has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

410.    The State of New Mexico is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT XXI**

**New York False Claims Act**
**N.Y. CLS St. Fin. § 187 et seq.**

411.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 410 of this Qui Tam Complaint.

412.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. CLS St. Fin. § 187 et seq.

413.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

414.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the New York State Government to approve or pay such false and fraudulent claims.

63

415.     By virtue of the acts described above, the Defendant has violated and continues to violate New York laws prohibiting the payment or receipt of bribes or kickbacks, namely N.Y. CLS Soc. Serv. § 366-d.

416.     From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

417.     Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

418.     The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable

419.     By reason of the Defendant's acts, the State of New York has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

420.     The State of New York is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXII

### North Carolina  False Claims Act
### N.C.G.S.A. § 1-605 et seq.

421.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 420 of this Qui Tam Complaint.

422.     This is a claim for treble damages and penalties under the North Carolina False Claims Act, N.C.G.S.A. § 1-605 et seq.

423.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or

approval.

424.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the North Carolina State Government to approve or pay such false and fraudulent claims.

425.    By virtue of the acts described above, the Defendant has violated and continues to violate North Carolina laws prohibiting the payment or receipt of bribes or kickbacks, namely N.C.G.S.A. § 108A-63 et seq.

426.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

427.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

428.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

429.    By reason of the Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

430.    The State of North Carolina is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXIII

### Oklahoma Medicaid  False Claims Act
### 63 Okl. St. § 5053 et seq.

431.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 430 of this Qui Tam Complaint.

432.  This is a claim for treble damages and penalties under the Oklahoma False Claims Act, 63 Okl. St. § 5053 et seq.

433.  By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

434.  By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve or pay such false and fraudulent claims.

435.  By virtue of the acts described above, the Defendant has violated and continues to violate Oklahamo laws prohibiting the payment or receipt of bribes or kickbacks, namely 56 Okl. St. § 1005 et seq.

436.  From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

437.  Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

438.  The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable inducements.

439.  By reason of the Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

440.  The State of Oklahoma is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXIV

### Rhode Island State False Claims Act
### R.I. Gen. Laws § 9-1.1-1 et seq.

441. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 440 of this Qui Tam Complaint.

442. This is a claim for treble damages and penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq.

443. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

444. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve or pay such false and fraudulent claims.

445. By virtue of the acts described above, the Defendant has violated and continues to violate Rhode Island laws prohibiting the payment or receipt of bribes or kickbacks, namely R.I. Gen. Laws § 5-48.1-3 et seq.

446. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

447. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

448. The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

449. By reason of the Defendant's acts, the State of Rhode Island has been damaged,

42790039 v1

and continues to be damaged, in a substantial amount to be determined at trial.

450. The State of Rhode Island is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXV

### Tennessee Medicaid False Claims Act
### T.C.A. § 71-5-181 et seq.

451. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 450 of this Qui Tam Complaint.

452. This is a claim for treble damages and penalties under the Tennessee False Claims Act, T.C.A. § 4-18-101 et seq., and the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 et seq.

453. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

454. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Tennessee State Government to approve or pay such false and fraudulent claims.

455. From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

456. Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

457. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and

68

continue to pay the claims that are non-payable.

458.    By reason of the Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

459.    The State of Tennessee is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT  XXVI

### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. § 36.001 et seq.

460.    Relator realleges and incorporates by reference the allegations contained in paragraphs l through 459 of this Qui Tam Complaint.

461.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 et seq.

462.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

463.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Texas State Government to approve or pay such false and fraudulent claims.

464.    By virtue of the acts described above, the Defendant has violated and continues to violate Texas laws prohibiting the payment or receipt of bribes or kickbacks, namely Tex. Hum. Res. Code Ann. § 32.039 et seq., and Tex. Hum. Res. Code Ann. § 36.001 et seq.

465.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

466.    Defendant knowingly presented claims for IDTF services resulting from kickbacks,

69

thereby causing the Medicaid program to reimburse ineligible claims.

467.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

468.    By reason of the Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

469.    The State of Texas is entitled to double damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXVII

### Vermont False Claims Act
### 32 VSA § 630  et seq.

470.    Relator realleges and incorporates by reference the allegations contained in paragraphs l through 469 of this Qui Tam Complaint.

471.    This is a claim for treble damages and penalties under the Vermont False Claims Act, 32 VSA § 630  et seq.

472.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

473.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Vermont State Government to approve or pay such false and fraudulent claims.

474.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

475.    Defendant knowingly presented claims for IDTF services resulting from kickbacks,

70

thereby causing the Medicaid program to reimburse ineligible claims.

476.    The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

477.    By reason of the Defendant's acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

478.    The State of Vermont is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXVIII

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann.§ 8.0l-216.1 et seq.

479.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 478 of this Qui Tam Complaint.

480.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann.§ 8.0l-216.1 et seq.

481.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

482.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Commonwealth of Virginia to approve or pay such false and fraudulent claims.

483.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

484.    Defendant knowingly presented claims for IDTF services resulting from kickbacks,

71

thereby causing the Medicaid program to reimburse ineligible claims.

485. The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable.

486. By reason of the Defendant's acts, the Commonwealth of Virginia has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

487. The Commonwealth of Virginia is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXIX

### Washington Medicaid Fraud False Claims Act
### RCWA 74.66.005 et seq.

488. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 487 of this Qui Tam Complaint.

489. This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act, RCWA 74.66.005 et seq.

490. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

491. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Washington State Government to approve or pay such false and fraudulent claims.

492. By virtue of the acts described above, the Defendant has violated and continues to violate Washington laws prohibiting the payment or receipt of bribes or kickbacks, namely RCWA

72

74.09.240.

493.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

494.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

495.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continue to pay the claims that are non-payable.

496.    By reason of the Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

497.    The State of Washington is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT XXX

### District of Columbia Procurement Reform Amendment Act
### D.C. Code Ann.§ 2-381.01 et seq.

498.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 497 of this Qui Tam Complaint.

499.    This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann.§ 2-381.01 et seq.

500.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

501.    By virtue of the acts described above, Defendant knowingly made, used or caused

73

to be made or used false records and statements, and omitted material facts to induce the District of Columbia Government to approve or pay such false and fraudulent claims.

502.    By virtue of the acts described above, the Defendant has violated and continues to violate District of Columbia laws prohibiting the payment or receipt of bribes or kickbacks, namely D.C. Code Ann.§ 4-802.

503.    From at least 2011 to present, Defendant offered kickbacks to DME companies to induce them to refer their patients to Defendant for IDTF services.

504.    Defendant knowingly presented claims for IDTF services resulting from kickbacks, thereby causing the Medicaid program to reimburse ineligible claims.

505.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable.

506.    By reason of the Defendant's acts, the District of Columbia has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

507.    The District of Columbia is entitled to treble damages, and the maximum penalty as provided by statute, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

### **Prayer for Relief**

WHEREFORE, qui tam Plaintiff prays for judgment against the Defendant as follows:

1.    That Defendant ceases and desists from violating 31 U.S. C. § 3729 *et seq.*, and the equivalent provisions of the States and the District of Columbia's statutes as set forth above;

2.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus the

maximum civil penalty as provided by statute for each violation of 31 U.S.C. §3729;

      3.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State Defendants have sustained because of Defendant's actions, plus the maximum civil penalty as provided by statute, for each violation of each State Defendant's false claims act statute as provided above;

      4.     That qui tam Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the States and District of Columbia statutes set forth above;

      5.     That qui tam Plaintiff be awarded all costs and expenses of this action, including attorneys' fees as allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the States and District of Columbia statutes set forth above; and

      6.     That all Plaintiffs recover such other relief as the Court deems just and proper.

## **Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Burr & Forman, LLP
Las Olas Centre II
350 East Las Olas Blvd., Suite 1440
Ft. Lauderdale, FL 33301
954-414-6200
954-414-6201 (Fax)
lslitow@burr.com

Laurence S. Litow
Attorneys for Relator

January 14, 2020

42790039 v1

# Exhibit 1

**Local Provider**

TEST ACCOUNT

26220 Test Court

Hollywood CA 90210

[P] (555) 555-5555 [F] (954) 775-3539

# VIRTUOX

PHONE: (877) 337-7111  Fax: (877) 347-9760

WEB: www.virtuox.net

## Overnight Oximetry Order Form

**Physician**

Test P

test

test city, AZ 123252525

[P] (121) 212-1212 [F] (212) 212-1212

NPI: 1999999999

**Patient Demographics:**  Name: _____ Sex: _____ DOB: _____ SS#: _____

Address: _____ City: _____ State: _____ Zip: _____

Home Phone: _____ Work Phone: _____

**Insurance Demographics:**  (*Copies of Private Insurance cards must be faxed for all non Medicare referrals)

Payer Name 1: _____ ID#: _____ Group #: _____ Phone #: _____

Payer Name 2: _____ ID#: _____ Group #: _____ Phone #: _____

**Diagnostic Orders:** Awake Oximetry CPT 94760 & Overnight Oximetry CPT 94762 : Immediately and repeat in 30 / 60 / 90 / other:_____ to validate oxygen settings.

Room Air_____ Oxygen:_____ APAP:____CPAP:____BIPAP:____ Dental Device:_____ Other:_____

### Check All ICD-9 that apply:

**Respiratory Related Codes**

___ 162.2-162.9 Malig Neoplasm of Main Bronchus

___ 491.20-491.21 Obst Chronic Bronchitis

___ 492.0-492.8 Emphysema

___ 493.00-493.92 Asthma

___ 494.0-494.1 Bronchiectasis

___ 496 Chronic Airway Obstruction

___ 515 Post Inflammatory Pulmonary Fibrosis

___ 518.5 Pulmonary insufficiency following trauma/surg

___ 518.81-518.89 Acute Resp Failure - Other Diss of the Lung

___ 518.51 Acute Resp Failure - Post trauma/surg

___ 518.52 Pulmonary insufficiency not classified - Post trauma/surg

___ 518.53 Acute/Chronic Resp Failure - Post trauma/surg

___ 780.09 Alteration of consciousness other

___ 780.79 Fatigue

___ 786.05 Shortness of Breath

___ 786.06 Tachypnea / Rapid Breathing

___ 786.07 Wheezing

___ 786.09 Resp Abnormality Other (e.g.Snoring)

___ 799.01 Asphyxia

___ 799.02 Hypox/Hypoxia

**Sleep Related Codes**

___ 327.21 Primary Central Sleep Apnea

___ 327.22 High Altitude Periodic Breathing

___ 327.23 OSA Obst Sleep Apnea

___ 327.24 Idiopathic Sleep Related non Obst alveolar Hypovent

___ 327.25 Cogenital Central Alveolar Hypovent. Syn.

___ 327.26 Sleep related Hypovent/Hypox in cond classifiable elsewhere

___ 327.27 Central Sleep Apnea in cond elsewhere

___ 780.51 Insomnia w/ Sleep Apnea

___ 780.53 Hypersomnia w/ Sleep Apnea

___ 780.54 Hypersomnia Unspec

___ 780.57 Unspec Sleep Apnea

___ 786.03 Apnea

___ 786.04 Cheyne-Stokes Respiration

**Cardiac Related Codes**

___ 391.8 Other Acute Rheumatic Heart Dis

___ 398.91 Rheumatic Heart Failure (Congestive)

___ 402.01 Malig HTN Heart Dis w/ Heart Failure

___ 402.11 Benign HTN Heart Dis w/ Heart Failure

___ 402.91 Unspec HTN Heart Dis w/ Heart Failure

___ 404.01 Malig HTN Heart & Renal Dis w/ Heart Failure

___ 404.03 Malig HTN Heart & Renal Dis w/ Heart & Renal Failure

___ 404.11 Benign HTN Heart & Renal Dis w/ Heart Failure

___ 404.13 Benign HTN Heart & Renal Dis w/ Heart & Renal Failure

___ 404.91 Unspec HTN Heart & Renal Dis w/ Heart Failure

___ 404.93 Unspec HTN Heart & Renal Dis w/ Heart & Renal Failure

___ 416.0 Primary Pulmonary Hypertension

___ 416.8 Other Chronic Pulmonary Heart Dis

___ 416.9 Chronic Pulmonary Heart Dis Unspec

___ 428.0 Congestive Heart Failure Unspec

___ 428.1 Left Heart Failure

___ 428.20-428.23 Systolic Heart Failure

___ 428.30-428.33 Diastolic Heart Failure

___ 428.40-428.43 Combined Systolic & Diastolic Heart Failure

___ 428.9 Heart Failure Unspec

Other: _____

___ Set up Nocturnal Oxygen @ ___LPM if patient qualifies from Overnight Oximetry Results

Date Patient Last Seen: ___/___/___

My signature below certifies that the named patient above is having an awake / overnight oximetry to determine if the patient desaturates while sleeping, and or qualifies for home nocturnal oxygen.

_____

Physician Signature

Fax order to:  Fax: (954) 775-3539

_____

Signature Date

V 2.28.2013

# Exhibit 2

| **CMS Manual System** | Department of Health & Human Services (DHHS) |
|---|---|
| **Pub. 100-20 One-Time Notification** | Centers for Medicare & Medicaid Services (CMS) |
| **Transmittal 166** | **DATE: JULY 22, 2005** |
| | **CHANGE REQUEST 3751** |

**SUBJECT: Overnight Oximetery Testing**

**I. SUMMARY OF CHANGES:** This instruction provides guidance on when a DME supplier may deliver test equipment on behalf of a Medicare-enrolled Independent Diagnostic Test Facility (IDTF).

**NEW/REVISED MATERIAL - EFFECTIVE DATE\*: August 22, 2005
IMPLEMENTATION DATE: August 22, 2005**

*Disclaimer for manual changes only: The revision date and transmittal number apply to the red italicized material only. Any other material was previously published and remains unchanged. However, if this revision contains a table of contents, you will receive the new/revised information only, and not the entire table of contents.*

**II. CHANGES IN MANUAL INSTRUCTIONS:** *(N/A if manual not updated.)*
**(R = REVISED, N = NEW, D = DELETED)** – *(Only One Per Row.)*

| R/N/D | CHAPTER/SECTION/SUBSECTION/TITLE |
|---|---|
| | N/A |
| | |
| | |

**III. FUNDING:** No additional funding will be provided by CMS; Contractor activities are to be carried out within their FY 2005 operating budgets.

**IV. ATTACHMENTS:**

| | |
|---|---|
| | Business Requirements |
| | Manual Instruction |
| | Confidential Requirements |
| X | One-Time Notification |
| | Recurring Update Notification |

\*Unless otherwise specified, the effective date is the date of service.

# Attachment – One-Time Notification

| Pub. 100-20 | Transmittal: 166 | Date: July 22, 2005 | Change Request 3751 |

**SUBJECT: Overnight Oximetry Testing**

## I.    GENERAL INFORMATION

**A.    Background:** CMS Pub100-3, Section 240.2.C requires all claims for home oxygen therapy to be supported by valid qualifying test results "performed by a qualified provider or supplier of laboratory services."

Qualifying test results may be obtained by oximetry testing, and in certain circumstances overnight oximetry testing may be appropriate. Overnight oximetry testing (code 94762) can be performed in the beneficiary's home or in another location.

**B.    Policy:** Beneficiaries may self administer home based overnight oximetry tests under the direction of a Medicare enrolled Independent Diagnostic Testing Facility (IDTF). Further, a DME supplier or another shipping entity may deliver a pulse oximetry test unit and related technology used to collect and transmit test results to the IDTF to a beneficiary's home under the following circumstances:

1) The beneficiary's treating physician has ordered an overnight pulse oximetry test.

2) The test is performed under the direction and/or instruction of a Medicare-approved IDTF. Because it is the beneficiary who self-administers this test, the IDTF must provide clear written instructions to the beneficiary on proper operation of the test equipment and must include access to the IDTF in order to address other concerns which may arise. Because CMS Pub100-3, Section 240.2.C prohibits DME suppliers from performing tests, the DME supplier may not create this instruction nor participate in the conduct of the test.

3) The test unit is sealed and tamper-proof such that test results cannot be accessed by anyone other than the IDTF who is responsible for transmitting a test report to the treating physician. The DME supplier may use related technology to download test results from the testing unit and transmit those results to the IDTF. In no cases may the DME supplier access or manipulate the test results in any form.

CMS does not intend to regulate the ownership of either the testing unit or the technology used to transmit test results.

Regulations regarding the operation of IDTFs are not changed by this instruction.

The carrier jurisdiction for the overnight pulse oximetry test is the location of the IDTF to which the test results are transmitted.

No shipping and/or handling charges may be made to or paid by a beneficiary because such charges are included in the indirect practice expenses for the Medicare physician fee schedule (MPFS) payment for the overnight pulse oximetry test.

Because the DME supplier cannot access the test results, and is acting merely as a courier of equipment, and is not involved in instructing the beneficiary how to perform the test, this does not violate the prohibition found in CMS Pub100-3, Section 240.2.C "A DME supplier is not considered a qualified provider or supplier of laboratory services for purposes of these guidelines."

Test results obtained under these circumstances will be accepted by DMERCs and will be used for purposes of qualifying the beneficiary for home oxygen therapy.

Contractors shall follow all applicable instructions regarding "purchased tests" as found in CMS IOM Pub.100-4.

According to the **Code of Federal Regulations** (42CFR§ 410.33) and CMS Manual System, Pub. 100-8, Medicare Program Integrity Manual Chapter 10 - Healthcare Provider/Supplier Enrollment, Section 5, there are specific requirements that must be met in order for an applicant to be enrolled in Medicare as an IDTF. All IDTFs, whether they provide multiple types of tests or only self-administered pulse oximetry testing must meet all the requirements for enrollment into the Medicare program.

Due to the previous uncertainty concerning reimbursement for home oximetry tests if you have enrolled IDTFs solely to do these tests you should reevaluate those enrollments to make sure they meet all IDTF qualifications. If there are any concerns you should communicate those with the IDTF to give them an opportunity to meet the standards. If the IDTF is unable to meet the requirements their enrollment should be revoked. The IDTF should be given 30 days to provide additional proof. After that time a revocation letter should be issued using reason 4 from the PIM Chapter 10 section 14.4.

## II.  BUSINESS REQUIREMENTS

*"Shall" denotes a mandatory requirement*
*"Should" denotes an optional requirement*

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | F I | R H H I | C a r r i e r | D M E R C | Shared System Maintainers | | | | Other |
| | | | | | | F I S S | M C S | V M S | C W F | |
| 3751.1 | DMERCs shall accept the results of overnight pulse oximetry tests when determining qualification for home oxygen therapy in cases where the test equipment is delivered by a DME supplier but only when: the beneficiary's treating physician has ordered an overnight pulse oximetry test; the test is performed under | | | X | X | | | | | |

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | F I | R H I | C a r i e r | D M E R C | Shared System Maintainers | | | | Other |
| | | | | | | F I S S | M C S | V M S | C W F | |
| | direction or instruction of a Medicare-approved Independent Diagnostic Testing Facility (IDTF); and the test unit is sealed and tamper-proof. | | | | | | | | | |
| 3751.2 | Contractors shall follow all applicable instructions regarding "purchased tests" as found in CMS IOM Pub.100-4. | | | X | X | | | | | |

## III. PROVIDER EDUCATION

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | F I | R H I | C a r i e r | D M E R C | Shared System Maintainers | | | | Other |
| | | | | | | F I S S | M C S | V M S | C W F | |
| | None. | | | | | | | | | |

## IV. SUPPORTING INFORMATION AND POSSIBLE DESIGN CONSIDERATIONS

### A. Other Instructions: N/A

| X-Ref Requirement # | Instructions |
|---|---|
| | |

**B.**  **Design Considerations:** N/A

| X-Ref Requirement # | Recommendation for Medicare System Requirements |
|---------------------|------------------------------------------------|
|                     |                                                |

**C.**  **Interfaces:** N/A

**D.**  **Contractor Financial Reporting /Workload Impact:** N/A

**E.**  **Dependencies:** N/A

**F.**  **Testing Considerations:** N/A

**V.**  **SCHEDULE, CONTACTS, AND FUNDING**

| Effective Date*: August 22, 2005 | No additional funding will be provided by CMS; Contractor activities are to be carried out within their FY 2005 operating budgets. |
|---|---|
| **Implementation Date:** August 22, 2005 | |
| **Pre-Implementation Contact(s):** Misty Whitaker (410) 786-3087 | |
| **Post-Implementation Contact(s):** Misty Whitaker (410) 786-3087 | |

*Unless otherwise specified, the effective date is the date of service.

# Exhibit 3

# Local Coverage Determination (LCD) for Noninvasive Ear or Pulse Oximetry For Oxygen Saturation (L29236)

## Contractor Information

**Contractor Name**
First Coast Service Options, Inc.
Back to Top

**Contractor Number**
09102

**Contractor Type**
MAC - Part B

## LCD Information

**Document Information**

**LCD ID Number**
L29236

**Primary Geographic Jurisdiction**
Florida

**LCD Title**
Noninvasive Ear or Pulse Oximetry For Oxygen Saturation

**Oversight Region**
Region IV

**Contractor's Determination Number**
94760

**Original Determination Effective Date**
For services performed on or after 02/02/2009

**AMA CPT/ADA CDT Copyright Statement**
CPT codes, descriptions and other data only are copyright
2010 American Medical Association (or such other date of
publication of CPT). All Rights Reserved. Applicable
FARS/DFARS Clauses Apply. Current Dental Terminology,
(CDT) (including procedure codes, nomenclature,
descriptors and other data contained therein) is copyright
by the American Dental Association. © 2002, 2004
American Dental Association. All rights reserved.
Applicable FARS/DFARS apply.

**Original Determination Ending Date**

**Revision Effective Date**

**Revision Ending Date**

**CMS National Coverage Policy**
Language quoted from CMS National Coverage Determinations (NCDs) and coverage provisions in interpretive manuals
are italicized throughout the Local Coverage Determination (LCD). NCDs and coverage provisions in interpretive
manuals are not subject to the LCD Review Process (42 CFR 405.860[b] and 42 CFR 426 [Subpart D]). In addition, an
administrative law judge may not review an NCD. See § 1869(f)(1)(A)(i) of the Social Security Act.

Unless otherwise specified, *italicized* text represents quotation from one or more of the following CMS sources:

Medicare Benefit Policy Manual, Chapter 15, section 80

**Indications and Limitations of Coverage and/or Medical Necessity**
Pulse oximetry provides a simple, accurate, and noninvasive technique for the continuous or intermittent monitoring of
arterial oxygen saturation. A small lightweight device attaches to the finger or toe and directs through the nailbed two
wavelengths of light; a photodetector measures absorption. Arterial pulsation is used to gate the signal to the arterial
component of blood contained within the nailbed.

Ear oximetry is a noninvasive method for evaluating arterial oxygenation. Ear oximeters are commonly used in sleep
studies.

Single and Multiple Determinations (94760, 94761):

Medicare will consider ear or pulse oximetry for oxygen saturation (CPT Codes 94760, 94761) to be medically necessary when the patient has a condition resulting in hypoxemia and there is a need to assess the status of a chronic respiratory condition, supplemental oxygen requirements and/or a therapeutic regimen (see ICD-9 Codes That Support Medical Necessity).

Continuous Overnight Monitoring (94762):

Medicare will consider ear or pulse oximetry for oxygen saturation by continuous overnight monitoring (CPT code 94762) to be medically necessary in the following circumstances (see ICD-9 Codes That Support Medical Necessity):

· The patient must have a condition for which intermittent arterial blood gas sampling is likely to miss important variations, and

· The patient must have a condition resulting in hypoxemia and there is a need to assess supplemental oxygen requirements and/or a therapeutic regimen.

Back to Top

# Coding Information

**Bill Type Codes:**
Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.

**Revenue Codes:**
Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

| 99999 | Not Applicable |
|-------|----------------|

**CPT/HCPCS Codes**

| 94760 | NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION; SINGLE DETERMINATION |
|-------|------------------------------------------------------------------------------|
| 94761 | NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION; MULTIPLE DETERMINATIONS (EG, DURING EXERCISE) |
| 94762 | NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION; BY CONTINUOUS OVERNIGHT MONITORING (SEPARATE PROCEDURE) |

**ICD-9 Codes that Support Medical Necessity**
Single and Multiple Determinations (94760, 94761):

| 162.2 - 162.9 | MALIGNANT NEOPLASM OF MAIN BRONCHUS - MALIGNANT NEOPLASM OF BRONCHUS AND LUNG UNSPECIFIED |
|---------------|-------------------------------------------------------------------------------------------|
| 391.8 | OTHER ACUTE RHEUMATIC HEART DISEASE |
| 398.91 | RHEUMATIC HEART FAILURE (CONGESTIVE) |
| 402.01 | MALIGNANT HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 402.11 | BENIGN HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 402.91 | UNSPECIFIED HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 404.01 | |

# Exhibit 4

# HCPCS Code **G0399**

Home sleep test (hst) with type iii portable monitor, unattended; minimum of 4 channels: 2 respiratory movement/airflow, 1 ecg/heart rate and 1 oxygen saturation

Procedures/Professional Services (Temporary Codes)

**G0399** is a valid 2019 HCPCS code for *Home sleep test (hst) with type iii portable monitor, unattended; minimum of 4 channels: 2 respiratory movement/airflow, 1 ecg/heart rate and 1 oxygen saturation* or just "***Home sleep test/type 3 porta***" for short, used in *Diagnostic laboratory (/service/diagnostic-laboratory/)*.

G0399 has been in effect since 03/13/2008

# HCPCS Code Details - G0399

| | |
|---|---|
| **HCPCS Code** | G0399 |
| **Description** | *Long description:*<br>Home sleep test (hst) with type iii portable monitor, unattended; minimum of 4 channels: 2 respiratory movement/airflow, 1 ecg/heart rate and 1 oxygen saturation |
| | *Short description:*<br>Home sleep test/type 3 porta |
| **HCPCS Modifier[1]** ❷ | |
| **HCPCS Pricing indicator** ❷ | 13 - Clinical Lab Fee Schedule - Price established by carriers (e.g., not otherwise classified, individual determination, carrier discretion) |
| **Multiple pricing indicator** ❷ | A - Not applicable as HCPCS priced under one methodology |
| **Coverage code** ❷ | C - Carrier judgment |

■ HCPCS Coding Procedures (/coding-procedures/)

3/25/2019                                G0399 - HCPCS Code for Home sleep test/type 3 porta

| | |
|---|---|
| **BETOS[2] code** ❓ | T2D  - Other tests - other |
| **HCPCS Action code** ❓ | N  - No maintenance for this code |
| **Type of service** ❓ | 5  - Diagnostic laboratory |
| **Effective date** ❓ | Effective Mar 13, 2008 |
| **Date added** ❓ | Added Mar 13, 2008 |
| | ▉ HCPCS Coding Procedures (/coding-procedures/) |

✉ Share this page

# See also

- HCPCS G0398 (/g-codes/G0398/)  ·  Home sleep study test (hst) with type ii portable monitor, unattended; minimum of 7 channels: eeg, eog, emg, ecg/heart rate, airflow, respiratory effort and oxygen saturation

- HCPCS G0400 (/g-codes/G0400/)  ·  Home sleep test (hst) with type iv portable monitor, unattended; minimum of 3 channels

[1] *Two-digit numeric codes* are Level I code modifiers copyrighted© by the American Medical Association's (https://www.ama-assn.org) Current Procedural Terminology (CPT).

[2] BETOS stands for "Berenson-Eggers Type Of Service"

# Exhibit 5

3/25/2019                                                                 Physician Fee Schedule Search Results

# CMS.gov
Centers for Medicare & Medicaid Services

Home | About CMS | Newsroom | Archive |     Share     Help     Print

type search term he     Search

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |
|---|---|---|---|---|---|---|---|

OVERVIEW          PHYSICIAN FEE SCHEDULE SEARCH          DOCUMENTATION & REF

Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

■ Search Results [1 Record(s)]

### Selected Criteria:

| Year: | 2018 | | HCPCS: | 94762 |
|---|---|---|---|---|
| Type of Info.: | Pricing Information | | Modifier: | All Modifiers |
| HCPCS Criteria: | Single HCPCS Code | | Locality: | 0910203 FORT LAUDERDALE, FL |
| MAC Option: | Specific Locality | | | |

Single HCPCS Code

Print Results          Download Results ▦          Email Results

| Code | Description |
|---|---|
| 94762 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns          Show All Columns

1

View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NC FC MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | 0910203 | $25.78 | $25.78 | $28.17 | NA | 35.9996 | | | NA | | |

1

View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

▣ Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 6

3/25/2019          Physician Fee Schedule Search Results

**CMS**.gov
Centers for Medicare & Medicaid Services

Home | About CMS | Newsroom | Archive |     Share     Help     Print

type search term he     Search

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVERVIEW   PHYSICIAN FEE SCHEDULE SEARCH   DOCUMENTATION FILES    Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

### Search Results [1 Record(s)]

Selected Criteria:

| Year: | 2018 | ▼ | HCPCS: | 94762 |
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0111205 SAN FRANCISCO-OAKLAND-HAYWARD (SAN FRANCISCO CNTY), CA ▼ |
| MAC Option: | Specific Locality | ▼ | | Update Results |

#### Single HCPCS Code

Print Results     Download Results     Email Results

| Code | Description |
| 94762 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns    Show All Columns

1       View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NA NO FC MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | 0111205 | $33.06 | $33.06 | $36.12 | NA | 35.9996 | | | NA | | |

1       View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

### Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 7

3/25/2019

Physician Fee Schedule Search Results

# CMS.gov
Centers for Medicare & Medicaid Services

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |
|---|---|---|---|---|---|---|---|

OVERVIEW    PHYSICIAN FEE SCHEDULE SEARCH    DOCUMENTATION FILES    Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

### Search Results (1 Record(s))

#### Selected Criteria:

| | | | | |
|---|---|---|---|---|
| Year: | 2018 | ▼ | HCPCS: | 94760 |
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0910203 FORT LAUDERDALE, FL |
| MAC Option: | Specific Locality | ▼ | | Update Results |

#### Single HCPCS Code

Print Results    Download All Results    Email Results

| Code | Description |
|---|---|
| 94760 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns    Show All Columns

1    View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NC MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T | 0910203 | $3.20 | $3.20 | $3.49 | NA | 35.9996 | | | NA | | |

1    View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

### Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 8

3/25/2019                                    Physician Fee Schedule Search Results



Home | About CMS | Newsroom | Archive |      Share    Help    Print

type search term he     Search

Centers for Medicare & Medicaid Services

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVE TWEPT       PHYSICIAN FEE SCHEDULE SEARCH       DOCUMENTATION FILES                          Tool Help

» Back to Search Criteria

## Physician Fee Schedule Search

📄 Search Results [1 Record(s)]

**Selected Criteria:**

| Year: | 2018 | ▼ | HCPCS: | 94760 | | |
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0111205 SAN FRANCISCO-OAKLAND-HAYWARD (SAN FRANCISCO CNTY), CA ▼ | | |
| MAC Option: | Specific Locality | ▼ | | | Private Sponsor | |

Single HCPCS Code

| Code | Description |
| 94760 | Measure blood oxygen level |

Print Results     Download Results ✉     Email Results

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns    Show All Columns

1                                    View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NO MI |
| | T | 0111205 | $3.49 | $3.49 | $3.81 | NA | 35.9996 | | | NA | | |

1                                    View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

📥 Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 9

Fee schedule lookup tool





En Español  Text Size: $- [A] +$

Join eNews



## Find fee schedules -- fee schedule lookup

Complete this form to obtain Medicare fee-for-service allowances. You must select a fee schedule and enter a procedure code, location, and date of service.

| | | |
|---|---|---|
| * *Required* | | |
| Select fee schedule | * MPFS | ☑ |
| Procedure code | * g0399 | |
| Date of service | * 12/5/2018 | |
| Location - locality | * Florida-03 | ☑ |

Submit    Reset

### More Information

- ›› Help guide
- ›› ASC payment indicators
- ›› MPFS policy indicator definitions
- ›› PDF, text, or Excel fee schedules
- ›› Recent fee schedule news
- ›› National physician fee schedule lookup on CMS.gov
- ›› Seasonal influenza vaccines pricing on CMS.gov

### Results

| Fee Schedule | MPFS | Procedure Code | G0399 | Date Of Service | 12/5/2018 |
|---|---|---|---|---|---|
| State | FL | Locality | 03 | Modifier | |
| Effective Date | 01/01/2018 | Description | Home sleep test/type 3 porta | | |

| NON OPPS | | OPPS | |
|---|---|---|---|
| NON FAC PAR | 154.19 | NON FAC PAR | 0.00 |
| NON FAC NON PAR | 146.48 | NON FAC NON PAR | 0.00 |
| NON FAC LC | 168.45 | NON FAC LC | 0.00 |
| NON FAC eRx LC | N/A | NON FAC eRx LC | N/A |
| NON FAC EHR LC | N/A | NON FAC EHR LC | N/A |
| NON FAC PQRS LC | N/A | NON FAC PQRS LC | N/A |
| NON FAC EHR PQRS LC | N/A | NON FAC EHR PQRS LC | N/A |
| NON FAC 2014 eRx/EHR LC | N/A | NON FAC 2014 eRx/EHR LC | N/A |
| NON FAC 2014 eRx/EHR PQRS LC | N/A | NON FAC 2014 eRx/EHR PQRS LC | N/A |
| FAC PAR | 154.19 | FAC PAR | 0.00 |
| FAC NON PAR | 146.48 | FAC NON PAR | 0.00 |
| FAC LC | 168.45 | FAC LC | 0.00 |
| FAC eRx LC | N/A | FAC eRx LC | N/A |
| FAC EHR LC | N/A | FAC EHR LC | N/A |
| FAC PQRS LC | N/A | FAC PQRS LC | N/A |
| FAC EHR PQRS LC | N/A | FAC EHR PQRS LC | N/A |
| FAC 2014 eRx/EHR LC | N/A | FAC 2014 eRx/EHR LC | N/A |
| FAC 2014 eRx/EHR PQRS LC | N/A | FAC 2014 eRx/EHR PQRS LC | N/A |

### Policy Indicators

| | | | | |
|---|---|---|---|---|
| Status | C | | | |
| Global Surgery | XXX | LCDs | L33405 |
| Facility Pricing | 1 | Conversion Factor | 35.9996 |
| PC/TC | 1 | Update Factor | 1.005 |
| Preoperative Percentage | 0.0 | Work RVU | 0.0 |
| Intraoperative Percentage | 0.0 | FAC PE RVU | 0.0 |
| Postoperative Percentage | 0.0 | NON FAC PE RVU | 0.0 |
| Multiple Surgery | 0 | Malpractice RVU | 0.0 |
| Bilateral Surgery | 0 | Work GPCI | 1.0 |
| Assistant At Surgery | 0 | Practice GPCI | 1.012 |
| Two Surgeons | 0 | Malpractice GPCI | 1.797 |
| Team Surgery | 0 | MPPR | 0.00 |
| Endoscopic Base1 | 0 | PDT | 9 |

### Results

| Fee Schedule | MPFS | Procedure Code | G0399 | Date Of Service | 12/5/2018 |
|---|---|---|---|---|---|

# Exhibit 10

NOTE: Should you have landed here as a result of a search engine (or other) link, be advised that these files contain material that is copyrighted by the American Medical Association. You are forbidden to download the files unless you read, agree to, and abide by the provisions of the copyright statement.

CPT codes and modifiers begin with a numeric character and HCPCS codes and modifiers begin with an alpha character. All Current procedural Terminology (CPT) codes and descriptors are copyrighted 2017 by the American Medical Association.

### California, Area 05, 2018 Medicare Part B Status C Fee Schedule
### (Effective January 1, 2018)

# - These amounts apply when service is performed in a facility setting.

C - The payment for the technical component is capped at the OPPS amount.

** - Limiting charge reduced based on the EHR negative adjustment program.

*** - Limiting charge reduced based on the PQRS negative adjustment program.

**** - Limiting charge reduced for EPs that are subject to both EHR and PQRS negative adjustment programs.
  Limiting charge applies to unassigned claims by non-participating providers.

| Notes | Procedure Code | Modifier | Par Fee | Nonpar Fee | Limiting Charge | EHR Limiting Charge** | PQRS Limiting Charge*** | EHR + PQRS Limiting Charge**** |
|---|---|---|---|---|---|---|---|---|
| | A9500 | | $121.70 | $115.62 | $132.96 | $128.97 | $130.31 | $126.40 |
| | A9502 | | $111.10 | $105.55 | $121.38 | $117.74 | $118.96 | $115.38 |
| | A9503 | | $14.82 | $14.08 | $16.19 | $15.71 | $15.87 | $15.40 |
| | A9505 | | $33.23 | $31.57 | $36.31 | $35.21 | $35.58 | $34.51 |
| | A9507 | | $835.24 | $793.48 | $912.50 | $885.13 | $894.25 | $867.43 |
| | A9510 | | $79.80 | $75.81 | $87.18 | $84.57 | $85.43 | $82.88 |
| | A9517 | | $40.70 | $38.67 | $44.47 | $43.14 | $43.59 | $42.27 |
| | A9521 | | $1,659.80 | $1,576.81 | $1,813.33 | $1,758.94 | $1,777.06 | $1,723.76 |
| | A9524 | | $90.25 | $85.74 | $98.60 | $95.65 | $96.63 | $93.74 |
| | A9537 | | $63.06 | $59.91 | · $68.90 | $66.83 | $67.52 | $65.49 |
| | A9538 | | $45.60 | $43.32 | $49.82 | $48.32 | $48.82 | $47.36 |
| | A9540 | | $22.74 | $21.60 | $24.84 | $24.09 | $24.35 | $23.61 |
| | A9541 | | $60.96 | $57.91 | $66.60 | $64.60 | $65.26 | $63.31 |
| | A9542 | | $4,070.40 | $3,866.88 | $4,446.91 | $4,313.50 | $4,357.97 | $4,227.23 |
| | A9543 | | $53,815.93 | $51,125.13 | $58,793.90 | $57,030.09 | $57,618.02 | $55,889.48 |
| | A9547 | | $2,038.46 | $1,936.54 | $2,227.02 | $2,160.21 | $2,182.48 | $2,117.00 |
| | A9548 | | $471.04 | $447.49 | $514.61 | $499.18 | $504.32 | $489.20 |
| | A9551 | | $686.76 | $652.42 | $750.28 | $727.78 | $735.28 | $713.22 |
| | A9552 | | $250.00 | $237.50 | $273.13 | $264.94 | $267.66 | $259.64 |
| | A9554 | | $39.90 | $37.91 | $43.60 | $42.29 | $42.72 | $41.43 |
| | A9556 | | $113.21 | $107.55 | $123.68 | $119.97 | $121.21 | $117.56 |
| | A9557 | | $424.18 | $402.97 | $463.42 | $449.51 | $454.15 | $440.52 |
| | A9558 | | $39.52 | $37.54 | $43.17 | $41.87 | $42.31 | $41.03 |
| | A9560 | | $106.48 | $101.16 | $116.33 | $112.85 | $114.01 | $110.60 |
| | A9561 | | $50.16 | $47.65 | $54.80 | $53.15 | $53.71 | $52.10 |
| | A9562 | | $883.24 | $839.08 | $964.94 | $936.00 | $945.65 | $917.27 |
| | A9563 | | $347.56 | $330.18 | $379.71 | $368.31 | $372.12 | $360.94 |
| | A9564 | | $331.13 | $314.57 | $361.76 | $350.90 | $354.52 | $343.88 |
| | A9567 | | $23.50 | $22.33 | $25.68 | $24.91 | $25.16 | $24.41 |
| | A9569 | | $1,659.80 | $1,576.81 | $1,813.33 | $1,758.94 | $1,777.06 | $1,723.76 |
| | A9570 | | $4,076.93 | $3,873.08 | $4,454.04 | $4,320.42 | $4,364.96 | $4,234.01 |
| | A9571 | | $4,076.93 | $3,873.08 | $4,454.04 | $4,320.42 | $4,364.96 | $4,234.01 |
| | A9580 | | $268.30 | $254.89 | $293.12 | $284.33 | $287.26 | $278.65 |
| | A9586 | | $2,964.00 | $2,815.80 | $3,238.17 | $3,141.03 | $3,173.40 | $3,078.21 |
| | A9600 | | $5,500.24 | $5,225.23 | $6,009.01 | $5,828.74 | $5,888.84 | $5,712.17 |

\# -   These amounts apply when service is performed in a facility setting.
C -   The payment for the technical component is capped at the OPPS amount.
\*\* -   Limiting charge reduced based on the EHR negative adjustment program.
\*\*\* -   Limiting charge reduced based on the PQRS negative adjustment program.
\*\*\*\* -   Limiting charge reduced for EPs that are subject to both EHR and PQRS negative adjustment programs.
          Limiting charge applies to unassigned claims by non-participating providers.

| Notes | Procedure Code | Modifier | Par Fee | Nonpar Fee | Limiting Charge | EHR Limiting Charge** | PQRS Limiting Charge*** | EHR + PQRS Limiting Charge**** |
|---|---|---|---|---|---|---|---|---|
| | G0186 | | $702.69 | $667.56 | $767.69 | $744.66 | $752.34 | $729.77 |
| # | G0186 | | $672.41 | $638.79 | $734.61 | $712.57 | $719.91 | $698.33 |
| | G0339 | | $4,617.01 | $4,386.16 | $5,044.08 | $4,892.77 | $4,943.21 | $4,794.91 |
| | G0340 | | $3,392.52 | $3,222.89 | $3,706.32 | $3,595.13 | $3,632.19 | $3,523.23 |
| | G0398 | | $416.98 | $396.13 | $455.55 | $441.89 | $446.44 | $433.06 |
| | G0398 | TC | $250.19 | $237.68 | $273.33 | $265.13 | $267.87 | $259.83 |
| | G0398 | 26 | $166.80 | $158.46 | $182.23 | $176.77 | $178.58 | $173.24 |
| | G0399 | | $290.06 | $275.56 | $316.89 | $307.38 | $310.56 | $301.23 |
| | G0399 | TC | $174.04 | $165.34 | $190.14 | $184.44 | $186.33 | $180.75 |
| | G0399 | 26 | $116.03 | $110.23 | $126.76 | $122.96 | $124.23 | $120.50 |
| | G0400 | | $261.06 | $248.01 | $285.21 | $276.66 | $279.51 | $271.12 |
| | G0400 | TC | $156.64 | $148.81 | $171.13 | $166.00 | $167.70 | $162.68 |
| | G0400 | 26 | $104.42 | $99.20 | $114.08 | $110.65 | $111.80 | $108.45 |
| | G0498 | | $210.60 | $200.07 | $230.08 | $223.18 | $225.48 | $218.72 |
| | G6017 | | $155.39 | $147.62 | $169.76 | $164.67 | $166.37 | $161.38 |
| | G9678 | | $160.00 | $152.00 | $174.80 | $169.56 | $171.30 | $166.16 |
| | R0070 | | $214.84 | $204.10 | $234.72 | $227.68 | $230.02 | $223.12 |
| | R0075 | | $214.84 | $204.10 | $234.72 | $227.68 | $230.02 | $223.12 |
| | 0054T | | $166.74 | $158.40 | $182.16 | $176.70 | $178.51 | $173.17 |
| | 0055T | | $166.74 | $158.40 | $182.16 | $176.70 | $178.51 | $173.17 |
| | 0075T | | $1,382.32 | $1,313.20 | $1,510.18 | $1,464.87 | $1,479.98 | $1,435.57 |
| | 0075T | 26 | $958.17 | $910.26 | $1,046.80 | $1,015.39 | $1,025.86 | $995.08 |
| | 0076T | | $456.18 | $433.37 | $498.38 | $483.43 | $488.41 | $473.75 |
| | 0076T | 26 | $95.81 | $91.02 | $104.67 | $101.53 | $102.58 | $99.50 |
| | 0159T | | $26.35 | $25.03 | $28.78 | $27.92 | $28.21 | $27.36 |
| | 0159T | TC | $22.71 | $21.57 | $24.81 | $24.06 | $24.31 | $23.58 |
| | 0159T | 26 | $3.66 | $3.48 | $4.00 | $3.89 | $3.92 | $3.81 |
| | 0191T | | $301.12 | $286.06 | $328.97 | $319.10 | $322.39 | $312.72 |
| # | 0191T | | $251.19 | $238.63 | $274.42 | $266.19 | $268.94 | $260.87 |
| | 0202T | | $2,937.36 | $2,790.49 | $3,209.06 | $3,112.80 | $3,144.88 | $3,050.54 |
| # | 0202T | | $1,643.44 | $1,561.27 | $1,795.46 | $1,741.59 | $1,759.55 | $1,706.76 |
| | 0213T | | $257.00 | $244.15 | $280.77 | $272.35 | $275.16 | $266.90 |
| # | 0213T | | $133.17 | $126.51 | $145.49 | $141.12 | $142.58 | $138.30 |
| | 0214T | | $123.57 | $117.39 | $135.00 | $130.95 | $132.30 | $128.33 |
| # | 0214T | | $73.54 | $69.86 | $80.34 | $77.92 | $78.73 | $76.36 |
| | 0215T | | $125.06 | $118.81 | $136.63 | $132.54 | $133.89 | $129.89 |
| # | 0215T | | $75.03 | $71.28 | $81.97 | $79.51 | $80.33 | $77.92 |
| | 0216T | | $231.53 | $219.95 | $252.94 | $245.35 | $247.88 | $240.44 |
| # | 0216T | | $113.13 | $107.47 | $123.59 | $119.89 | $121.12 | $117.50 |
| | 0217T | | $112.70 | $107.07 | $123.13 | $119.44 | $120.67 | $117.05 |
| # | 0217T | | $62.67 | $59.54 | $68.47 | $66.41 | $67.10 | $65.09 |
| | 0218T | | $114.67 | $108.94 | $125.28 | $121.52 | $122.77 | $119.09 |
| # | 0218T | | $63.66 | $60.48 | $69.55 | $67.47 | $68.16 | $66.13 |
| | 0249T | | $338.83 | $321.89 | $370.17 | $359.06 | $362.77 | $351.89 |

# Exhibit 11

  

# CMS Medicare FFS Provider e-News

*Brought to you by the Medicare Learning Network®*

### Table of Contents for Friday, March 8, 2013

To All Health Care Professionals, Providers, and Suppliers

*Mandatory Payment Reductions in the Medicare Fee-for-Service (FFS) Program – "Sequestration"*

The *Budget Control Act of 2011* requires, among other things, mandatory across-the-board reductions in Federal spending, also known as sequestration. The *American Taxpayer Relief Act of 2012* postponed sequestration for 2 months. As required by law, President Obama issued a sequestration order on March 1, 2013. The Administration continues to urge Congress to take prompt action to address the current budget uncertainty and the economic hardships imposed by sequestration.

This listserv message is directed at the Medicare FFS program (i.e., Part A and Part B). In general, Medicare FFS claims with dates-of-service or dates-of-discharge on or after April 1, 2013, will incur a 2 percent reduction in Medicare payment. Claims for durable medical equipment (DME), prosthetics, orthotics, and supplies, including claims under the DME Competitive Bidding Program, will be reduced by 2 percent based upon whether the date-of-service, or the start date for rental equipment or multi-day supplies, is on or after April 1, 2013.

The claims payment adjustment shall be applied to all claims after determining coinsurance, any applicable deductible, and any applicable Medicare Secondary Payment adjustments.

Though beneficiary payments for deductibles and coinsurance are not subject to the 2 percent payment reduction, Medicare's payment to beneficiaries for unassigned claims is subject to the 2 percent reduction. The Centers for Medicare & Medicaid Services encourages Medicare physicians, practitioners, and suppliers who bill claims on an unassigned basis to discuss with beneficiaries the impact of sequestration on Medicare's reimbursement.

Questions about reimbursement should be directed to your Medicare claims administration contractor. As indicated above, we are hopeful that Congress will take action to eliminate the mandatory payment reductions.

# Exhibit 12



DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Medicare & Medicaid Services

**Medicare Learning Network®**

**noridian** Healthcare Solutions

Click Here to Print a Text-Only Version

Official Information Health Care Professionals Can Trust

# Independent Diagnostic Testing Facility (IDTF) Fact Sheet

This Medicare Learning Network® Fact Sheet provides details of the requirements for an Independent Diagnostic Testing Facility (IDTF) to be enrolled in the Medicare program.

## Definition

An IDTF is a facility that is independent both of an attending or consulting physician's office and of a hospital. However, IDTF general coverage and payment policy rules apply when an IDTF furnishes diagnostic procedures in a physician's office (see 42 Code of Federal Regulations (CFR) 410.33(a)(1)).

Effective for diagnostic procedures performed on or after March 15, 1999, Medicare Administrative Contractors (MACs) pay for diagnostic procedures under the physician fee schedule when performed by an IDTF. An IDTF may be a fixed location or a mobile entity. It is independent of a physician's office or hospital.

### TAKE NOTE

With the exception of hospital-based and mobile IDTFs, a fixed-base IDTF does not:

1. Share a practice location with another Medicare-enrolled individual or organization

2. Lease or sublease its operations or its practice location to another Medicare-enrolled individual or organization or

3. Share diagnostic testing equipment used in the initial diagnostic test with another Medicare-enrolled individual or organization.

## Medicare Enrollment

An IDTF should be open and operational at the time it submits the CMS-855B application to initially enroll in Medicare.

## One Enrollment per Practice Location

- An IDTF must separately enroll each of its practice locations (with the exception of locations that are used solely as warehouses or repair facilities). This means that an enrolling IDTF can have only one practice location on its Form CMS-855B enrollment application. If an IDTF is adding a practice location to its existing enrollment, it must submit a new complete Form CMS-855B application for that location and have that location undergo a separate site visit. Also, each of the IDTF's mobile units must enroll separately. Consequently, if a fixed IDTF site also contains a mobile unit, the mobile unit must enroll separately from the fixed location.
- Each separately enrolled practice location of the IDTF must meet all applicable IDTF requirements. The location's failure to comply with any of these requirements will result in the revocation of its Medicare billing privileges.

## Effective Date of Billing Privileges

The filing date of an IDTF Medicare enrollment application is the date that the MAC receives a signed application that it is able to process to approval (see 42 CFR section 410.33(i)). The effective date of billing privileges for a newly enrolled IDTF is the later of the following:

- The filing date of the Medicare enrollment application that was subsequently approved by the MAC or
- The date the IDTF first started furnishing services at its new practice location. A newly-enrolled IDTF, therefore, may not receive reimbursement for services furnished before the effective date of billing privileges.

IDTFs should note that, if an IDTF application is rejected and a new application is later submitted, the date of filing is the date the MAC receives the new enrollment application.

## Leasing and Staffing

A mobile IDTF does not include entities that lease or contract with a Medicare enrolled provider or supplier to provide:

- Diagnostic testing equipment
- Non-physician personnel described in 42 CFR section 410.33(c) or
- Diagnostic testing equipment and non-physician personnel described in 42 CFR section 410.33(c). This is because the provider or supplier is responsible for providing the appropriate level of physician supervision for the diagnostic testing.

## Multi-State Independent Diagnostic Testing Facilities

An IDTF that operates across State boundaries must:

- Maintain documentation that its supervising physicians and technicians are licensed and certified in each of the States in which it operates and
- Operate in compliance with all applicable Federal, State, and local licensure and regulatory requirements with regard to the health and safety of patients.

The point of the actual delivery of service means the place of service (POS) on the claim form. When the IDTF performs or administers an entire diagnostic test at the beneficiary's location, the beneficiary's location is the POS. When one or more aspects of the diagnostic testing are performed at the IDTF, the IDTF is the POS. (See 42 CFR section 410.33(e)(1)). See Place of Service Issues section below for further information about coding for POS.

2

### Requirements for an IDTF Supervising Physician

An IDTF must have one or more supervising physicians who are responsible for:

- The direct and ongoing oversight of the quality of the testing performed
- The proper operation and calibration of equipment used to perform tests and
- The qualifications of non-physician IDTF personnel who use the equipment

Not every supervising physician has to be responsible for all functions. One supervising physician can be responsible for the operation and calibration of equipment, while other supervising physicians can be responsible for test supervision and the qualifications of non-physician personnel. The basic requirement, however, is that all the supervisory physician functions must be properly met at each location, regardless of the number of physicians involved. This is particularly applicable to mobile IDTF units that are allowed to use different supervisory physicians at different locations. They may have a different physician supervise the test at each location. The physicians used need only meet the proficiency standards for the tests they are supervising. Each supervising physician must be limited to providing general supervision at no more than three IDTF sites. This applies to both fixed sites and mobile units where three concurrent operations are capable of performing tests.

Supervising physicians must meet the following criteria:

1. Be licensed to practice in the State(s) where the diagnostic tests he or she supervises will be performed
2. Be enrolled in Medicare; however, the physician(s) need not necessarily be Medicare enrolled in the State where the IDTF is enrolled
3. Meet the proficiency tests for any tests he or she supervises
4. Is not currently excluded or barred
5. Provide general supervision for no more than three IDTF sites

### Requirements for an IDTF Interpreting Physician

IDTFs are not required to have interpreting physicians. If the IDTF does have such physicians, the IDTF interpreting physician must:

1. Be licensed to practice in the State(s) where the diagnostic tests he or she supervises will be performed
2. Be enrolled in Medicare
3. Not be currently excluded or barred



4. Be qualified to interpret the types of tests (codes) listed in the enrollment application

### Requirements for an IDTF Technician

An IDTF technician must:

1. Meet the certification and/or license standards of the State in which tests are performed at the time of the IDTF enrollment and/or at the time any tests are performed
2. Be qualified to perform the types of tests (codes) listed in the enrollment application

## Performance Standards for IDTFs

As part of its enrollment application, an IDTF must complete Attachment 2 Independent Diagnostic Testing Facilities of **Form CMS-855B**. This attachment lists the Independent Diagnostic Testing Facilities Postal Service Standards, are in 42 CFR 410.33(g). In completing the enrollment application, including Attachment 2, the IDTF certifies that it meets the following standards and all other requirements consistent with 42 CFR 410.33(g).

## Requirements for IDTFs:

| 1 | Operate its business in compliance with all applicable Federal and State licensure and regulatory requirements for the health and safety of patients. |
|---|---|
| 2 | Provide complete and accurate information on its enrollment application. Changes in ownership, changes of location, changes in general supervision, and adverse legal actions must be reported to the MAC on the Medicare enrollment application within 30 calendar days of the change. All other changes to the enrollment application must be reported within 90 calendar days. |
| 3 | Maintain a physical facility on an appropriate site. For the purposes of this standard, a post office box, commercial mail box, hotel, or motel, is not considered an appropriate site. The physical location must have an address, including the suite identifier, which is recognized by the United States Postal Service (USPS). <br><br> • The physical facility, including mobile units, must contain space for equipment appropriate to the services designated on the enrollment application, facilities for hand washing, adequate patient privacy accommodations, and the storage of both business records and current medical records within the office setting of the IDTF, or IDTF home office, not within the actual mobile unit. <br><br> • IDTF suppliers that provide services remotely and do not see beneficiaries at their practice location are exempt from providing hand washing and adequate patient privacy accommodations. |
| 4 | Have all applicable diagnostic testing equipment available at the physical site excluding portable diagnostic testing equipment. A catalog of portable diagnostic equipment, including diagnostic testing equipment serial numbers, must be maintained at the physical site. In addition, portable diagnostic testing equipment must be available for inspection within two business days of the Centers for Medicare & Medicaid Services (CMS) inspection request. The IDTF must maintain a current inventory of the diagnostic testing equipment, including serial and registration numbers, provide this information to the designated MAC upon request, and notify the MAC of any changes in equipment within 90 days. |
| 5 | Maintain a primary business phone under the name of the designated business. The primary business phone must be located at the designated site of the business, or within the home office of the mobile IDTF units. The telephone number or toll free numbers must be available in a local directory and through directory assistance. IDTFs may not use "call forwarding" or an answering service as their primary method of receiving calls from beneficiaries during posted operating hours. |
| 6 | Have a comprehensive liability insurance policy of at least $300,000 per location that covers both the place of business and all customers and employees of the IDTF. The policy must be carried by a non-relative owned company. Failure to maintain required insurance at all times will result in revocation of the IDTF's billing privileges retroactive to the date the insurance lapsed. IDTF suppliers are responsible for providing the contact information for the issuing insurance agent and the underwriter. In addition, the IDTF must: <br><br> • Ensure that the insurance policy remain in force at all times and provide coverage of at least $300,000 per incident; and <br><br> • Notify the CMS-designated MAC in writing of any policy changes or cancellations. |
| 7 | Agree not to directly solicit patients, which include, but are not limited to, a prohibition on telephone, computer, or in-person contacts. The IDTF must accept only those patients referred for diagnostic testing by an attending physician, who is furnishing a consultation or treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Non-physician practitioners may order tests as set forth in section 410.32(a)(3). |

| | |
|---|---|
| 8 | Answer, document, and maintain documentation of a beneficiary's written clinical complaint at the physical site of the IDTF (For mobile IDTFs this documentation would be stored at their home office.) This includes, but is not limited to the following:<br><br>• The name, address, telephone number, and health insurance claim number of the beneficiary<br><br>• The date the complaint was received, the name of the person receiving the complaint, and a summary of actions taken to resolve the complaint<br><br>• If an investigation was not conducted, the name of the person making the decision and the reason for the decision |
| 9 | Openly post these standards for review by patients and the public. |
| 10 | Disclose to the government any person having ownership, financial, or control interest, or any other legal interest in the supplier at the time of enrollment or within 30 days of a change. |
| 11 | Have its testing equipment calibrated and maintained per equipment instructions and in compliance with applicable manufacturers suggested maintenance and calibration standards. |
| 12 | Have technical staff on duty with the appropriate credentials to perform tests. The IDTF must be able to produce the applicable Federal or State licenses or certifications of the individuals performing these services. |
| 13 | Have proper medical record storage and be able to retrieve medical records upon request from CMS or the MAC within two business days. |
| 14 | Permit CMS, including its agents, or its designated MAC to conduct unannounced, on-site inspections to confirm the IDTF's compliance with these standards. The IDTF must be accessible during regular business hours to CMS and beneficiaries and must maintain a visible sign posting the normal business hours of the IDTF. |
| 15 | Enroll in Medicare for any diagnostic testing services that it furnishes to a Medicare beneficiary, regardless of whether the service is furnished in a mobile or fixed base location. |
| 16 | Bill for all mobile diagnostic services that are furnished to a Medicare beneficiary, unless the mobile diagnostic service is part of a service provided under arrangement as described in section 1861(w)(1) of the Act. (Section 1861(w)(1) states that the term "arrangements" is limited to arrangements under which receipt of payments by the hospital, critical access hospital, skilled nursing facility, home health agency or hospice program (whether in its own right or as an agent), with respect to services for which an individual is entitled to have payment made under this title, discharges the liability of such individual or any other person to pay for the services.)<br><br>If the IDTF claims that it is furnishing services under arrangement as described in section 1861(w)(1), the IDTF must provide documentation of such with its initial or revalidation Form CMS-855 application. |

## Billing Issues for IDTFs

Consistent with 42 CFR 410.32(a), the supervisory physician for the IDTF, whether or not for a mobile unit, may not order tests to be performed by the IDTF, unless the supervisory physician is the patient's treating physician and is not otherwise prohibited from referring to the IDTF. The supervisory physician is the patient's treating physician if he or she furnishes a consultation or treats the patient for a specific medical problem and uses the test results in the management of the patient's medical problem.

If an IDTF wants to bill for an interpretation performed by a physician who does not share a practice with the IDTF, the IDTF must meet certain conditions concerning the anti-markup payment limitation. If a physician working for an IDTF (or a party related to the IDTF through common ownership or control as described in 42 CFR 413.17) does not order the technical component (TC) or the professional component (PC) of a diagnostic test (excluding clinical diagnostic laboratory tests), it would not be subject to the anti-markup payment limitation (see Chapter 1, Section 30.2.9 of the "Medicare Claims Processing Manual").

### Transtelephonic and Electronic Monitoring Services

Transtelephonic and electronic monitoring services (for example, 24 hour ambulatory EKG monitoring, pacemaker monitoring and cardiac event detection) may perform some of their services without actually seeing the patient. Most but not all of these billing codes currently are 93012, 93014, 93040, 93224, 93225, 93226, 93232, 93230, 93231, 93233, 93236, 93270, 93271, 93731, 93733, 93736, 95953, and 95956. These monitoring service entities should be classified as IDTFs and must meet all IDTF requirements. CMS currently does not have specific certification standards for IDTF technicians; technician credentialing requirements for IDTFs are at the MAC's discretion. They do require a supervisory physician who performs General Supervision. Final enrollment of a transtelephonic or electronic monitoring service as an IDTF requires a site visit.

For any entity that lists and will bill codes 93012, 93014, 93268, 93270, 93271, or 93272, the MAC must make a written determination that the entity actually has a person available on a 24-hour basis to answer telephone inquiries. Use of an answering service in lieu of the actual person is not acceptable. The person performing the attended monitoring should be listed in Section 3 of Attachment 2 of Form CMS-855B. The qualifications of the person are at the MAC's discretion. The MAC shall check that the person is available by attempting to contact the applicant during non-standard business hours. In particular, at least one of the contact calls should be made between midnight and 6:00 AM. If the applicant does not meet the availability standard, they should receive a denial of enrollment.

### Ordering of Tests

All procedures performed by the IDTF must be specifically ordered in writing by the physician or practitioner who is treating the beneficiary, that is, the physician who is furnishing a consultation or treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. (Non-physician practitioners may order tests as set forth in CFR 410.32(a)(3).)



The order must specify the diagnosis or other basis for the testing. The supervising physician for the IDTF may not order tests to be performed by the IDTF, unless the IDTF's supervising physician is in fact the beneficiary's treating physician. That is, the physician in question had a relationship with the beneficiary prior to the performance of the testing and is treating the beneficiary for a specific medical problem. The IDTF may not add any procedures based on internal protocols without a written order from the treating physician.

### Diagnostic Tests Subject to the Anti-Markup Payment Limitation

In most instances, physicians working for an IDTF do not order diagnostic tests because such tests are generally ordered by the patient's treating physician. If a physician working for an IDTF does not order a diagnostic test, the test is not subject to the anti-markup payment limitation. However, if a physician working for an IDTF (or a physician financially related to the IDTF through common ownership or control) orders a diagnostic test payable under the Medicare Physician Fee Schedule (MPFS), the anti-markup payment limitation may apply (depending on whether the performing physician or other supplier meets the "sharing a practice" requirements). For further information in this case, IDTFs should refer to the "Medicare Claims Processing Manual," Chapter 1, Section 30.2.9, Payment to Physician or Other Supplier for Diagnostic Tests Subject to the Anti-Mark-up Payment Limitation, available at http://cms.hhs.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c01.pdf.

### Therapeutic Procedures

An IDTF shall not be allowed to bill for any CPT or HCPCS codes that are solely therapeutic.

6

## Place of Service Issues

CMS released MLN Matters® Article MM7631 on April 1, 2013, which advises physicians, providers, and suppliers of the national policy and coding instructions for Place of Service (POS). The importance of this national policy is underscored by consistent findings, in annual or biennial reports from Calendar Year (CY) 2002 through CY 2007, by the Office of the Inspector General (OIG) that physicians and other suppliers frequently incorrectly report the POS in which they furnish services.

This article advises that CMS establishes that, for all services, with two exceptions, paid under the MPFS, the POS code to be used by the physician and other supplier will be assigned as the same setting in which the beneficiary received the face-to-face service. Because a face-to-face encounter with a physician or other provider is required for nearly all services paid under the MPFS and anesthesia services, this rule will apply to the overwhelming majority of MPFS services.

In cases where the face-to-face requirement is obviated, such as those when a physician or other provider provides the professional component (PC) interpretation of a diagnostic test from a distant site, the POS code assigned by the physician or other provider will be the setting in which the beneficiary received the technical component (TC) of the service. For example, a beneficiary receives an MRI at an outpatient hospital near his/her home. The hospital submits a claim that would correspond to the TC portion of the MRI. The physician furnishes the PC portion of the beneficiary's MRI from their office location –POS code 22 will be used on the physician's claim for the PC to indicate that the beneficiary received the face-to-face portion of the MRI, the TC, at the outpatient hospital. IDTFs should review this article in order to use the correct POS code when billing for services.

For more details about this policy, you should refer to MLN Matters® Number MM7631, Revised and Clarified Place of Service (POS) Coding Instructions. The article is available at http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/MM7631.pdf.

Additional clarification about this policy may be found at Frequently Asked Questions Related to Change Request 7631(Revised and Clarified Place of Service Coding Instructions), dated April 25, 2013, available at http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/FAQs-CR7631-4-25-13.pdf.

## Resources

The following resources will help IDTFs understand Medicare requirements:

| For More Information About: | Resource |
| --- | --- |
| "Medicare Claims Processing Manual," Chapter 35 | http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c35.pdf |
| 42 CFR 410.33 | http://www.gpo.gov/fdsys/pkg/CFR-2010-title42-vol2/pdf/CFR-2010-title42-vol2-sec410-33.pdf |
| "Medicare Program Integrity Manual," Chapter 15 | http://cms.hhs.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c15.pdf |
| Medicare Enrollment Application CMS-Form 855B | http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855b.pdf |
| MLN Matters® Number MM7631 | http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMatters Articles/downloads/MM7631.pdf |
| "Medicare Claims Processing Manual," Chapter 1 | http://cms.hhs.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c01.pdf |

## Hyperlink Table

| Embedded Hyperlink | Complete URL |
|---|---|
| 42 CFR section 410.33(i) | http://www.gpo.gov/fdsys/pkg/CFR-2010-title42-vol2/pdf/CFR-2010-title42-vol2-sec410-33.pdf |
| Form CMS-855B | http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855b.pdf |
| MM7631 | http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/MM7631.pdf |
| "Medicare Program Integrity Manual," Chapter 3, Section 3.3.2.4 | https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf |







Check out CMS on:

  

Twitter,     LinkedIn,    YouTube

The Medicare Learning Network® Disclaimers are available at http://go.cms.gov/Disclaimer-MLN-Product on the CMS website.

The Medicare Learning Network®, MLN Connects®, and MLN Matters® are registered trademarks of the U.S. Department of Health & Human Services (HHS).

# Exhibit 13

Data.CMS.gov | Data.CMS.gov
Data.**CMS**.gov

VIRTUOX, INC.

ORGANIZATION

5850 CORAL RIDGE DR
CORAL SPRINGS, FL

Specialty

Independent Diagnostic Testing Facility (IDTF)

NPI: 1518906940

START OVER

Services provided by this provider:

Displaying records 1 – 4 of 4

Measurement of oxygen saturation in blood using ear or finger device

HCPCS CODE: 94760
PRODUCT/SERVICE IS NOT A DRUG
PLACE OF SERVICE: OFFICE

| 20,855 | 20103 | $5.00 | $4.13 | $3.10 |
|---|---|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

Overnight measurement of oxygen saturation in blood using ear or finger device

HCPCS CODE: 94762
PRODUCT/SERVICE IS NOT A DRUG
PLACE OF SERVICE: OFFICE

| 131,803 | 122553 | $39.00 | $31.29 | $23.66 |
|---|---|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

Home sleep test (hst) with type iii portable monitor, unattended; minimum of 4 channels: 2 respiratory movement/airflow, 1 ecg/heart rate and 1 oxygen saturation

HCPCS CODE: G0399
PRODUCT/SERVICE IS NOT A DRUG
PLACE OF SERVICE: OFFICE

| 4,458 | 4291 | $450.00 | $279.22 | $215.31 |
|---|---|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

Home sleep test (hst) with type iv portable monitor, unattended; minimum of 3 channels

HCPCS CODE: G0400
PRODUCT/SERVICE IS NOT A DRUG
PLACE OF SERVICE: OFFICE

| 78 | 78 | $450.00 | $258.47 | $202.64 |
|---|---|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

‹ 1 ›

CPT Copyright 2014 American Medical Association. All Rights Reserved.

# Exhibit 14

3/25/2019                                                    Physician Fee Schedule Search Results

**CMS**.gov

Centers for Medicare & Medicaid Services

Home | About CMS | Newsroom | Archive |          Share      Help      Print

type search term he      Search

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVERVIEW       PHYSICIAN FEE SCHEDULE SEARCH       DOCUMENTATION FILES                                    Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

Search Results (2 Records))

### Selected Criteria:

| Year: | 2016 | ▼ | HCPCS: | 94762 | |
|---|---|---|---|---|---|
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0111205 San Francisco, CA | ▼ |
| MAC Option: | Specific Locality | ▼ | | Specific Locality | |

### Single HCPCS Code

Print Results      Download Results ⎙      Email Results

| Code | Description |
|---|---|
| 94762 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns          Show All Columns

1                                          View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NC FC MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | 0111205 | $33.96 | $33.96 | $37.10 | NA | 35.8043 | | | NA | | |

1                                          View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

### Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 15

3/25/2019                                        Physician Fee Schedule Search Results

Home | About CMS | Newsroom | Archive |        Share    Help    Print

# CMS.gov
Centers for Medicare & Medicaid Services

type search term he |    Search    :

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVERVIEW        PHYSICIAN FEE SCHEDULE OVERVIEW        FEE SCHEDULE RULES        Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

📊 Search Results [1 Record(s)]

**Selected Criteria:**

| Year: | 2018 | ▼ | HCPCS: | 94762 | |
|---|---|---|---|---|---|
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0910203 Fort Lauderdale, FL | ▼ |
| MAC Option: | Specific Locality | ▼ | | | |

### Single HCPCS Code

Print Results    Download Results 📊    Email Results

| Code | Description |
|---|---|
| 94762 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns        Show All Columns

1                                          View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR TRANS IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR TRANS IMP FAC PE RVU | NO FO MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | 0910203 | $25.69 | $25.69 | $28.07 | NA | 35.8043 | | | NA | | |

1                                          View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

📥 Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 16

3/25/2019                                    Physician Fee Schedule Search Results

**CMS**.gov
Centers for Medicare & Medicaid Services

Home | About CMS | Newsroom | Archive |     Share    Help    Print

type search term for     Search

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVERVIEW          PHYSICIAN FEE SCHEDULE SEARCH          DOCUMENTATION FILES                              Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

Search Results [1 Record(s)]

**Selected Criteria:**

| Year: | 2016 | ▼ | HCPCS: | 94760 | |
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0111205 San Francisco, CA | ▼ |
| MAC Option: | Specific Locality | ▼ | | | |

### Single HCPCS Code

Print Results    Download Results ✉    Email Results

| Code | Description |
| 94760 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns          Show All Columns

1

View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | NA FC MI |
| | T | 0111205 | $4.14 | $4.14 | $4.52 | NA | 35.8043 | | | NA | | |

1

View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 17

3/25/2019                                        Physician Fee Schedule Search Results

# CMS.gov
Centers for Medicare & Medicaid Services

Home | About CMS | Newsroom | Archive |          Share      Help     Print

type search term he        Search

| Medicare | Medicaid/CHIP | Medicare-Medicaid Coordination | Private Insurance | Innovation Center | Regulations & Guidance | Research, Statistics, Data & Systems | Outreach & Education |

OVERVIEW        PHYSICIAN FEE SCHEDULE SEARCH        DOCUMENTATION & FILES                    Tool Help

« Back to Search Criteria

## Physician Fee Schedule Search

### Search Results (1 Record(s))

**Selected Criteria:**

| Year: | 2016 | ▼ | HCPCS: | 94760 | |
|---|---|---|---|---|---|
| Type of Info.: | Pricing Information | ▼ | Modifier: | All Modifiers | ▼ |
| HCPCS Criteria: | Single HCPCS Code | ▼ | Locality: | 0910203 Fort Lauderdale, FL | ▼ |
| MAC Option: | Specific Locality | ▼ | | Update Search | |

#### Single HCPCS Code

Print Results      Download Results ☒      Email Results

| Code | Description |
|---|---|
| 94760 | Measure blood oxygen level |

For your convenience, search results can be printed, downloaded or emailed.

Show Default Columns        Show All Columns

1                                           View Items Per Page: 10 ▼ Go

| MODIFIER ▲ | PROC STAT ▲ | MAC LOCALITY ▲ | NON-FACILITY PRICE | FACILITY PRICE | NON-FACILITY LIMITING CHARGE | FACILITY LIMITING CHARGE | CONV FACT | NA FLAG FOR TRANS NON-FAC PE RVU | NA FLG FOR FULLY IMP NON-FAC PE RVU | NA FLAG FOR TRANS FACILITY PE RVU | NA FLAG FOR FULLY IMP FAC PE RVU | N( F( MI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | 0910203 | $3.56 | $3.56 | $3.89 | NA | 35.8043 | | | NA | | |

1                                           View Items Per Page: 10 ▼ Go

[1]Section 5102(b) of the Deficit Reduction Act of 2005 requires a payment cap on the technical component (TC) of certain diagnostic imaging procedures and the TC portions of the global diagnostic imaging services. This cap is based on the Outpatient Prospective Payment System (OPPS) payment. To implement this provision, the physician fee schedule amount is compared to the OPPS payment amount and the lower amount is used for payment.

Back to Top

### Downloads

Help with Physician Fee Schedule Search (PDF, 141KB)

Data Last Modified: 01/11/2019

Get Help with File Formats and Plug-Ins | Submit Feedback

# Exhibit 18

NOTE: Should you have landed here as a result of a search engine (or other) link, be advised that these files contain material that is copyrighted by the American Medical Association. You are forbidden to download the files unless you read, agree to, and abide by the provisions of the copyright statement.

CPT codes and modifiers begin with a numeric character and HCPCS codes and modifiers begin with an alpha character. All Current procedural Terminology (CPT) codes and descriptors are copyrighted 2016 by the American Medical Association.

## California, Area 05, 2017 Medicare Part B Contractor Priced Fee Schedule
### (Effective January 1, 2017)

\# - These amounts apply when service is performed in a facility setting.

C - The payment for the technical component is capped at the OPPS amount.

\*\* - Limiting charge reduced based on the EHR negative adjustment program.

\*\*\* - Limiting charge reduced based on the PQRS negative adjustment program.

\*\*\*\* - Limiting charge reduced for EPs that are subject to both EHR and PQRS negative adjustment programs.
    Limiting charge applied to unassigned claims by non-participating providers.

| Notes | Procedure Code | Modifier | Par Fee | Nonpar Fee | Limiting Charge | EHR Limiting Charge** | PQRS Limiting Charge*** | EHR + PQRS Limiting Charge**** |
|---|---|---|---|---|---|---|---|---|
| | A9500 | | $121.70 | $115.62 | $132.96 | $128.97 | $130.31 | $126.40 |
| | A9502 | | $111.10 | $105.55 | $121.38 | $117.74 | $118.96 | $115.38 |
| | A9503 | | $14.82 | $14.08 | $16.19 | $15.71 | $15.87 | $15.40 |
| | A9505 | | $33.23 | $31.57 | $36.31 | $35.21 | $35.58 | $34.51 |
| | A9507 | | $677.01 | $643.16 | $739.63 | $717.45 | $724.85 | $703.10 |
| | A9509 | | $207.98 | $197.58 | $227.22 | $220.40 | $222.67 | $215.99 |
| | A9510 | | $79.80 | $75.81 | $87.18 | $84.57 | $85.43 | $82.88 |
| | A9512 | | $13.52 | $12.84 | $14.77 | $14.32 | $14.47 | $14.03 |
| | A9516 | | $207.98 | $197.58 | $227.22 | $220.40 | $222.67 | $215.99 |
| | A9517 | | $40.70 | $38.67 | $44.47 | $43.14 | $43.59 | $42.27 |
| | A9521 | | $1,659.80 | $1,576.81 | $1,813.33 | $1,758.94 | $1,777.06 | $1,723.76 |
| | A9524 | | $90.25 | $85.74 | $98.60 | $95.65 | $96.63 | $93.74 |
| | A9528 | | $41.31 | $39.24 | $45.13 | $43.77 | $44.23 | $42.90 |
| | A9530 | | $11.66 | $11.08 | $12.74 | $12.36 | $12.49 | $12.12 |
| | A9531 | | $4.42 | $4.20 | $4.83 | $4.68 | $4.74 | $4.59 |
| | A9537 | | $63.06 | $59.91 | $68.90 | $66.83 | $67.52 | $65.49 |
| | A9538 | | $45.60 | $43.32 | $49.82 | $48.32 | $48.82 | $47.36 |
| | A9539 | | $35.72 | $33.93 | $39.02 | $37.85 | $38.24 | $37.09 |
| | A9540 | | $22.74 | $21.60 | $24.84 | $24.09 | $24.35 | $23.61 |
| | A9541 | | $60.96 | $57.91 | $66.60 | $64.60 | $65.26 | $63.31 |
| | A9542 | | $4,050.15 | $3,847.64 | $4,424.79 | $4,292.04 | $4,336.29 | $4,206.21 |
| | A9543 | | $51,827.77 | $49,236.38 | $56,621.84 | $54,923.18 | $55,489.40 | $53,824.72 |
| | A9547 | | $2,038.46 | $1,936.54 | $2,227.02 | $2,160.21 | $2,182.48 | $2,117.00 |
| | A9548 | | $471.04 | $447.49 | $514.61 | $499.18 | $504.32 | $489.20 |
| | A9551 | | $683.34 | $649.17 | $746.55 | $724.14 | $731.62 | $709.67 |
| | A9552 | | $250.00 | $237.50 | $273.13 | $264.94 | $267.66 | $259.64 |
| | A9554 | | $39.90 | $37.91 | $43.60 | $42.29 | $42.72 | $41.43 |
| | A9555 | | $296.28 | $281.47 | $323.69 | $313.98 | $317.22 | $307.71 |
| | A9556 | | $102.91 | $97.76 | $112.42 | $109.05 | $110.17 | $106.87 |
| | A9557 | | $424.18 | $402.97 | $463.42 | $449.51 | $454.15 | $440.52 |
| | A9558 | | $35.92 | $34.12 | $39.24 | $38.07 | $38.46 | $37.31 |
| | A9560 | | $106.48 | $101.16 | $116.33 | $112.85 | $114.01 | $110.60 |
| | A9561 | | $50.16 | $47.65 | $54.80 | $53.15 | $53.71 | $52.10 |
| | A9562 | | $883.24 | $839.08 | $964.94 | $936.00 | $945.65 | $917.27 |
| | A9567 | | $23.38 | $22.21 | $25.54 | $24.77 | $25.04 | $24.28 |

\# - These amounts apply when service is performed in a facility setting.
C - The payment for the technical component is capped at the OPPS amount.
\*\* - Limiting charge reduced based on the EHR negative adjustment program.
\*\*\* - Limiting charge reduced based on the PQRS negative adjustment program.
\*\*\*\* - Limiting charge reduced for EPs that are subject to both EHR and PQRS negative adjustment programs.
   Limiting charge applied to unassigned claims by non-participating providers.

| Notes | Procedure Code | Modifier | Par Fee | Nonpar Fee | Limiting Charge | EHR Limiting Charge** | PQRS Limiting Charge*** | EHR + PQRS Limiting Charge**** |
|---|---|---|---|---|---|---|---|---|
| | A9568 | | $1,253.63 | $1,190.95 | $1,369.59 | $1,328.50 | $1,342.20 | $1,301.94 |
| | A9569 | | $1,659.80 | $1,576.81 | $1,813.33 | $1,758.94 | $1,777.06 | $1,723.76 |
| | A9570 | | $4,076.93 | $3,873.08 | $4,454.04 | $4,320.42 | $4,364.96 | $4,234.01 |
| | A9572 | | $6,470.64 | $6,147.11 | $7,069.18 | $6,857.11 | $6,927.80 | $6,719.97 |
| | A9580 | | $266.97 | $253.62 | $291.66 | $282.91 | $285.83 | $277.25 |
| | A9586 | | $2,964.00 | $2,815.80 | $3,238.17 | $3,141.03 | $3,173.40 | $3,078.21 |
| | A9600 | | $3,678.84 | $3,494.90 | $4,019.14 | $3,898.56 | $3,938.75 | $3,820.59 |
| | G0186 | | $699.19 | $664.23 | $763.86 | $740.95 | $748.59 | $726.12 |
| # | G0186 | | $669.06 | $635.61 | $730.95 | $709.02 | $716.34 | $694.84 |
| | G0339 | | $4,594.04 | $4,364.34 | $5,018.99 | $4,868.42 | $4,918.61 | $4,771.05 |
| | G0340 | | $3,375.64 | $3,206.86 | $3,687.89 | $3,577.25 | $3,614.13 | $3,505.71 |
| | G0398 | | $414.91 | $394.16 | $453.28 | $439.69 | $444.22 | $430.89 |
| | G0398 | TC | $248.95 | $236.50 | $271.98 | $263.82 | $266.54 | $258.54 |
| | G0398 | 26 | $165.97 | $157.67 | $181.32 | $175.88 | $177.70 | $172.36 |
| | G0399 | | $288.62 | $274.19 | $315.32 | $305.85 | $309.02 | $299.74 |
| | G0399 | TC | $173.17 | $164.51 | $189.19 | $183.51 | $185.40 | $179.84 |
| | G0399 | 26 | $115.45 | $109.68 | $126.13 | $122.35 | $123.61 | $119.90 |
| | G0400 | | $259.76 | $246.77 | $283.79 | $275.28 | $278.10 | $269.77 |
| | G0400 | TC | $155.86 | $148.07 | $170.28 | $165.17 | $166.88 | $161.87 |
| | G0400 | 26 | $103.90 | $98.71 | $113.52 | $110.11 | $111.25 | $107.92 |
| | G0498 | | $206.98 | $196.63 | $226.12 | $219.34 | $221.61 | $214.96 |
| | G6017 | | $154.62 | $146.89 | $168.92 | $163.85 | $165.54 | $160.57 |
| | G9678 | | $160.00 | $152.00 | $174.80 | $169.56 | $171.30 | $166.16 |
| | R0070 | | $211.46 | $200.89 | $231.02 | $224.09 | $226.40 | $219.60 |
| | R0075 | | $211.46 | $200.89 | $231.02 | $224.09 | $226.40 | $219.60 |
| | 0054T | | $165.91 | $157.61 | $181.25 | $175.81 | $177.63 | $172.29 |
| | 0055T | | $165.91 | $157.61 | $181.25 | $175.81 | $177.63 | $172.29 |
| | 0075T | | $1,375.44 | $1,306.67 | $1,502.67 | $1,457.59 | $1,472.62 | $1,428.44 |
| | 0075T | 26 | $953.40 | $905.73 | $1,041.59 | $1,010.34 | $1,020.76 | $990.14 |
| | 0076T | | $453.91 | $431.21 | $495.89 | $481.01 | $485.98 | $471.39 |
| | 0076T | 26 | $95.33 | $90.56 | $104.14 | $101.02 | $102.06 | $98.99 |
| | 0159T | | $26.22 | $24.91 | $28.65 | $27.78 | $28.07 | $27.23 |
| | 0159T | TC | $22.60 | $21.47 | $24.69 | $23.95 | $24.20 | $23.47 |
| | 0159T | 26 | $3.64 | $3.46 | $3.98 | $3.86 | $3.90 | $3.78 |
| | 0191T | | $1,257.84 | $1,194.95 | $1,374.19 | $1,332.97 | $1,346.71 | $1,306.31 |
| | 0202T | | $2,922.75 | $2,776.61 | $3,193.10 | $3,097.31 | $3,129.24 | $3,035.36 |
| # | 0202T | | $1,635.26 | $1,553.50 | $1,786.53 | $1,732.94 | $1,750.79 | $1,698.27 |
| | 0213T | | $255.72 | $242.93 | $279.37 | $270.99 | $273.78 | $265.57 |
| # | 0213T | | $132.51 | $125.88 | $144.76 | $140.42 | $141.86 | $137.61 |
| | 0214T | | $122.96 | $116.81 | $134.33 | $130.31 | $131.64 | $127.70 |
| # | 0214T | | $73.17 | $69.51 | $79.94 | $77.53 | $78.34 | $75.98 |
| | 0215T | | $124.44 | $118.22 | $135.95 | $131.87 | $133.24 | $129.24 |
| # | 0215T | | $74.66 | $70.93 | $81.57 | $79.12 | $79.94 | $77.53 |
| | 0216T | | $230.38 | $218.86 | $251.69 | $244.13 | $246.65 | $239.25 |

California, Area 05

# Exhibit 19

Fee schedule lookup tool

   

En Español  Text Size:  - A +  Website assistance
10 a.m - 2 p.m
Mon. - Fri.
Join eNews  Chat now

FL        Part B

## Find fee schedules -- fee schedule lookup

Complete this form to obtain Medicare fee-for-service allowances. You must select a fee schedule and enter a procedure code, location, and date of service.

* Required

Select fee schedule  * MPFS  ☑
Procedure code  * G0399
Date of service  * 4/1/2017
Location - locality  * Florida-03  ☑ ❶

Submit    Reset

### More Information
›› Help guide
›› ASC payment indicators
›› MPFS policy indicator definitions
›› PDF, text, or Excel fee schedules
›› Recent fee schedule news
›› National physician fee schedule lookup on CMS.gov
›› Seasonal influenza vaccines pricing on CMS.gov

### Results

| Fee Schedule | MPFS | Procedure Code | G0399 | Date Of Service | 4/1/2017 |
|---|---|---|---|---|---|
| State | FL | Locality | 03 | Modifier | |
| Effective Date | 01/01/2017 | Description | Home sleep test/type 3 porta | | |

| NON OPPS ⱴ | | OPPS ⱴ | |
|---|---|---|---|
| NON FAC PAR ⱴ | 153.42 | NON FAC PAR ⱴ | 0.00 |
| NON FAC NON PAR ⱴ | 145.75 | NON FAC NON PAR ⱴ | 0.00 |
| NON FAC LC ⱴ | 167.61 | NON FAC LC ⱴ | 0.00 |
| NON FAC eRx LC ⱴ | N/A | NON FAC eRx LC ⱴ | N/A |
| NON FAC EHR LC ⱴ | N/A | NON FAC EHR LC ⱴ | N/A |
| NON FAC PQRS LC ⱴ | N/A | NON FAC PQRS LC ⱴ | N/A |
| NON FAC EHR PQRS LC ⱴ | N/A | NON FAC EHR PQRS LC ⱴ | N/A |
| NON FAC 2014 eRx/EHR LC ⱴ | N/A | NON FAC 2014 eRx/EHR LC ⱴ | N/A |
| NON FAC 2014 eRx/EHR PQRS LC ⱴ | N/A | NON FAC 2014 eRx/EHR PQRS LC ⱴ | N/A |
| FAC PAR ⱴ | 153.42 | FAC PAR ⱴ | 0.00 |
| FAC NON PAR ⱴ | 145.75 | FAC NON PAR ⱴ | 0.00 |
| FAC LC ⱴ | 167.61 | FAC LC ⱴ | 0.00 |
| FAC eRx LC ⱴ | N/A | FAC eRx LC ⱴ | N/A |
| FAC EHR LC ⱴ | N/A | FAC EHR LC ⱴ | N/A |
| FAC PQRS LC ⱴ | N/A | FAC PQRS LC ⱴ | N/A |
| FAC EHR PQRS LC ⱴ | N/A | FAC EHR PQRS LC ⱴ | N/A |
| FAC 2014 eRx/EHR LC ⱴ | N/A | FAC 2014 eRx/EHR LC ⱴ | N/A |
| FAC 2014 eRx/EHR PQRS LC ⱴ | N/A | FAC 2014 eRx/EHR PQRS LC ⱴ | N/A |

### Policy Indicators ⱴ

| Status ⱴ | C | | |
|---|---|---|---|
| Global Surgery ⱴ | XXX | LCDs ⱴ | L33405 |
| Facility Pricing ⱴ | 1 | Conversion Factor ⱴ | 35.8887 |
| PC/TC ⱴ | 1 | Update Factor ⱴ | 1.005 |
| Preoperative Percentage ⱴ | 0.0 | Work RVU ⱴ | 0.0 |
| Intraoperative Percentage ⱴ | 0.0 | FAC PE RVU ⱴ | 0.0 |
| Postoperative Percentage ⱴ | 0.0 | NON FAC PE RVU ⱴ | 0.0 |
| Multiple Surgery ⱴ | 0 | Malpractice RVU ⱴ | 0.0 |
| Bilateral Surgery ⱴ | 0 | Work GPCI ⱴ | 1.0 |
| Assistant At Surgery ⱴ | 0 | Practice GPCI ⱴ | 1.021 |
| Two Surgeons ⱴ | 0 | Malpractice GPCI ⱴ | 1.756 |
| Team Surgery ⱴ | 0 | MPPR ⱴ | 0.00 |
| Endoscopic Base1 ⱴ | | PDT ⱴ | 9 |

### Results

# Exhibit 20

f    in    🐦    You🔲    ⊙





SEARCH ...

HOME  >  **VENDOR NEWS**  >  VirtuOx Acquires Instant Diagnostic
Systems

# VirtuOx Acquires Instant Diagnostic Systems

⊙ August 23, 2018   ▲ RTSleepWorld   ⊳ Vendor News

VirtuOx, Inc., a healthcare IT company providing diagnostic tools and
services to enable healthcare organizations and professionals
diagnose and treat a variety of disease states, announced today the
acquisition of Instant Diagnostic Systems (IDS). The transaction was
facilitated by VERTESS (http://www.vertess.com), a leading healthcare
M+A advisory firm. K&L Gates, led by attorney Joshua Skora and his
team, provided legal counsel to VirtuOx in the transaction.

VirtuOx, a diversified healthcare technology platform operating
numerous entities, operating in all 50 states and abroad has begun
executing an acquisition strategy to grow strategically within the lab
services sector. "This is an ideal acquisition for us," said Steven F. Lica,
Chief Executive Officer of VirtuOx. He added, "Not only do we
increase our POX testing and HST testing platform, but we have also
gained a valuable and experienced team with IDS a pioneer in our
space."

VERTESS, on behalf of VirtuOx, is currently seeking additional
acquisitions in the areas of Home Sleep Testing (HST), pulse oximetry,
cardiac telemetry monitoring, insomnia, and related IT products and



services. Please contact Bradley Smith, Managing Director of
VERTESS, to discuss.

### Share this:

💙 Twitter      📘 Facebook      💼 LinkedIn      🔴 Reddit      📌 Pinterest

💙 Pocket

| Siemens | nSpire Introduces | ResMed MatrixCare |
|---|---|---|
| Healthineers to | Iris IQ, RT | Acquisition Expands |
| Acquire Epocal from | Department | Reach into Long- |
| Alere to Complete | Analytics Platform | Term Care Settings |
| its Blood Gas | In "New Product" | In "Acquisitions" |
| Portfolio | | |
| In "Vendor News" | | |

🏷  ACQUISITION      VIRTUOX

### BE THE FIRST TO COMMENT

# Leave a Reply

Enter your comment here...

# Exhibit 21

‹ BACK TO PROVIDER SEARCH RESULTS

# INSTANT DIAGNOSTIC SYSTEMS, INC.

ORGANIZATION
1740 4TH AVE SE
DECATUR, AL



**Specialty**
Independent Diagnostic Testing Facility (IDTF)

NPI: 1922017616

START OVER

Services provided by this provider:

Displaying records 1 – 2 of 2

Overnight measurement of oxygen saturation in blood using ear or finger device
HCPCS CODE: 94762          PRODUCT/SERVICE IS NOT A DRUG                    PLACE OF SERVICE: OFFICE

| 53,854 | 49870 | $38.00 | $28.58 | $22.09 |
|--------|-------|--------|--------|--------|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

Home sleep test (hst) with type iii portable monitor, unattended; minimum of 4 channels: 2 respiratory movement/airflow, 1 ecg/heart rate and 1 oxygen saturation
HCPCS CODE: G0399          PRODUCT/SERVICE IS NOT A DRUG                    PLACE OF SERVICE: OFFICE

| 4,778 | 4751 | $250.00 | $247.53 | $192.00 |
|-------|------|---------|---------|---------|
| Number of Services | Number of Beneficiaries | Average Submitted Charge | Average Medicare Allowed Amount | Average Medicare Payment |

# Exhibit 22



# The VirtuOx Total Solution

Low cost software + low cost oximeters =
The industry's most cost effective way to qualify oxygen patients!



# VPOD CapOx

- FDA Approved
- Measures ETCO2, POX, HR, RR
- Data Storage
- Uploads to VirtuOx Applications

## VPOD CapOx Product Features:

- 2.8 inch TFT, monitoring $EtCO_2/CO_2$, RR and $SpO_2$, PR

- Temperature, Pressure compensation system and Zero readjustment system

- Balance gas compensation minimizing influence against other gases

- Lung pressure and temperature compensation (BTPS compensation) available

- Applicable for intubated or non-intubated patients

- Pump flux for adult and infant

- Water filter specially designed for heavy humid environment

- Audio and Visual alarm for exceeding limits and Apnea

- 24 hours graphic trend can be stored after power-off

- Standard with MoveOxy™ $SpO_2$, Optional with Nellcor $SpO_2$

- USB Connectivity to PC for data transfer

Call Toll-Free 877-337-7111 • https://WWW.VIRTUOX.NET

# Exhibit 23



# VPOD CapOx, a VirtuOx Pulse Oximetry Device

VirtuOx is also a nationwide Medicare approved Independent Diagnostic Testing Facility. "The VirtuOx Total Solution" consists of our flagship Overnight Oximetry Testing platform VirtuOx , combined with our FDA approved VirtuOx compatible Pulse Oximeter Devices called "VirtuOx VPODs". The VPOD line consists of handheld, wrist worn, table top and fingertip oximeters that can store up to 72 hours of recorded memory. By combining VirtuOx software with inexpensive hardware "The VirtuOx Total Solution" is the industry's most cost effective way to qualify oxygen patients.

VirtuOx is the latest generation of CMS approved Overnight Oximetry Testing software. It is designed to be an easy to use, trouble free software application available to all HME providers. There is no software to download or purchase and no contracts to sign. Best of all, the report is available quickly provided you have fulfilled CMS guidelines as a predicate to obtaining the report. VirtuOx is compatible with the VPOD line of pulse oximeters as well as 920M, 920M Plus, 8500, 2500A and WristOx pulse oximeters.

## Technical Specifications

### EtCO₂/CO₂

| | |
|---|---|
| EtCO$_2$/CO$_2$ range | 0 – 150mmHg (0 - 20kPa, or 0 - 20%(V/V)) |
| Accuracy | ±2mmHg when 0 - 40 mmHg |
| | ±5%(reading) when > 41 - 70mmHg |
| | ±8%(reading) when > 71 - 100mmHg |
| | ±10%(reading) when > 101 - 150mmHg |
| Update | Every breath, 10sec, 20sec or 30sec selectable |
| Trend length | 24 hours |

### RESPIRATION RATE

| | |
|---|---|
| Range | 3 - 150t/min |
| Accuracy | ±1%(reading) or ±1 times/min whichever is greater |
| Trend length | 24 hours |
| Flux | 50 - 250cc/min selectable |

### SpO₂

| | |
|---|---|
| Oximetry saturation range | 0 - 100% |
| Accuracy | ±2% when 70 - 100% |
| | ±3% when 50 - 69% |
| Trend length | 24 hours |

### PULSE RATE

| | |
|---|---|
| Range | 30 - 250 bpm |
| Accuracy | ±2bpm or ±2% (reading) when 30 - 250bpm |
| Trend length | 24 hours |

### POWER

| | |
|---|---|
| AC input | 100V - 250V, 50Hz/60Hz |
| AC power consumption | 5W |

### OPERATION

| | |
|---|---|
| Working temperature | 5°C - 40°C |
| Humidity | 30 - 75% (non-condensing) |
| Atmospheric pressure | 86 - 106kPa |

### BATTERY

| | |
|---|---|
| Battery type | Built-in rechargeable lithium battery |
| Battery capacity | 3.6V, 3000mAh |
| Working time | 10 hours |

### PHYSICAL DATA

| | |
|---|---|
| Dimension | 70mm(W) X 160mm(H) X 40mm(D) |
| Weight | 600grams |

### LANGUAGE

English/Spanish/Dutch

### Data Transmission to VirtuOx



### View Summary and Detail Oximetry Reports



### Manage Business with Dashboards



# Call Toll-Free 877-337-7111



# Exhibit 24



# VPOD CapOx Patient Self Administered Overnight Oximetry and Capnography Instructions on Room Air

**Patient Name** _____   **Reading ID** _____

Your prescriber ordered this oximetry and capnography test to monitor your blood oxygen and end tidal $CO_2$ levels while you are asleep. It is vital you closely follow these instructions to get the best results.

VirtuOx is the testing facility that will process the test results and send them to your prescriber. Per Medicare guidelines, the company that delivers the testing device to you cannot assist with the instruction or performance of the test.

**DME Courier:** _____   **Phone** _____

**Please follow the conditions below as prescribed:**

_____

## Your testing device: VPOD CapOx



IMPORTANT

• You must stay awake for the first 10 minutes of the test.
• Remove any fingernail polish and coverings from the finger you will be using.

## TEST SETUP



1  Confirm the finger probe cable and water filter are attached to the top of the device.

Finger Probe Cable — Nasal Cannula Connection Tube — Water Filter

2  Confirm the nasal cannula connection tube is connected to the water filter.

Nasal Cannula Connection Tube — Water Filter

3  Attach sensor to index finger and apply tape or Band Aid to secure sensor to your finger.

4  Press and hold the bottom left button down until powered ON.

Power Button

5  Insert the nasal cannula prongs into your nose and adjust the slider to secure it. Go to sleep. Wear it all night.

6  When you wake up in the morning, take the device off. Press and hold the bottom left button until you power it OFF.

Power Button

## ADDITIONAL INSTRUCTIONS

- For best results, place the probe on your index finger. However, you may use any finger as long as it receives a reading from the device.

- If the probe or cannula falls off during the night:
    1) Place the probe on your finger and reinsert the nasal cannula prongs into your nose.
    2) Check to see the oximeter is ON and displays numbers.
    3) If the oximeter is OFF, press the power button to turn it ON.

- You may remove the probe and nasal cannula only in case of hygienic necessity. When you return to bed, put the probe back on your finger and reinsert the nasal cannula as you did before.



# VPOD CapOx Patient Self Administered Overnight Oximetry and Capnography Instructions on Oxygen

**Patient Name** _____   **Reading ID** _____

Your prescriber ordered this oximetry and capnography test to monitor your blood oxygen and end tidal $CO_2$ levels while you are asleep. It is vital you closely follow these instructions to get the best results.

VirtuOx is the testing facility that will process the test results and send them to your prescriber. Per Medicare guidelines, the company that delivers the testing device to you cannot assist with the instruction or performance of the test.

**DME Courier:** _____   **Phone** _____

**Please follow the conditions below as prescribed:**

_____

## Your testing device: VPOD CapOx



IMPORTANT

• You must stay awake for the first 10 minutes of the test.
• Remove any fingernail polish and coverings from the finger you will be using.

## TEST SETUP



1  Confirm the finger probe cable and water filter are attached to the top of the device.

Finger Probe Cable / Nasal Cannula Connection Tube / Water Filter

2  Confirm the nasal cannula connection tube is connected to the water filter.

Nasal Cannula Connection Tube / Water Filter

3  Confirm your oxygen source is connected to your testing device.

To CapOx —— —— To Oxygen

4  Attach sensor to index finger and apply tape or Band Aid to secure sensor to your finger.

5  Press and hold the bottom left button down until powered ON.

Power Button

6  Insert the nasal cannula prongs into your nose and adjust the slider to secure it. Go to sleep. Wear it all night.

7  When you wake up in the morning, take the device off. Press and hold the bottom left button until you power it OFF.

Power Button

## ADDITIONAL INSTRUCTIONS

- For best results, place the probe on your index finger. However, you may use any finger as long as it receives a reading from the device.

- If the probe or cannula falls off during the night:
   1) Place the probe on your finger and reinsert the nasal cannula prongs into your nose.
   2) Check to see the oximeter is ON and displays numbers.
   3) If the oximeter is OFF, press the power button to turn it ON.

- You may remove the probe and nasal cannula only in case of hygienic necessity. When you return to bed, put the probe back on your finger and reinsert the nasal cannula as you did before.

# Exhibit 25

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**　　　　　Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room – WO66-G609
Silver Spring, MD 20993-0002

Shenzhen Creative Industry Company, Limited
C/O Mr. Charlie Mack
Principal Engineer
International Regulatory Consultants, LLC
77325 Joyce Way
Echo, Oregon 97826

**MAR 3 0 2010**

Re: K093016
　　Trade/Device Name: Vital Signs Monitor, Model PC-900A
　　Regulation Number: 21 CFR 870.2700
　　Regulation Name: Oximeter
　　Regulatory Class: II
　　Product Code: DQA, CCK
　　Dated: March 18, 2010
　　Received: March 24, 2010

Dear Mr. Mack:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the
indications for use stated in the enclosure) to legally marketed predicate devices marketed in
interstate commerce prior to May 28, 1976, the enactment date of the Medical Device
Amendments, or to devices that have been reclassified in accordance with the provisions of
the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket
approval application (PMA). You may, therefore, market the device, subject to the general
controls provisions of the Act. The general controls provisions of the Act include
requirements for annual registration, listing of devices, good manufacturing practice,
labeling, and prohibitions against misbranding and adulteration. Please note: CDRH does
not evaluate information related to contract liability warranties. We remind you, however,
that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III
(PMA), it may be subject to additional controls. Existing major regulations affecting your
device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In
addition, FDA may publish further announcements concerning your device in the Federal
Register.

Page 2- Mr. Mack

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://www.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Anthony D. Watson, B.S., M.S., M.B.A.
Director
Division of Anesthesiology, General Hospital,
   Infection Control and Dental Devices
Office of Device Evaluation
Center for Devices and
   Radiological Health

Enclosure

## Indications for Use

510(k) Number (if known):

Device Name: Vital Signs Monitor, Model PC-900A

Indications for Use:

The Vital Signs Monitor is designed for monitoring the vital physiological signs of the patient. It is used for non-invasive continuous monitoring of oxygen saturation ($SpO_2$), pulse rate, $CO_2$ and respiration rate.

The Vital Signs Monitor is adaptable to adult and pediatric usage in a hospital environment. It is intended to be used only under regular supervision of clinical personnel.

Prescription Use ____√____    AND/OR    Over-The-Counter Use _____
(Part 21 CFR 801 Subpart D)          (21 CFR 801 Subpart C)

(PLEASE DO NOT WRITE BELOW THIS LINE-CONTINUE ON ANOTHER PAGE OF NEEDED)

Concurrence of CDRH, Office of Device Evaluation (ODE)

(Division Sign-Off)
Division of Anesthesiology, General Hospital
Infection Control, Dental Devices

Page 1 of _____

510(k) Number: ___K093016___      30 of 738

# Exhibit 26

3/27/2019                                                    DMEPOS Fee Schedules

CGS
A CELERIAN GROUP COMPANY

myCGS Login | Contact Us | Join/

Home » Fees » JC DME » DMEPOS Fee Schedules

## 2019 - 1st Quarter Florida DMEPOS Fee Schedule

| HCPCS: | Mod 1: | Mod 2: | Category: | Fee Schedule: | Rural Fee Indicator: | Rura |
|--------|--------|--------|-----------|---------------|----------------------|------|
| E0466  | RR     |        | FS        | $1,099.02     |                      |      |

**CATEGORY KEY**

CR = Capped Rental Items
FS = Frequently Serviced Items
IN = Inexpensive and Other Routinely Purchased Items
OS = Ostomy, Tracheostomy & Urological Items
OX = Oxygen and Oxygen Equipment
PE = Parenteral and Enteral Nutrition
PO = Prosthetics & Orthotics
SD = Surgical Dressings
SU = Supplies
TE = Transcutaneous Electrical Nerve Stimulators
TS = Therapeutic Shoes

- DMEPOS Fee Schedule
- Drug Fees, Pharmacy Dispensing Fees
  & Pharmacy Supply Fees

FORESEE  WE WANT TO HEAR FROM YOU! TAKE THE FORESEE CUSTOMER SATISFACTION SURVEY.

| UTILITIES | STAY CONNECTED | SITE INFO | CONTACT US |
|-----------|----------------|-----------|------------|
| JOIN/UPDATE LISTSERV | FACEBOOK | VIDEO TOUR | PEOPLE WITH ME! |
| PRINT | TWITTER | WEBSITE FEEDBACK | |
| BOOKMARK | YOUTUBE | SITE MAP | |
| EMAIL | | DISCLAIMER | |
| | | PRIVACY STATEMENT | |

# Exhibit 27

# Data.**CMS**.gov

Get Started    Developers    Q    Sign In

‹ BACK TO PROVIDER SEARCH RESULTS

## TESTSMARTER INC

## ORGANIZATION
## 177 NW MADISON ST
## LAKE CITY, FL

Specialty

Independent Diagnostic Testing Facility (IDTF)

NPI: 1043925947

NEVER ENROLL

## Services provided by this provider:

Displaying records **1 – 1** of 1.

## Overnight measurement of oxygen saturation in blood using ear or finger device
HCPCS CODE: 94762
PRODUCT/SERVICE IS NOT A DRUG.
PLACE OF SERVICE: OFFICE

| 43 | 43 | $38.60 |
|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge |

| $23.84 | $18.69 |
|---|---|
| Average Medicare Allowed Amount | Average Medicare Payment |

‹ | 1 | ›

CPT Copyright 2014 American Medical Association. All Rights Reserved.

Data.**CMS**.gov A federal government website managed by the Centers
for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244

SIGN UP FOR EMAIL UPDATES      Data.CMS.gov      OpenPaymentsData.CMS.gov      Data.Medicare.gov

Data.Medicaid.gov      Data.HealthCare.gov      FOIA      No Fear Act      Privacy Policy      FAQ's

CMS contact info      Help with file formats & plug-ins

# Exhibit 28

# Data.**CMS**.gov

‹ BACK TO PROVIDER SEARCH RESULTS

# DIAGNOSTIC MEDICAL TESTING INC

## ORGANIZATION
## 2435 US HIGHWAY 19
## HOLIDAY, FL

Specialty

Independent Diagnostic Testing Facility (IDTF)

NPI: 1386302008

PAC ID: ...

## Services provided by this provider:

Displaying records **1 – 3** of 3.

### Pulmonary exercise testing
HCPCS CODE: 94620
PRODUCT/SERVICE IS NOT A DRUG.
PLACE OF SERVICE: OFFICE

| 6,710 | 3260 | $87.29 |
|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge |

| $40.60 | $29.82 |
|---|---|
| Average Medicare Allowed Amount | Average Medicare Payment |

### Measurement of oxygen saturation in blood using ear or finger device
HCPCS CODE: 94760
PRODUCT/SERVICE IS NOT A DRUG.
PLACE OF SERVICE: OFFICE

| 1,441 | 1376 | $25.00 |
|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge |

| $3.22 | $2.42 |
|---|---|
| Average Medicare Allowed Amount | Average Medicare Payment |

Overnight measurement of oxygen saturation in blood using ear or finger device

HCPCS CODE: 94762
PRODUCT/SERVICE IS NOT A DRUG.
PLACE OF SERVICE: OFFICE

| 2,470 | 2323 | $74.98 |
|---|---|---|
| Number of Services | Number of Beneficiaries | Average Submitted Charge |

| $23.84 | $17.36 |
|---|---|
| Average Medicare Allowed Amount | Average Medicare Payment |



CPT Copyright 2014 American Medical Association. All Rights Reserved.

Data.**CMS**.gov A federal government website managed by the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244

SIGN UP FOR EMAIL UPDATES      Data.CMS.gov      OpenPaymentsData.CMS.gov      Data.Medicare.gov

Data.Medicaid.gov      Data.HealthCare.gov      FOIA      No Fear Act      Privacy Policy      FAQ's

CMS contact info      Help with file formats & plug-ins

# Exhibit 29

To: virtuox     Page 2 of 2

# VIRTUOX

Phone: (877) 337-7111     Web: www.virtuox.net

## Overnight Oximetry Order Form

Physician

Phone:
Fax:
NPI:

### Patient Information:

Name: _____ Sex: F  DOB: _____ SS#: _____
Address: _____ City: _____ State: _____ Zip: _____
Home Phone: _____ Work Phone: _____ Cell Phone: _____

Insurance: (Copies of Private Insurance cards must be faxed for all non Medicare referrals)

Payer Name 1: _____ ID#: _____ Group #: _____ Phone #: _____
Payer Name 2: _____ ID#: _____ Group #: _____ Phone #: _____

Diagnostic Orders:  Awake Oximetry CPT 94760 & Overnight Oximetry CPT 94762 : immediately and repeat in 30 / 60 / 90 / other: _____ to validate oxygen settings.

Room Air: _____ Oxygen: _____ APAP: _____ CPAP: _____ BIPAP: _____ Dental Device: _____ Other: _____

Check All ICD-10 that apply: (ICD-10 codes shown below are Medicare approved Diagnosis codes. Other payers may require alternate ICD-10 codes)

| Respiratory Related Codes | | Cardiac Related Codes | |
|---|---|---|---|
| __C34.90 | Malignant neoplasm of unspecified part of unspecified bronchus or lung | __I50.30 | Unspecified diastolic (congestive) heart failure |
| __J44.9 | Chronic obstructive pulmonary disease, unspecified | __I50.31 | Acute diastolic (congestive) heart failure |
| __J44.1 | Chronic obstructive pulmonary disease with (acute) exacerbation | __I50.32 | Chronic diastolic (congestive) heart failure |
| __J45.9 | Simply terms Unspecified | __I50.33 | Acute on chronic diastolic (congestive) heart failure |
| __J45.90 | Mild intermittent asthma, uncomplicated | __I50.40 | Unspecified combined systolic (congestive) and diastolic (congestive) heart failure |
| __J45.22 | Mild intermittent asthma with status asthmaticus | __I50.41 | Acute combined systolic (congestive) and diastolic (congestive) heart failure |
| __J45.21 | Mild intermittent asthma with (Acute) exacerbation | __I50.42 | Chronic combined systolic (congestive) and diastolic (congestive) heart failure |
| __J45.909 | Unspecified asthma, uncomplicated | __I50.43 | Acute on chronic combined systolic (congestive) and diastolic (congestive) heart failure |
| __J47.9 | Bronchiectasis, uncomplicated | | |
| __J47.1 | Bronchiectasis with (Acute) exacerbation | __I50.9 | Heart failure, unspecified |
| __J84.10 | Post Inflammatory Pulmonary Fibrosis | __I01.8 | Other acute rheumatic heart disease |
| __J96.90 | Acute respiratory failure, unspecified whether with hypoxia or hypercapnia | __I09.81 | Rheumatic Heart Failure (Congestive) |
| __R40.0 | Somnolence | __I27.0 | Primary Pulmonary Hypertension |
| __R40.1 | Stupor | __I27.89 | Other specified pulmonary heart diseases |
| __R06.02 | Shortness of breath | __I27.9 | Pulmonary Heart Disease, Unspecified |
| __R06.82 | Tachypnea / Rapid breathing | __I50.9 | Congestive Heart Failure, Unspecified |
| __R06.2 | Wheezing | __I50.1 | Left Heart Failure |
| __R06.00 | Dyspnea | __I50.20 | Unspecified systolic (congestive) heart failure |
| ✓R06.83 | Snoring | __I50.21 | Acute systolic (congestive) heart failure |
| __R09.01 | Asphyxia | __I50.22 | Chronic systolic (congestive) heart failure |
| __R09.02 | Hypoxia / Hypoxemia | __I50.23 | Acute on chronic systolic (congestive) heart failure |

| Sleep Related Codes | | Other: _____ |
|---|---|---|
| __G47.30 | Apnea, Unspecified | |
| __G47.30 | Hypersomnia with Sleep Apnea, Unspecified | |
| __G47.30 | Insomnia with Sleep Apnea, Unspecified | |
| __R09.02 | Hypoxemia | |
| __G47.30 | Sleep Apnea, Unspecified | |
| __G47.33 | Sleep Apnea, Adult Pediatric | |

Date Patient Last Seen: 6 / 6 / 18

Any signature below certifies that the named patient above is having an awake / overnight oximetry to determine if the patient desaturates while sleeping, and or qualifies for home nocturnal oxygen.

_____                                         6/11/18
Physician Signature                                      Signature Date

Please fax this prescription back to (000) 000-0000

V 1.3.2018

To: virtuox    Page 1 of 2



No cost software + low cost oximeters =
The industry's most cost effective way to quality oxygen patients!

# Pulse Oximetry Patient Cover Sheet

**To:** VirtuOx, Inc.

**Fax:** (888) 295-2922

**Fr:**

**Dt:** 07/18/2018

**Re:** Patient Name:

DOB:

Reading ID:

Insurance:        MEDICARE

Physician Name:

NPI:





**VirtuOx Corporate**

5850 Coral Ridge Drive
Suite 304
Coral Springs, FL 33076
Phone: 877.337.7111

**VirtuOx Laboratory**

150 Executive Park Blvd.
Suite 3210
San Francisco, CA 94134
Phone: 877.337.7111

Administrator PUTSmodem3                                        (171) 07/19/2018 11:50:04 AM -0500



Reading ID: ▬▬
Session ID: ▬▬
IDTF Upload Date: 07/19/2018
5850 Coral Ridge Drive, Suite 304, Coral Springs, Florida 33076
Phone: (877) 337-7111  Fax: (866) 677-4465

## Pulse Oximetry - Summary Report

**Patient Information**

TOPEKA, KS 66070
Phone: (785) ▬▬
Gender: Female
Date of Birth: ▬▬

**Physician Information**

Topeka, KS 66606
Phone: (785) ▬▬
Fax: (785) ▬▬
NPI: ▬▬

**Provider Information**

Topeka, KS 66609
Phone: ▬▬
Fax: (000) 000-0000

| Start: 6/20/2018 1:15:44 AM | End: 6/20/2018 8:39:40 AM<br>Test Condition: Overnight on Room Air | Duration: 7:23:56 |
|---|---|---|

| SpO2 Data | | Pulse Data | | Considerations |
|---|---|---|---|---|
| Time ≤ 88% | 1.3 MIN | High pulse | 81.0 BPM | **Oxygen** |
| Time ≤ 89% | 22.3 MIN | Low pulse | 54.0 BPM | It appears this patient qualifies for Nocturnal |
| High SpO2 | 99.0% | Average Pulse | 62.0 BPM | Oxygen per Medicare guidelines; please |
| Low SpO2 | 86.0% | Bradycardia time | 134.3 MIN | inquire with respiratory company for |
| Basal SpO2 | 91.8% | Percent time in Bradycardia | 30.4% | Coverage Guidelines for Group II. |
| Delta SpO2 | 0.1 MIN | Tachycardia time | 0.0 MIN | |
| Time consecutive ≤ 88% | 0.2 MIN | Percent time in Tachycardia | 0.0% | |
| Awake SpO2 | 96.0% | Artifact events | 2.8 MIN | |
| Artifact events | 2.8 MIN | | | |
| **SpO2 ODI Data** | | | | |
| Oxygen Desaturation Events (3%) | 63 | | | |
| Oxygen Desaturation Index (ODI) | 8 | | | |
| A desaturation event is defined as a decrease in SpO2 ≥ 3 percentage points within a 3 minute window of onset. | | | | |

**Medicare / Private Insurance Qualifications:**

Group I: An SpO2 at or below 88 percent, for at least 5 minutes taken during sleep who's SpO2 is at or above 89 percent while awake
Group I Delta: A decrease in SpO2 of more than 5 percent from basal SpO2, for at least 5 minutes with symptoms or signs to hypoxemia
Group II: An SpO2 of 89 percent during sleep for at least 5 minutes with any of the following: 1) Dependent edema suggesting congestive heart failure, or 2) Pulmonary hypertension or cor pulmonale, determined by measurement of pulmonary artery pressure, gated blood pool scan, echocardiogram, or "P" pulmonale on EKG (P wave greater than 3 mm in standard leads II, III, or AVF), or 3) Erythrocythemia with a hematocrit greater than 56 percent



Oximeter: WristOx, A 4 second signal averaging Low Resolution Pulse Oximeter   Serial #: 501564640



## TILE ROOFING
I N S T I T U T E

Date: September 22, 2017 **rev October 5, 2017**

To: All Roofing, Building, Restoration and Insurance Industry Professionals

Re: Obsolete Concrete Roof Tiles Formerly Produced in Florida

In response to the vast amount of hurricane damage related inquiries from industry professionals, please note the following list of concrete roof tiles that have been produced in or shipped to Florida over the past several decades.

The following roof tiles are obsolete and *do not interlock* with the profiles currently offered by our existing member roof tile manufacturers. Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson.

Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson

- o Any tile with Wallin/Pioneer Spanish S
- o Any tile with Wallin/Pioneer 9" Flat
- o Any tile with Wallin/Pioneer Two Piece Barrel
- o Any tile with Wallin/Pioneer Cottage Shingle
- o Any tile with Pioneer Flat
- o Any tile with Currier Venetian
- o Any tile with Hanson/Pioneer/Bender Palema
- o Any tile with Hanson/Pioneer Bender Nordic Flat
- o Any tile with Hanson Flat including Horizon/Slate/ Southern Shake/Victorian Slate/Old World
- o Any tile with Hanson/Pioneer Hacienda
- o Any tile with Hanson Regal
- o Any tile with Entegra Valencia
- o Any tile with Entegra Skandia Flat
- o Any tile with Entegra Estate manufactured in Indiantown or Pompano Beach
- o Any tile with Entegra Europa (WAVE) tile

- o Any Flat or "S" tiles labeled "Gory" or "GA"
- o Any Flat or "S" tiles labeled "Vanguard"
- o Any Flat or "S" tiles labeled "Bender"
- o Any Flat or "S" tiles labeled "Wallin"
- o Any Flat or "S" tiles labeled "Duntex"
- o Any Flat or "S" tiles labeled "Currier"
- o Any Flat or "S" tiles labeled "APE"
- o Any flat or "S" tiles labeled "Pioneer"
- o Any Flat or "S" tiles labeled "Marley"
- o Any flat of "S" tiles labeled "Ceetile"
- o Any Flat or "S" tiles labeled "Lifetile"
- o Any Flat or "S" tiles labeled "Monray"
- o Any Flat or "S" tiles labeled "Monier"
- o Any Flat or "S" tiles labeled "Superior"
- o Any flat or "S" tiles labeled "Westile"
- o Any flat tile labeled Boral Lifetile "BUSA"

In the event that a tile roof requires a complete replacement, our existing member manufacturers will strive to offer colors that closely resemble the existing roof, however the likelihood of an exact color replacement is highly unlikely.

If we might provide any additional information or assistance, please feel free to email us at Rolson@tileroofing.org.

Sincerely,
Rick Olson
TRI President



**TILE ROOFING**
I N S T I T U T E

Date: September 22, 2017 **rev October 5, 2017**

To:    All Roofing, Building, Restoration and Insurance Industry Professionals

Re:    Obsolete Concrete Roof Tiles Formerly Produced in Florida

In response to the vast amount of hurricane damage related inquiries from industry professionals, please note the following list of concrete roof tiles that have been produced in or shipped to Florida over the past several decades.

The following roof tiles are obsolete and *do not interlock* with the profiles currently offered by our existing member roof tile manufacturers. Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson.

Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson

- o  Any tile with Wallin/Pioneer Spanish S
- o  Any tile with Wallin/Pioneer 9" Flat
- o  Any tile with Wallin/Pioneer Two Piece Barrel
- o  Any tile with Wallin/Pioneer Cottage Shingle
- o  Any tile with Pioneer Flat
- o  Any tile with Currier Venetian
- o  Any tile with Hanson/Pioneer/Bender Palema
- o  Any tile with Hanson/Pioneer Bender Nordic Flat
- o  Any tile with Hanson Flat including Horizon/Slate/
     Southern Shake/Victorian Slate/Old World
- o  Any tile with Hanson/Pioneer Hacienda
- o  Any tile with Hanson Regal
- o  Any tile with Entegra Valencia
- o  Any tile with Entegra Skandia Flat
- o  Any tile with Entegra Estate manufactured in
     Indiantown or Pompano Beach
- o  Any tile with Entegra Europa (WAVE) tile

- o  Any Flat or "S" tiles labeled "Gory" or "GAI"
- o  Any Flat or "S" tiles labeled "Vanguard"
- o  Any Flat or "S" tiles labeled "Bender"
- o  Any Flat or "S" tiles labeled "Wallin"
- o  Any Flat or "S" tiles labeled "Duntex"
- o  Any Flat or "S" tiles labeled "Currier"
- o  Any Flat or "S" tiles labeled "APE"
- o  Any flat or "S" tiles labeled "Pioneer"
- o  Any Flat or "S" tiles labeled "Marley"
- o  Any flat of "S" tiles labeled "Ceetile"
- o  Any Flat or "S" tiles labeled "Lifetile"
- o  Any Flat or "S" tiles labeled "Monray"
- o  Any Flat or "S" tiles labeled "Monier"
- o  Any Flat or "S" tiles labeled "Superior"
- o  Any flat or "S" tiles labeled "Westile"
- o  Any flat tile labeled Boral Lifetile "BUSA"

In the event that a tile roof requires a complete replacement, our existing member manufacturers will strive to offer colors that closely resemble the existing roof, however the likelihood of an exact color replacement is highly unlikely.

If we might provide any additional information or assistance, please feel free to email us at Rolson@tileroofing.org.

Sincerely,
Rick Olson
TRI President



**TILE ROOFING**
I N S T I T U T E

Date: September 22, 2017 **rev October 5, 2017**

To:  All Roofing, Building, Restoration and Insurance Industry Professionals

Re:  Obsolete Concrete Roof Tiles Formerly Produced in Florida

In response to the vast amount of hurricane damage related inquiries from industry professionals, please note the following list of concrete roof tiles that have been produced in or shipped to Florida over the past several decades.

The following roof tiles are obsolete and *do not interlock* with the profiles currently offered by our existing member roof tile manufacturers. Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson.

Identifying marks on the back of each tile may include Pioneer, Currier, Entegra, Wallin, P, Bender and or Hanson

- o Any tile with Wallin/Pioneer Spanish S
- o Any tile with Wallin/Pioneer 9" Flat
- o Any tile with Wallin/Pioneer Two Piece Barrel
- o Any tile with Wallin/Pioneer Cottage Shingle
- o Any tile with Pioneer Flat
- o Any tile with Currier Venetian
- o Any tile with Hanson/Pioneer/Bender Palema
- o Any tile with Hanson/Pioneer Bender Nordic Flat
- o Any tile with Hanson Flat including Horizon/Slate/
  Southern Shake/Victorian Slate/Old World
- o Any tile with Hanson/Pioneer Hacienda
- o Any tile with Hanson Regal
- o Any tile with Entegra Valencia
- o Any tile with Entegra Skandia Flat
- o Any tile with Entegra Estate manufactured in
  Indiantown or Pompano Beach
- o Any tile with Entegra Europa (WAVE) tile

- o Any Flat or "S" tiles labeled "Gory" or "GA"
- o Any Flat or "S" tiles labeled "Vanguard"
- o Any Flat or "S" tiles labeled "Bender"
- o Any Flat or "S" tiles labeled "Wallin"
- o Any Flat or "S" tiles labeled "Duntex"
- o Any Flat or "S" tiles labeled "Currier"
- o Any Flat or "S" tiles labeled "APE"
- o Any flat or "S" tiles labeled "Pioneer"
- o Any Flat or "S" tiles labeled "Marley"
- o Any flat of "S" tiles labeled "Ceetile"
- o Any Flat or "S" tiles labeled "Lifetile"
- o Any Flat or "S" tiles labeled "Monray"
- o Any Flat or "S" tiles labeled "Monier"
- o Any Flat or "S" tiles labeled "Superior"
- o Any flat or "S" tiles labeled "Westile"
- o Any flat tile labeled Boral Lifetile "BUSA"

In the event that a tile roof requires a complete replacement, our existing member manufacturers will strive to offer colors that closely resemble the existing roof, however the likelihood of an exact color replacement is highly unlikely.

If we might provide any additional information or assistance, please feel free to email us at Rolson@tileroofing.org.

Sincerely,
Rick Olson
TRI President