## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                    )
the States of Arkansas, California,          )
Colorado, Connecticut, Delaware,             )
Florida, Georgia, Illinois, Indiana,         )
Iowa, Louisiana, Maryland,                   )
the Commonwealth of Massachusetts,           )
Michigan, Minnesota, Missouri,               )    Case No.: 19-CV-61084
Montana, Nevada, New Jersey,                 )
New Mexico, New York, North Carolina,        )    Judge: Hon. Robert N. Scola, Jr.
Oklahoma, Rhode Island, Tennessee, Texas,    )
Vermont, the Commonwealth of Virginia,       )
Washington, and the District of Columbia,    )
*ex rel.* AMBER WATT,                        )
                                             )
     Plaintiff,       )
                                             )
v.                                           )
                                             )
VIRTUOX, INC.                                )
                                             )
     Defendant.       )
                                             )

## VIRTUOX, INC.'s MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

**K&L GATES LLP**

Javier A. Roldan Cora
John H. Lawrence, *pro hac vice pending*
Mark A. Rush, *pro hac vice pending*
Joshua I. Skora, *pro hac vice pending*
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
T: (305) 539-3300
F: (305) 358-7095
javier.roldancora@klgates.com
john.lawrence@klgates.com
mark.rush@klgates.com
joshua.skora@klgates.com

*Attorneys for VirtuOx, Inc.*

## PRELIMINARY STATEMENT

Relator's First Amended Complaint ("Complaint")—claiming that VirtuOx, Inc. ("VirtuOx") violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. and its state counterparts—fails to plead any actionable theories of FCA liability.[1]  The heart of this case is an antiquated statutory and regulatory regime that has been significantly outpaced by technology and advancements in health care.  VirtuOx, a Medicare-approved independent diagnostic testing facility ("IDTF"), utilizes a remote and mobile technology platform to provide diagnostic tests to patients in their homes nationwide.  The statutory and regulatory regime that governs IDTFs was created for "brick and mortar" IDTFs that test patients in a facility—not those that utilize mobile technology to provide comprehensive in-home services from coast to coast.  The Centers for Medicare & Medicaid Services ("CMS") has not promulgated any rules, regulations, or guidance to account for IDTFs like VirtuOx, and Relator attempts to exploit this fact through the Complaint's allegations.  However, Relator's claims fail because they are based on statutory and regulatory requirements that either do not exist or are stretched far beyond their application.  Indeed, all of Relator's FCA claims are based on *legal conduct*, and Relator fails to cite any legal authority that establishes that VirtuOx violated the FCA.[2]

Moreover, the Complaint fails to cite any alleged false claims, is pervasively defined by non-particularized allegations, is dependent upon publicly available information, and is built upon allegations pleaded "upon information and belief" and wholly deficient *ipse dixit* statements.  These insufficiencies, coupled with Relator's status as VirtuOx's competitor, are fatal to the Complaint as they clearly demonstrate that the Complaint lacks the indicia of reliability required by the FCA.  In short, the Complaint fails to meet the most basic FCA pleading requirements—let

---

[1] The United States Attorney's Office for the Southern District of Florida (the "Government") filed its declination to intervene on January 19, 2021, ECF No. 49.  The State Plaintiffs filed their collective notice of declination to intervene on May 6, 2021, ECF No. 51.  As a result of these declinations, the State of Maryland's claims were dismissed without prejudice, ECF No. 52.

[2] The Complaint includes claims under various state versions of the FCA.  Because these state versions contain substantively similar requirements as the federal FCA, VirtuOx's arguments herein under the federal FCA apply equally to the state versions, and they should be dismissed.

alone the heightened pleading standards demanded of Relator—and should be dismissed.[3]

*First*, Relator's allegation that VirtuOx violated the FCA by improperly billing claims for its overnight pulse oximetry ("POX") testing from its San Francisco, California location ("California Office") instead of its Coral Springs, Florida location ("Florida Office") has no legal basis.  Relator has not cited, and cannot cite, to a single statute, regulation, or rule VirtuOx purportedly violates when it bills POX testing from its California Office.  The reason for this failure is simple:  no such authority exists.  The only guidance is sub-regulatory, is not discussed in the Complaint, and supports VirtuOx's billing locality.

*Second*, Relator has failed to plead any legal or regulatory basis for her allegation that VirtuOx improperly bills for "spot checks" in conjunction with certain POX testing.  Specifically, Relator offers no support for the allegation that the spot check that VirtuOx performs when ordered by a physician is "encompassed" by the POX testing.  The billing codes at issue—94760 and 94762—are for services that occur on distinct dates of service and can be billed separately.

*Third*, Relator's claim that VirtuOx engaged in unlawful off-label promotion of the VPOD CapOx and is liable for related billing—including that associated with third parties' ordering of non-invasive ventilators ("NIVs") for patients—is entirely contradicted by applicable standards and case law.  Federal payors allow reimbursement for off-label use of a medical device so long as it is approved by the U.S. Food and Drug Administration ("FDA") or cleared for some other use, and may be used to perform the relevant service.  Relator has also not adequately alleged a causal chain for purposes of FCA liability between VirtuOx's alleged off-label promotion of the VPOD CapOx and NIV claims.

*Fourth*, Relator's attempt to recast VirtuOx's lawful conduct in providing POX devices to durable medical equipment companies ("DMEs") for POX testing as an unlawful kickback scheme is unfounded and permitted by CMS.  Specifically, VirtuOx's provision of POX devices to DMEs is part of a "courier model," wherein CMS allows a DME to deliver testing equipment on behalf of a Medicare-enrolled IDTF, such as VirtuOx, to patients.  CMS has also stated that it does not

---

[3] The Compliant fails to state under which specific provisions of the FCA it is brought and, instead, broadly alleges that Relator sues under 31 U.S.C. § 3729(a)(1) and (a)(2).  Consequently, Relator has failed to adequately allege the various subsections of § 3729(a)(1) and their elements and has thereby failed to apprise VirtuOx of the specific nature of Relator's claims.  However, VirtuOx's arguments apply with equal force to any claims Relator may bring under § 3729(a)(1)—including, but not limited to, any alleged retention of overpayments and conspiracy.

intend to regulate the ownership of the POX device.  Consequently, Relator's kickback allegations are belied by CMS's own guidance.

*Finally*, each of Relator's FCA claims against VirtuOx is entirely devoid of particularized supporting allegations.  Despite filing a 162-page Complaint—which includes over 85 pages of exhibits—Relator *has not identified a single false claim* that VirtuOx purportedly submitted to Medicare or Medicaid for payment.  Relator pleads central aspects of each of her alleged sweeping fraud schemes "upon information and belief" no fewer than *17 times*.  Rather than plead particularized facts, Relator makes conclusory arguments and blanket pronouncements about VirtuOx's alleged conduct; predominantly relies on publicly available information; and essentially asks the Court to "take her word for it" that her claims are reliable.  These deficiencies are deepened further by Relator's status as a "corporate outsider," her lack of access to information allegedly supportive of her claims, and the unreliable perspective from which she pleads.

## BACKGROUND

### I.   **VirtuOx**

VirtuOx operates Medicare-approved IDTFs, including in California and Florida, and provides IDTF-related services to patients across the country.  *See* Relator's First Amended Complaint ("ECF No. 41"), ¶¶ 18–20, 106–108.  As an overnight respiratory care diagnostic testing company, VirtuOx performs a variety of home-based diagnostic tests.  *See id.* ¶¶ 18–20, 94, 99, 115–16.  Of central focus is VirtuOx's home-based POX testing.  Specifically, POX testing is used to test oxygen levels in the blood, which is a critical data point for the diagnosis and treatment of respiratory and other ailments.  *See id.* ¶¶ 94, 99, 123, 143.  Medicare requires POX testing scores to cover certain therapies including long-term oxygen, and these scores support medical necessity for many other therapeutic interventions.  *See id.* ¶¶ 94, 99, 144–45.

Physicians order POX tests to diagnose and treat patients with signs and/or symptoms of low oxygen.  *See id.* ¶¶ 94, 123–24, 150–51.  Physicians send POX orders either to VirtuOx or a DME that will send the order to VirtuOx.  *See id.* ¶¶ 126, 152.  VirtuOx collects a patient's information, including insurance information, and arranges for delivery of the POX test to the patient.  *See id.* ¶¶ 95, Ex. 1.  VirtuOx ships, or a DME couriers, the POX device with VirtuOx's instructions for use to the patient's residence.  *See id.* ¶¶ 95, 152, Ex. 24.  The patient follows VirtuOx's instructions and self-administers the test.  *See id.* ¶ 154, Ex. 24.  After the test is

complete, VirtuOx analyzes the data and transmits the data to the patient's physician. *Id.* ¶¶ 98, 156.

## II.   Regulatory Requirements

Very few regulatory requirements exist to govern IDTFs providing home-based overnight POX testing.  The regulatory provisions that specify the *enrollment* requirements applying to an IDTF are located at 42 C.F.R. § 410.33.[4]  CMS acknowledges that there are certain IDTFs, like VirtuOx—which it has generally referred to as providing "transtelephonic and electronic monitoring services"—that perform services without actually seeing the patient. CMS MLN Matters, "Independent Diagnostic Testing Facility (IDTF) Fact Sheet," at 6 (Aug. 2016).  CMS notes that it does not have specific certification standards for IDTF technicians; instead, such requirements for IDTFs are at the Medicare Administrative Contractor's ("MAC") discretion. *Id.* Similar to CMS, MACs have not promulgated any specific guidance as to POX testing and billing applicable to IDTFs like VirtuOx.  For example, CMS National Coverage Determination for Home Use of Oxygen ("NCD 240.2") solely addresses coverage criteria for home oxygen itself—and not for POX testing or related billing—and requires all claims for home oxygen therapy to be supported by valid qualifying test results "performed by a qualified provider or supplier of laboratory services."  Additionally, Local Coverage Determination L33797 Oxygen and Oxygen Equipment—which covers all DME MAC jurisdictions—solely applies to DMEs, and not IDTFs, and does not address POX testing or billing.

The sole guidance that exists regarding POX testing and billing is sub-regulatory and is located at CMS Pub. 100-20, Transmittal 173 (Aug. 16, 2005) ("Transmittal 173").[5]  Transmittal 173 interprets Section C of NCD 240.2 and specifically permits Medicare beneficiaries to self-administer overnight POX tests "under the direction of a Medicare enrolled" IDTF.  Transmittal 173 also sets forth the specific parameters of the "courier model," wherein "a DME supplier or another shipping entity may deliver a pulse oximetry test unit and related technology used to collect and transmit test results to the IDTF to a beneficiary's home."  Transmittal 173 expressly

---

[4] 42 C.F.R. § 410.33(e)(2) states, in part, that "[w]hen one or more aspects of the diagnostic testing are performed at the IDTF, the IDTF is the place of service."  Relator has not cited this language; Relator has not alleged that one or more aspects of VirtuOx's POX testing do not occur at the California Office; and § 410.33(e)(2) is inapplicable because it relates to enrollment, not billing.
[5] Relator appends CMS Pub. 100-20, Transmittal 166 (July 22, 2005) ("Transmittal 166") to the Complaint. *See* ECF No. 41, Ex. 2.  However, Transmittal 166 was replaced by Transmittal 173.

states that "CMS does not intend to regulate the ownership of either the testing unit or the technology used to transmit test results." As to billing for overnight POX testing, Transmittal 173 solely maintains that "[t]he carrier jurisdiction for the overnight pulse oximetry test is the location of the IDTF to which the test results are transmitted." It does not define the term "transmitted."

## STANDARD OF REVIEW

### I. False Claims Act

The FCA is neither "an all-purpose antifraud statute," nor a vehicle for "punish[ing] garden-variety breaches of contract or regulatory violations" or "polic[ing] technical compliance with complex federal regulations." *Universal Health Servs., Inc. v. U.S.* ex rel. *Escobar*, 136 S. Ct. 1989, 2003 (2016) (citation omitted); *U.S.* ex rel. *Williams v. Renal Care Grp.*, 696 F.3d 518, 528 (6th Cir. 2012) (citation omitted). While a "law designed to punish and deter fraud," the FCA is not a vehicle for "'punish[ing] honest mistakes or incorrect claims submitted thorough mere negligence' or imposing 'a burdensome obligation' on [defendants] rather than a 'limited duty to inquire.'" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (citation omitted). Instead, liability attaches when a defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or knowingly retains an overpayment. 31 U.S.C. §§ 3729(a)(1)(A)–(B), (G).

#### A. Falsity

Submission of a false claim is the "*sine qua non*" of an FCA violation. *See Urquilla-Diaz*, 780 F.3d at 1052. Factual falsity exists when the defendant submits an incorrect description of the goods or services provided, or those goods and services were not provided as represented. *See U.S. v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1259 (M.D. Fla. 2015) (citation omitted). Legal falsity exists where the defendant "knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Id.* (quotation marks and citation omitted). Federal courts widely maintain there cannot be a finding of legal falsity without a violation of some rule, regulation, or standard, or a breach of duty. *See, e.g.*, *U.S. v. Halifax Hosp. Med. Ctr.*, 2014 WL 68603, at *8 (M.D. Fla. Jan. 8, 2014).

#### B. Scienter

Application of the FCA's scienter requirement is "rigorous." *Escobar*, 136 S. Ct. at 2002. The FCA does not require "proof of a specific intent to defraud," yet it "does not attach [liability] to

innocent mistakes or simple negligence." *U.S.* ex rel. *Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (citation and quotation marks omitted); *see also id.* at 1154 (citing *U.S.* ex rel. *Clausen v. Lab. Corp. of America*, 290 F.3d 1301, 1311 (11th Cir. 2002) (stating the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider *knowingly* asks the Government to pay amounts it does not owe.") (emphasis added)). Where "the defendant's interpretation of a statute or regulation was reasonable," "'there [wa]s no authoritative contrary interpretation' of the rule," and "the defendant [did not] actually kn[o]w or [otherwise] should have known that its conduct violated a regulation in light of any ambiguity," a relator cannot satisfy the knowledge requirement under the FCA. *Phalp*, 857 F.3d at 1155 (11th Cir. 2017) (citation omitted); *Space Coast*, 94 F. Supp. 3d at 1262 (citation omitted). Stated differently, "[u]nder the FCA's knowledge element, then, the court's focus is on the objective reasonableness of the defendant's interpretation of an ambiguous term and whether there is any evidence that the [Government] warned the defendant away from that interpretation." *U.S.* ex rel. *Purcell v. MWI Corp.*, 807 F.3d 281, 290 (D.C. Cir. 2015). In cases of disputed interpretative questions, it is difficult to establish even the loosest standard of knowledge under the FCA. *Id.* at 288.

### C.  Materiality

Similarly, the materiality requirement is "rigorous," "demanding" and "not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 136 S. Ct. at 2002–04. To be actionable, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." *Escobar*, 136 S. Ct. at 2002. In other words, it must have a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality does not exist "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment"; the "Government would have the option to decline to pay if it knew of the defendant's noncompliance"; or "where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. Rather, no one single factor is dispositive. *See id.* at 2003–04.

### II.  **Federal Rules of Civil Procedure 8 and 12**

The Federal Rules of Civil Procedure require Relator to plead "a short and plain statement of the claim showing that [she] is entitled to relief" and to state each allegation simply, concisely,

and directly. Fed. R. Civ. P. 8(a)(2), (d)(1). Where Relator fails to state a facially plausible claim to relief, the Court must dismiss the Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). *See Urquilla-Diaz*, 780 F.3d at 1051. A facially plausible claim pleads "content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). It demands more than "labels and conclusions" and "formulaic recitation[s]" of the elements of an FCA claim. *See Twombly*, 550 U.S. at 555. Indeed, while "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. A complaint cannot survive a motion to dismiss "[w]here [it] pleads facts that are merely consistent with a defendant's liability" because "it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (quotation marks and citation omitted).

## III.   <u>Federal Rule of Civil Procedure 9(b)</u>

To plead a viable claim under the FCA, Relator is required to plead with particularity pursuant to the heightened pleading requirements of Rule 9(b). *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009). Accordingly, Relator "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *U.S.* ex rel. *Bingham v. HCA, Inc.*, 2016 WL 6027115, at *4 (S.D. Fla. Oct. 14, 2016), *aff'd sub nom. Bingham v. HCA, Inc.*, 783 F. App'x 868 (11th Cir. 2019). Rule 9(b) is an exacting standard, which demands "paragraph-by-paragraph" scrutiny of the complaint's allegations. *U.S.* ex rel. *Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444 (6th Cir. 2008).[6]

If Relator is unable to specifically identify actual false claims allegedly submitted for payment, she may be able to satisfy Rule 9(b) if she alleges the actual submission of a false claim and offers "some indicia of reliability" to support that allegation. *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018). Federal courts "evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *U.S.* ex rel. *Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006). It is not enough that Relator "merely . . . describe[s] a private scheme in detail [and] then . . . allege[s] simply and

---

[6] The failure to satisfy Rule 9(b) requires dismissal of the Complaint under Rule 12(b)(6). *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

without any stated reason . . . [her] belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted." *Id*.

## ARGUMENT

I.  **Relator Cannot State a Claim Under the FCA Because the Allegedly False Locality Billing Scheme is Premised on Purported Non-Compliance with Standards that Do Not Exist**

### A. Relator Fails to Plead Falsity with Respect to Any Claims Submitted from VirtuOx's California Office.

Relator alleges that VirtuOx falsely represented the location of its IDTF services as its California Office rather than the Florida Office. *See, e.g.*, ECF No. 41, ¶¶ 3–4, 94–122, 187–88. Relator has *no legal basis* to support this claim, and the Complaint otherwise fails to plead how any claims submitted from the California Office are false, rendering the allegation fatally flawed. Indeed, Relator completely fails to cite any statute, regulation, or rule requiring VirtuOx to bill from the Florida Office.  While Relator has appended, without discussion, sub-regulatory guidance, the sub-regulatory guidance Relator cites has been replaced.  More importantly, the sub-regulatory guidance that currently exists cannot be the basis of an enforcement action in this context under the recent U.S. Supreme Court decision, *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), and that sub-regulatory guidance otherwise supports VirtuOx's billing from its California Office.

1.  *Relator does not and cannot cite to a single statute, regulation, or rule rendering false any claim VirtuOx billed from the California Office.*

Relator does not—and simply cannot—identify a violation of a single rule or standard or a breach of duty to support her assertions that the Florida Office is the proper billing locality for VirtuOx's services or that claims billed from the California Office are false. *See, e.g., U.S.* ex rel. *Barker v. Tidwell*, 2015 WL 3505554, at *5 (M.D. Ga. June 3, 2015).  Rather, as set forth in detail above, the entire universe of IDTF-related regulations and guidance is devoid of any standards clearly governing billing locality in this context.

In fact, rather than showing VirtuOx certified compliance with any applicable laws and regulations which were a prerequisite to receiving a Government benefit, *Urquilla-Diaz*, 780 F.3d at 1052, Relator relies on a series of unsupported conclusions to create the *appearance* of a legal violation and resulting false claim.  For example, Relator concludes, always "[u]pon information and belief," that (1) VirtuOx provides IDTF services from the Florida Office since it is VirtuOx's

"corporate office" and "principal place of business"; (2) patients call the Florida Office with healthcare inquiries and that VirtuOx handles "insurance billing activities" there; and (3) "virtually no IDTF services are being performed" in the California Office. ECF. No. 41, ¶¶ 104–05, 109. Relator even goes so far as implying that, because she received a busy signal when calling the California Office, but reached someone at the Florida Office, VirtuOx is somehow creating "a front for purpose of billing Medicare for the higher allowable" rate. *Id.* ¶¶ 111–12. At no point does Relator cite to any authority or otherwise explain how such business activities determine proper billing locality. Put simply, Relator has levied her disagreement with VirtuOx's business decisions, but she has not established a facially plausible claim of falsity.

Relator's misplaced reliance on Transmittal 166 and, by extension, its replacement, Transmittal 173 (collectively, the "Transmittals"), does not cure her fatally flawed falsity allegations. *See id.*, Ex. 2. The Transmittals do not interpret or analyze any statutes, regulations, or rules pertaining to the operation of Medicare-enrolled IDTFs and, at best, are ambiguous. Relator appends Transmittal 166 without substantive discussion, presumably because Relator knows it is sub-regulatory guidance entirely inapplicable to IDTF billing and locality requirements. *See id.* ¶¶ 96, Ex. 2. Instead, the Transmittals establish a regime whereby DMEs deliver Medicare-enrolled IDTFs' testing equipment to patients' homes, without making *any* changes to IDTF enrollment or operation regulations. *See* Transmittal 173, at 1–3.

Only one sentence of the Transmittals could conceivably relate to proper billing locality for VirtuOx's IDTF services: the applicable "carrier jurisdiction for the overnight [POX] test is the location of the IDTF to which the test results are transmitted." *Id.* at 3. Not only does Relator not cite or discuss this language, but even if she had, it is entirely inapposite. *See* ECF. No. 41, ¶¶ 96, Ex. 2. The Transmittals neither define "transmitted," nor provide exemplar scenarios determining carrier jurisdiction based on transmission of POX testing results—failing to create a "statute or regulation the compliance with which is a condition for Government payment" for IDTF billing locality. *Space Coast*, 94 F. Supp.3d at 1259.

> 2. *The U.S. Supreme Court's opinion in* Allina *and the case's progeny prohibit using the Transmittals as a basis for falsity under the FCA.*

Even if Relator had argued the Transmittals' application to IDTF billing locality, *Allina* and its progeny prohibit liability premised on sub-regulatory guidance not subject to notice-and-comment rulemaking and directly affecting reimbursement. The Transmittals were not subject to

notice-and-comment rulemaking and, since their issuance, have served as gap-filling policy within the context of the broadly worded language of NCD 240.2.C.  The meaning of "transmitted" in the Transmittals directly affects VirtuOx's entitlement to reimbursement because it affects the applicable carrier jurisdiction to which VirtuOx bills claims.  As such, Relator cannot establish falsity (or knowledge) under the FCA because the Transmittals are a substantive legal standard that fails to satisfy *Allina*'s requirements.

The thrust of *Allina*'s holding is that the establishment or alteration of a substantive legal standard—one that creates, defines, or regulates the rights, duties, or powers of the parties, particularly as it relates to payment—must go through notice-and-comment rulemaking.  Also critical is *Allina*'s position that a gap-filling policy that interprets a broadly worded statute or regulation must go through the rulemaking process to be valid and enforceable.  In *Allina*, the Court considered whether a change to a Department of Health and Human Services ("HHS") reimbursement formula for hospitals treating low-income patients "establish[ed] or changed a substantive legal standard governing . . . the payment for services" and thus was required to undergo notice-and-comment rulemaking under the Medicare Act. *Allina Health Servs.*, 139 S. Ct. at 1809–10 (quotation marks and citation omitted).  The Court—in a 7-1 decision—invalidated the formula change, finding that the "failure to give notice and a chance to comment was fatal." *Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 933 (E.D. Pa. 2019) (citation omitted). Importantly, the Court stated that, assuming that an underlying statute does not speak directly to an issue, "when the government establishes or changes an avowedly 'gap'-filling policy, it can't evade its notice-and-comment obligation under [42 U.S.C.] § 1395hh(a)(2)." *Allina Health Servs.*, 139 S. Ct. at 1817.

Federal courts have applied *Allina* in the FCA context, dismissing claims predicated on policies affecting reimbursement that did not undergo notice-and-comment rulemaking.  In *Polansky v. Exec. Health Res., Inc.*, the "core of [r]elator's theory of liability [wa]s that [d]efendant exploited the difference in reimbursement rates for inpatient and outpatient services," causing submission of claims for inpatient services that should have been billed as outpatient. 422 F. Supp. 3d at 919.  The court found the at-issue CMS 24-hour policy "delineate[d] the circumstances in which a hospital [wa]s entitled to higher inpatient reimbursement," thus requiring advance public notice and opportunity to comment as a substantive legal standard "affect[ing] the right to, or amount of reimbursement[.]" *Id.* at 934–35.  The court maintained that the relator could not "justify

CMS's failure to provide notice and comment for the 24-hour policy by characterizing it as mere guidance on a preexisting standard when the policy, in substance, is a gap-filling exercise prompted by the ambiguity of the prior policy." *Id.* at 936 (citation omitted).  Accordingly, without notice-and-comment rulemaking, "*Allina* compel[led] the conclusion that there can be no FCA liability on" the 24-hour policy claims. *Id.*

The importance of *Allina* and *Polansky* is clear:  Relator cannot establish falsity under the FCA when the sole basis for liability is a substantive legal standard that has not been subject to notice-and-comment rulemaking.  Here, Relator cannot attempt to use the Transmittals—which she has yet to do—to support a claim that VirtuOx exploited differences in the existing reimbursement regime for the sake of capturing higher revenues.  Neither can she attempt to argue—which she also has yet to do—that the Transmittals interpret a preexisting standard. Relator does not and cannot cite to a preexisting standard, rule, or regulation that opines on VirtuOx's proper billing locality.  Indeed, even through the most charitable lens, the concept of locality is solely from the Transmittals and not a statute, regulation, or even another guidance document.  The Transmittals, therefore, are unquestionably "gap filler" under *Allina* and *Polansky* such that falsity—and, importantly, FCA liability—cannot be established.

### 3.  *The Government—the true party-in-interest—"may not bring actions based solely on allegations of noncompliance with guidance documents."*

The Government—the real party-in-interest in FCA cases—advises its attorneys not to use "enforcement authority to effectively convert guidance documents into binding rules." Rachel L. Brand, "Memorandum: Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases," at 2 (Jan. 25, 2018).  Indeed, the Government expressly instructs that enforcement actions "must be based on violations of applicable legal requirements, not mere noncompliance with guidance documents issued by federal agencies, because guidance documents cannot by themselves create binding requirements that do not already exist by statute or regulation." Dep't of Just., Justice Manual, Title 1-20.100 (Dec. 2018) (citation omitted).  The Government "may not bring actions based solely on allegations of noncompliance with guidance documents." *Id.*  Thus, an FCA action cannot be predicated on lack of compliance with guidance in and of itself, particularly if that guidance amounts to a substantive legal standard that was not subject to notice-and-comment rulemaking or a clear interpretation of an existing statute or regulation. *See* HHS, Advisory Opinion 20-05 on Implementing *Allina* (Dec. 3, 2020) (affirming

the same).

**B. Relator Fails to Plead VirtuOx's Alleged Knowledge that Claims Submitted from the California Office Were False.**

Relator generally alleges, without more, that VirtuOx "knowingly" violated the FCA when it falsely represented its location of services as its California Office. *See* ECF No. 41, ¶¶ 186, 202–03, 214.  Such an allegation fails to satisfy the "rigorous" scienter standard of the FCA. *See Escobar*, 136 S. Ct. at 2002.  As set forth above, within the entire IDTF-related universe of standards, there are zero statutes, regulations, or rules on proper billing locality.  VirtuOx simply could not have actually known, deliberately ignored, or recklessly disregarded non-existent standards of conduct for billing claims. 31 U.S.C. § 3729(a)(1)(A)–(B), (b)(1). *See Phalp*, 857 F.3d at 1155 (quoting *U.S. v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1358 (11th Cir. 2005)) (maintaining that a defendant's interpretation of an ambiguous regulation must be reasonable, and the defendant must not have known or should have known the conduct was unlawful).

The only conceivable basis for VirtuOx's "knowledge" of proper billing locality is the Transmittals, which are irrelevant.  Even if they were applicable for argument's sake, the Transmittals are at best ambiguous as to the criteria to determine proper billing locality.  As discussed, the Transmittals neither define what "transmitted" means, nor provide exemplar scenarios where the carrier jurisdiction was determined based on transmission of POX testing results. *See* Transmittal 173, at 3 (defining the applicable carrier jurisdiction as "the location of the IDTF to which the test results are transmitted").  It does not contain *any* discussion—apart from this one sentence—regarding the IDTF to which POX test results are transmitted.

To the extent the Transmittals dictate VirtuOx's proper billing locality, there is no allegation or evidence that the data at issue was not transmitted to California.  It was also objectively reasonable for VirtuOx to conclude that the California Office, as opposed to the Florida Office, was the proper "carrier jurisdiction" to which its testing results were "transmitted." VirtuOx provides IDTF "services to patients and [DME] companies *throughout the United States*." ECF No. 41, ¶ 19 (emphasis added).  The Transmittals, published in 2005, do not contemplate a nationwide platform for the transmission of POX test results, nor should they, because the Transmittals focus on home oxygen coverage, not IDTF payment or enrollment requirements. Moreover, with exactly zero regulations or guidance warning VirtuOx away from its interpretation

that it could bill from the California Office, VirtuOx acted without authoritative guidance to the contrary and without reason to know its billing was in any way improper. To suggest otherwise is "interpretive afterthought" impermissibly straining to apply the Transmittals. *See U.S. v. Napco Int'l, Inc.*, 835 F. Supp. 493, 498 (D. Minn. 1993).

### C. Relator Fails to Plead that VirtuOx's Selection of the California Office as Its Billing Locality Was Material to Reimbursement Decisions.

Relator fails to plead plausible allegations that VirtuOx's alleged misrepresentations about its billing locality were material to reimbursement decisions. *See, e.g.*, ECF No. 41, ¶¶ 100 115–20, 203, 212–13. This failure is fatal as the FCA's materiality standard is "rigorous," "demanding," and "not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 136 S. Ct. at 2002–04. With zero legal support in the entire universe of IDTF-related regulations and guidance for Relator's billing locality assertions, VirtuOx could not and did not violate "a condition of payment," as there are simply no conditions about billing locality attached in this context. *See Escobar*, 136 S. Ct. at 2003. For the same reasons, the Government would have no basis to decline payment based on knowledge of VirtuOx's billing locality. *Id.*[7] By drawing inferences, it seems, at best, that Relator believes the Government would not have reimbursed VirtuOx if it knew the Florida Office was the proper billing locality. However, there is no requirement that dictates that the California Office is not the appropriate billing location, and Relator's series of inferences about differences in allowable rates is insufficient to plead materiality, particularly in light of the "rigorous" standard mandated by *Escobar.*

### II. VirtuOx's Billing for "Spot Checks" Does Not Result in False Claims or Otherwise Amount to Improper Conduct

Relator utilizes unsubstantiated and bald-faced assertions in the Complaint to try to create the appearance of false claims by alleging that VirtuOx falsely billed codes 94760 and 94762 concurrently in order to obtain additional payment for the same service. *See, e.g.*, ECF No. 41, ¶¶ 5–6, 123–32, 189. In so doing, Relator fails to sufficiently allege any aspect of an FCA claim. Specifically, Relator alleges that "Code 94760 was always billed concurrently with [code] 94762, and as such there should not have been a claim submitted for [code] 94760. Those claims would

---

[7] For purposes of materiality, the fact that the Government declined to intervene on January 19, 2021, is relevant. ECF No. 49.

all be false claims." *Id.* ¶ 131.  Grasping at straws to support this conclusion, Relator basely claims, "[t]here is no reason to perform a spot check at the same time as an overnight study."  *Id.* ¶¶ 6, 125.  However, Relator does not cite to a single statute, regulation, or rule prohibiting the performance of a spot check as part of an overnight POX study or for the billing of codes 94760 and 94762.  Consequently, Relator has not plausibly established falsity under the FCA. *See Space Coast*, 94 F. Supp. 3d at 1259.

Separately, Relator's claims must fail as a matter of law because she fails to make specific claims about VirtuOx's alleged knowledge and the materiality of its claims. *See, e.g.*, ECF No. 41, ¶¶ 130–31, 186, 202–03, 212–14.  As she cannot with her locality billing claims, Relator cannot establish scienter and materiality because she has not cited or discussed any authority that would render VirtuOx's alleged conduct unlawful.  General assertions that VirtuOx knowingly submitted false claims and/or received a certain sum more than allegedly allowed fails to meet these "rigorous" standards. *See Escobar*, 136 S. Ct. at 2002–04.  As such, Relator's "spot check" claim should be dismissed.

## III.     Relator Failed to Sufficiently Allege that VirtuOx's Promotion of the VPOD CapOx for Home Use Caused the Submission of False Claims

Relator alleges that VirtuOx's promotion of the VPOD CapOx for home use constituted unlawful off-label promotion and that the related claims VirtuOx submitted constituted false claims under the FCA.  *See, e.g.*, ECF No. 41, ¶¶ 7, 133–47, 149.  However, claims submitted to federal payors for off-label use of a medical device do not constitute *per se* false claims, even if the device was promoted for the off-label use in question. *See U.S.* ex rel. *Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1023 (C.D. Cal. 2015) (finding relator's allegation that defendant intentionally marketed its Class III medical device for an unapproved use without seeking preapproval from the FDA insufficient to support a claim that the defendant submitted false claims to Medicare for the alleged unapproved use).  Unless otherwise provided in applicable guidance, federal payors allow reimbursement for off-label use of a medical device so long as the medical device is approved or cleared by FDA for some other use, and may be used to perform the relevant service. *Id*.; *U.S.* ex rel. *Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 345, 347 (D. Mass. 2011) ("'Medicare and Medicaid reimbursement for off-label uses of medical devices is more permissive than reimbursement for off-label uses of pharmaceuticals' . . . . Off-label promotion cases involving medical devices are uniquely complicated by the relatively more permissive and

undefined nature of Medicare and Medicaid cover of 'off-label' medical devices."). Here, Relator pleads that the VPOD CapOx is an FDA cleared device, and has not pleaded any guidance establishing that the alleged off-label use of the device is not reimbursable. Consequently, Relator cannot establish falsity or the other required elements to advance a claim under the FCA.[8]

Relator further alleges that the off-label use of the VPOD CapOx caused physicians to order NIVs for patients, which in turn were supplied by DMEs and billed to federal payors. *See, e.g.*, ECF No. 41, ¶¶ 148–49, 190, 210. As stated above, off-label use of a device does not preclude reimbursement from federal payors. Moreover, even if VirtuOx promoted the VPOD CapOx to providers for an unapproved use and DMEs supplied and billed federal payors for NIVs, Relator's allegations fail. Merely alleging that VirtuOx marketed the VPOD CapOx for an unapproved use is not sufficient to support a finding that claims that providers submitted were false or that VirtuOx caused the submission of a false claim under the FCA. *Dan Abrams Co. LLC v. Medtronic Inc.*, No. 19-56377, 2021 WL 1235845, at *2–3 (9th Cir. Apr. 2, 2021) (finding that neither off-label use nor off-label marketing of a medical device gives rise to a false claim for Medicare reimbursement).

## IV.   Relator's Kickback Claim Should Be Dismissed Because It Sets Forth Legal Conduct

Relator alleges that VirtuOx knowingly presented claims for IDTF services resulting from kickbacks under the AKS, 42 U.S.C. § 1320a-7b, by providing DMEs with POX devices that were owned by VirtuOx and were used for POX testing. *See, e.g.*, ECF No. 41, ¶¶ 8, 150–64, 191–99, 204–09. This claim has no support, as the conduct at issue is permitted by CMS. Apart from broadly citing to the AKS and the FCA, Relator fails to cite any specific authority that would suggest that it is unlawful for VirtuOx to own the devices and provide them to DMEs to then courier to patients in response to physician-ordered home-based POX testing. Relator cannot cite to any such authority because none exists.

Instead, Transmittal 166—which Relator cites—and its replacement, Transmittal 173, set

---

[8] Relator relies on VirtuOx's own website to assert that VirtuOx is marketing the VPOD CapOx for use without clinical supervision. *See* ECF No. 41, ¶¶ 135–36. Accordingly, the crux of Relator's allegation—that the device is promoted for off-label, home use—has been publicly disclosed. *See U.S.* ex rel. *Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015) (concluding publicly available websites intended to disseminate information about defendants' programs qualified as news media for the public disclosure bar). Since Relator's allegations are substantially the same as the information on VirtuOx's website and she is not an original source, her claims fail pursuant to the public disclosure bar. 31 U.S.C. § 3730(e)(4).

forth a "courier model" wherein CMS permits DMEs to courier VirtuOx-owned POX devices to and from patients' homes. Specifically, the Transmittals provide "guidance on when a DME supplier may deliver test equipment on behalf of a Medicare-enrolled" IDTF. The Transmittals state that "[o]vernight oximetry testing (code 94762) can be performed in the beneficiary's home or in another location" and that it can be "self-administered" by a patient "under the direction of a Medicare enrolled" IDTF. They add that "a DME supplier or another shipping entity may deliver a pulse oximetry test unit and related technology used to collect and transmit test results to the IDTF to a beneficiary's home." In other words, pursuant to the Transmittals' own terms, under this courier model, the DME "is acting merely as a courier of equipment" and "CMS does not intend to regulate the ownership of . . . the testing unit . . . ." Relator's kickback and related FCA claims, therefore, are unsupported and should be dismissed.

## V.   Relator's Claims Fail to Satisfy the Heightened Pleading Standards of Rule 9(b)

Relator's 162-page Complaint—which alleges that VirtuOx engaged in sweeping fraud schemes—fails to identify a single false claim. The Complaint also fails to establish that a false claim was submitted with corresponding indicia of reliability. Relator lacks personal knowledge of the purported violations and facts that form the entire basis of her Complaint as she is a competitor and non-employee of VirtuOx. The Complaint is rife with allegations pleaded on the basis of "information and belief," speculation, second-hand information, and information that is otherwise publicly available and non-specific—all of which are fundamentally insufficient under the demanding pleading requirements of Rule 9(b). As such, Relator's claims should be dismissed.

### A.   Relator's Complaint Fails to Identify a Single False Claim that VirtuOx Allegedly Submitted for Payment.

Despite bringing an FCA action against VirtuOx based on four alleged fraudulent schemes that purportedly occurred over many years, Relator fails to identify a single false claim. *Clausen*, 290 F.3d at 1311 (stating that an actual false claim is "the *sine qua non* of an [FCA] violation"); *Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 2021 WL 1609823, at *5 (11th Cir. Apr. 26, 2021) ("Relators' complaint fails to identify even a single, concrete example of a false claim submitted to the government."). Relator has failed to identify *which* claims were supposedly false, "the particular document[s] and statement[s] alleged to be false, who made or used [them], when the statement[s were] made, how the statement[s were] false, and

what . . . [VirtuOx] obtained as a result." *United States* ex rel. *Bingham v. HCA, Inc.*, 2016 WL 6027115, at *4 (S.D. Fla. Oct. 14, 2016) (citation and internal quotations omitted).

Instead of pleading actual false claims, Relator relies on incomplete publicly available information to *estimate* the number of claims paid to VirtuOx and cursorily concludes that all such claims must be false. ECF No. 41, ¶¶ 115–20, 130–32; 168–69; 177–79. Such pleading is fundamentally insufficient to satisfy the Eleventh Circuit's heightened Rule 9(b) pleading requirements. *Est. of Helmly*, 2021 WL 1609823, at *6 (stating "that relators cannot 'rely on mathematical probability to conclude that [a defendant] surely must have submitted a false claim at some point'" (citation omitted)); *Barys* ex rel. *U.S. v. Vitas Healthcare Corp.*, 298 F. App'x 893, 897 (11th Cir. 2008) (holding that relator's "conclusory statements are insufficient to justify" a less stringent pleading requirement under Rule 9(b)).

**B. Relator's Allegations Lack Sufficient Indicia of Reliability.**

Not only does Relator fail to identify a single false claim that VirtuOx allegedly submitted for payment, she fails to plead—for any of the Complaint's purported schemes—that VirtuOx submitted a false claim for payment with corresponding indicia of reliability. *U.S. v. Choudhry*, 262 F. Supp. 3d 1299, 1310 (M.D. Fla. 2017) ("[M]ere[] speculat[ion] that an unlawful . . . scheme exist[ed] and, by extension . . . that all Medicare claims were 'tainted'" is insufficient). Similarly, Relator alleges violations of the AKS, but fails to plead with particularity a single instance when VirtuOx provided a "kickback" to any DME, let alone one that resulted in the submission of a false claim. *U.S.* ex rel. *Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 705 (11th Cir. 2014) (establishing that a relator must plead an alleged FCA kickback scheme with particularity, coupled with strong indicia that a false claim was actually submitted).

1. *Relator's status substantially undermines the credibility of the Complaint and its indicia of reliability under Rule 9(b).*

As a "corporate outsider" and competitor, Relator lacks "first-hand knowledge" of VirtuOx's operations and billing practices and "a sufficient basis" for her allegations that VirtuOx "actually submitted" false claims to the Government. *See Clausen*, 290 F.3d at 1314; *Thornton v. Nat'l Compounding Co., Inc.*, 2019 WL 2744623, at *12 (M.D. Fla. July 1, 2019). Through the Complaint's allegations, it is clear that Relator does not know, *inter alia*, how VirtuOx's IDTF-related services or billing practices function, including POX testing; who at VirtuOx is responsible for submitting claims to the Government; what representations VirtuOx has purportedly made to

the Government and when; who VirtuOx's patients are (beyond an unidentified "family friend") or the dates on which they were provided services; VirtuOx's specific interactions with prescribing physicians; or how VirtuOx's California and Florida Offices operate. *Est. of Helmly*, 2021 WL 1609823, at *5 (upholding dismissal based on relators' lack of access and knowledge and stating, "Relators have 'failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims'" (quoting *U.S.* ex rel. *Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010))).

Relator attempts to rely on her "work in the industry" to bolster her claims. ECF No. 41, ¶ 180.  However, she does not have any direct knowledge of VirtuOx's operations or billing practices beyond how she operates her own IDTF, what she has gleaned from publicly available sources, furtively gained through her "family friend," or ostensibly gathered from the statements of unidentified third-parties, some of which she was not even present for based on her own admissions. *See e.g.*, ECF No. 41, ¶¶ 115, 165, 170, 181–85.  Tellingly, one of Relator's primary allegations to support her billing locality claim—the central claim in the Complaint—is an alleged "busy signal" from an external telephone line at VirtuOx's California Office. *Id.* ¶ 111.

"[N]either the Federal Rules nor the [FCA] offer any special leniency under these particular circumstances to justify [a competitor and corporate outsider] failing to allege with the required specificity the circumstances of the fraudulent conduct [s]he asserts in h[er] action." *Clausen*, 290 F.3d at 1314.  Relator's status as a competitor and corporate outsider, "[w]ithout personal knowledge of [VirtuOx's] billing practices," is insufficient to establish indicia of reliability for her allegations to satisfy Rule 9(b). *U.S. v. Health First, Inc.*, No. 619CV2237ORL37LRH, 2021 WL 301089, at *5 (M.D. Fla. Jan. 22, 2021); *see also Mastej*, 591 F. App'x at 704 (same).

    2.   *Relator Fails to Plead With Particularity that VirtuOx Submitted False Claims to the Government.*

Coupled with the Relator's lack of personal knowledge, the Complaint is defined by pleading that is wholly devoid of the particularity required by Rule 9(b)—a deficiency that runs across all of Relator's alleged schemes.  To establish an FCA claim under Rule 9(b), Relator must plead the who, what, when, where, and how of the alleged fraud. *Bingham*, 2016 WL 6027115, at *4.  The Complaint cannot survive the exacting "paragraph-by-paragraph" scrutiny that Rule 9(b) requires.  *Marlar*, 525 F.3d at 444.

For example, for her "spot check" claim, Relator alleges that physicians were somehow "forced to order both" a spot check and a POX test for patients based on the wording of "VirtuOx's prescription form." ECF No. 41, ¶¶ 127–28, 171. However, Relator does not identify a single physician who was purportedly misled or "forced" into ordering both tests, and she fails to supply any other supporting details. For her billing locality claim, Relator pleads that an unidentified "friend" received POX testing from VirtuOx, and Relator was told by an unidentified Medicare representative at an unidentified time that "the place of service had been listed as San Francisco, California." *Id.* ¶ 174. In claiming that VirtuOx provides kickbacks to DMEs, Relator pleads that these kickbacks occurred without identifying a single DME or a single specific exchange amounting to an alleged kickback. *Id.* ¶¶ 150–64. Instead of providing any support for this claim, Relator pleads that unidentified managers at unidentified DMEs communicated to her that VirtuOx provided free POX devices. *Id.* ¶¶ 182–83. For her FDA claim, Relator alleges that unidentified patients who were tested with VirtuOx's VPOD CapOx were "put at risk" in unidentified ways, given that unidentified physicians *may have* prescribed unidentified home oxygen therapy. *Id.* ¶¶ 133–49. Relator further pleads that unidentified DMEs submitted unidentified claims to Medicare for NIVs based on the unidentified patients' use of the VPOD CapOx. *Id.* ¶¶ 146–49. *See U.S.* ex rel. *Lorona v. Infilaw Corp.*, 2019 WL 3778389, at *5 (M.D. Fla. Aug. 12, 2019) (dismissing relator's claims as deficient under Rule 9(b) where relator alleged "an unidentified person at an unidentified time . . . provided [the relator] with unidentified documents 'demonstrating a violation'").

Moreover, Relator pleads upon "information and belief" at least *17* times in her Complaint. *See, e.g.*, *id.* ¶ 99, 138; *see U.S.* ex rel. *Shurick v. Boeing Co.*, 2008 WL 5054739, at *3 (M.D. Fla. Nov. 21, 2008) ("It is not enough to plead fraudulent acts under the FCA based on information and belief."). Incredibly, Relator pleads "upon information and belief" to assert key portions of her theories of liability, including, but not limited to, whether the alleged schemes ever occurred, ECF No. 41, ¶ 2; whether VirtuOx submitted claims from the California Office and for how long, *id.* ¶¶ 4, 104–05, 108–09; and whether VirtuOx sought FDA clearance for its VPOD CapOx device, *id.* ¶ 138.

The Complaint also relies on attenuated "if-then" arguments, such that *if* Relator's conclusory allegations are true, *then* other equally unsupported allegations must also be true. *See Clausen*, 290 F.3d at 1311–12 ("[F]ailure to allege with any specificity if—or when—any actual

improper claims were submitted to the Government is . . . fatal to [a] complaint[].").  For example, Relator claims that, *if* her unsupported VPOD CapOx off-label allegations are true, *then* Defendant must also be liable for any DMEs' claims for any, potentially non-existent, patients who are not true candidates for NIVs. *See, e.g.*, ECF No. 41, ¶¶ 181, 190.

Relator also relies on incomplete, publicly available information to speculate as to the number of claims VirtuOx allegedly submitted in connection with the purported schemes, without actually identifying any false claims.  *See U.S.* ex rel. *Clark v. Tallahassee Surgical Assocs.*, P.A., 2010 WL 11650950, at *1 (N.D. Fla. June 2, 2010) (stating that even "speculation about what likely happened is not enough" (citing *Clausen*, 290 F.3d at 1311)).  Tellingly, at one point in the Complaint, Relator attempts to estimate 2017 and 2018 claim numbers, including after an acquisition, "based on 2016 numbers" and assumes that "[t]he actual current numbers *would be higher*." ECF No. 41 ¶ 119–20 (emphasis added); *id.* ¶¶ 118, 166, 168–69.  As the Eleventh Circuit has held, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" pursuant to Rules 9(b) and 12(b)(6). *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

The Complaint's Rule 9(b) pleading deficiencies as to each of the alleged schemes are particularly apparent in Relator's *ipse dixit* pleading.  For example, Relator cursorily concludes that VirtuOx's "location of services is, and should be listed on its claims to Medicare or other payers, as Florida," ECF No. 41, ¶ 114, despite failing to plead supporting legal authority or factual allegations with particularity. *See also id.* ¶¶ 109, 112–14, 125, 129, 131, 162–64, 189, 191.  Additionally, Relator states that "[t]here is no reason to perform a spot check at the same time as an overnight study" because "[t]he overnight study would encompass what would be learned from a spot check," but she offers no support for these sweeping assertions. *Id.* ¶ 6.  Relator similarly urges the Court to "take her word for it" when she asserts that VirtuOx's VPOD CapOx puts "patients at risk of being incorrectly 'qualified' for home oxygen therapy or non-invasive ventilation," *id.* ¶ 144, and that a DME's couriering of POX devices pursuant to the Transmittals' defined courier model is "a clear kickback." *Id.* ¶ 164.

## CONCLUSION

For the reasons set forth herein, VirtuOx respectfully requests that the Court dismiss Relator's Complaint.

This the 7th day of May, 2021.

*/s/ Javier A Roldan Cora*

**K&L GATES LLP**
Javier A. Roldan Cora
John H. Lawrence, *pro hac vice pending*
Mark A. Rush, *pro hac vice pending*
Joshua I. Skora, *pro hac vice pending*
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
T: (305) 539-3300
F: (305) 358-7095
javier.roldancora@klgates.com
john.lawrence@klgates.com
mark.rush@klgates.com
joshua.skora@klgates.com

*Attorneys for VirtuOx, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on May 7, 2021, the foregoing Memorandum of Law in Support of Motion to Dismiss was filed via ECF filing, which will serve all counsel of record in the above-referenced matter.

This the 7th day of May, 2021.

*/s/ Javier A Roldan Cora*

**K&L GATES LLP**
Javier A. Roldan Cora
John H. Lawrence, *pro hac vice pending*
Mark A. Rush, *pro hac vice pending*
Joshua I. Skora, *pro hac vice pending*
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
T: (305) 539-3300
F: (305) 358-7095
javier.roldancora@klgates.com
john.lawrence@klgates.com
mark.rush@klgates.com
joshua.skora@klgates.com

*Attorneys for VirtuOx, Inc.*
