UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>the States of Arkansas, California, )<br>Colorado, Connecticut, Delaware, Florida, )<br>Georgia, Illinois, Indiana, Iowa, Louisiana, )<br>Maryland, the Commonwealth of )<br>Massachusetts, Michigan, Minnesota, )<br>Missouri, Montana, Nevada, )<br>New Jersey, New Mexico, )<br>New York, North Carolina, Oklahoma, )<br>Rhode Island, Tennessee, Texas, Vermont, )<br>the Commonwealth of Virginia, Washington,)<br>and the District of Columbia, )<br>*Ex rel.* AMBER WATT, )<br>   )<br>             Plaintiffs, )<br>v.   )<br>   )<br>VIRTUOX, INC., )<br>   )<br>             Defendant. )<br>_____) | Case No. 19-CV-61084-CIV-SCOLA |

**PLAINTIFF/RELATOR AMBER WATT'S RESPONSE
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

 

**BURR & FORMAN, LLP**
Laurence S. Litow (FL Bar No.: 0328758)
Andrew G. Melling (*admitted pro hac vice*)
Las Olas Centre II
350 East Las Olas Blvd., Suite 1440
Ft. Lauderdale, FL 33301
954-414-6200
954-414-6201 (Fax)
lslitow@burr.com

*Attorneys for Plaintiff/Relator*

45609896 v1

Plaintiff/Relator Amber Watt ("Plaintiff"), by and through her undersigned counsel, submits the following Response in Opposition to Defendant's Motion to Dismiss. As set forth with particularity in Plaintiff's Amended Complaint, the Defendant VirtuOx, has violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., has caused the federal government to suffer extensive financial damages, and Plaintiff's Amended Complaint should not be dismissed.

## I. RELEVANT BACKGROUND

Plaintiff's Amended Complaint addresses the fraudulent activity engaged in by the Defendant in the Independent Diagnostic Testing Facility ("IDTF") industry. The Defendant is a Florida corporation that provides IDTF services to patients, and durable medical equipment ("DME") companies, throughout the United States.

IDTF's are used to test whether patients qualify for home oxygen therapy, or non-invasive ventilation. *See* First Amended Complaint ("Am. Compl.") ¶¶ 94-98. Generally, the patient obtains the device, a pulse oximeter, or a capnograph, from either a DME company, or by having it mailed to them directly from an IDTF. *Id*. at ¶ 95. The patient then wears the device, which collects the patient's oxygen levels overnight. The next day, the data collected by the device is transmitted electronically to an IDTF, which generates a report indicating whether the patient qualifies for either home oxygen therapy or non-invasive ventilation. *Id*. at ¶ 97 - 98.

The IDTF is paid a fee by federal and state payors (such as Medicare) to interpret the data. *Id*. at ¶ 99. The fee paid by Medicare, and other governmental payors, varies based on where the IDTF claims the services were provided. *Id*. at ¶ 100. As an example, and as set forth in the Amended Complaint, the amount reimbursed by Medicare in 2016 for an overnight pulse oximetry test, with a location of service of San Francisco, California, was $6.48 more, than with a location of service of Coral Springs, Florida. *Id*. at ¶ 115.

Plaintiff's first claim of fraud alleged in the Amended Complaint, is that Defendant is falsely claiming that it is providing IDTF services in San Francisco, CA, when they are actually being provided in Coral Springs, FL. *Id*. at ¶ 108 – 114, Exhibit 29 to Am. Compl. P. 3 (attached hereto as Exhibit 1). This scheme has resulted in Medicare paying millions of dollars more for these services, then had VirtuOx correctly identified Coral Springs, FL as their location of service. As will be discussed further below, Plaintiff's Amended Complaint satisfies the heightened pleading standard of FRCP 9(b), and provides proof of an actual false claim submitted to Medicare by Defendant. Accordingly, Defendant's motion should be denied.

The allegations in Plaintiff's second claim of fraud involves Defendant billing Medicare for procedures that were never rendered. *Id*. at ¶ 116 - 117. There are two types of pulse oximetry testing at issue. The first is an overnight test. The second is a "spot check", or single determination. *Id*. at ¶ 123 - 124. A spot check is used generally when a physician wants to know what a patient's oxygen level is at a specific moment in time. Defendant does not perform spot checks, but falsely billed Medicare for these services. *Id*. at ¶ 125, 131, and Exhibit 29 to Am. Compl. ¶. 3 (attached hereto as Exhibit 1). By doing so, Defendant has caused Medicare to pay for this test on tens of thousands of claims. Am. Compl. ¶ 131 – 132, and Exhibit 13. As will be addressed in greater detail below, Plaintiff's Amended Complaint satisfies the heightened pleading standard of FRCP 9(b), and provides proof of an actual false claim submitted to Medicare by Defendant for these spot checks that were never performed. Accordingly, Defendant's motion should be denied.

The third fraudulent scheme that Defendant engages in involves the selling of medical devices for off label uses and falsely informing customers that the devices are in fact FDA approved for the marketed use. Defendant advertises to its DME customers that they can use Defendant's capnograph[1] to qualify their patients for non-invasive ventilation. Am. Compl. ¶¶ 134-136, and Exhibits 22-24. They advertise that the capnograph is FDA approved for use **without clinical supervision**. *Id.* As set forth in the Amended Complaint, this is entirely false. The device has only been approved for use **in a hospital environment**. Am. Compl. Exhibit 25. Due to this false representation, Defendant's customers, (physicians and DME companies) are using a device to qualify their patients for non-invasive ventilation that is not FDA approved for that purpose. Defendant is submitting false claims for testing performed on a device they know is not FDA approved for that purpose. Accordingly, Defendant's motion should be denied.

The Plaintiff's fourth claim is that Defendant is providing free pulse oximeters to DME companies in exchange for referrals of IDTF business to Defendant. It is the DME companies that refer patients to Defendant, and the free pulse oximeters are an illegal inducement and a kickback under the Anti-kickback statute. Accordingly, Defendant's motion should be denied.

---

[1] A capnograph is a device that measures a patient's carbon dioxide levels. Am. Comp. ¶ 134.

As will be addressed in detail below, Plaintiff's Amended Complaint sets forth the elements of a False Claims Act case, and meets the heightened pleading standard of FRCP Rule 9(b). Accordingly, Defendant's Motion to Dismiss should be denied.

## II.  LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A motion to dismiss should not be granted if the factual allegations are "enough to raise a right to relief above the speculative level," and a complaint should not be dismissed "even if it appears that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Under Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," although "conditions of a person's mind," such as malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b). "The 'particularity' requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008).

Additionally, "[t]he United States is the real party in interest in a qui tam action under the FCA even if it is not controlling the litigation." *U.S. ex rel. Dimartino v. Intelligent Decisions, Inc.*, 308 F. Supp. 2d. 1318, 1322 n. 8 (M.D. Fla. 2004) citing *U.S. ex rel. Rodgers v. Arkansas,* 154 F. 3d 865, 868 (8th Cir. 1998); *U.S. ex rel. Hyatt v. Northrop Corp.*, 91 F. 3d 1211, 1217 n. 8 (9th Cir. 1996); *U.S. ex rel. Milam v. University of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 48-49 (4th Cir. 1992). As set forth in the Notice of the United States That It Is Not Intervening

At This Time (ECF 49), the government has been unable to decide at this time whether to proceed with this action as it is "awaiting information from VirtuOx pertaining to certain issues involved in the government's investigation." *ECF* 49, p. 1. Further, the United States Government in its Notice, requested that "this Court solicit the written consent of the United States before ruling or granting its approval", in the event that defendant proposes that this action be dismissed. *ECF* 49, p. 2. As such, this is not a case where the United States has had an opportunity to conclude its investigation, and declined intervention.

### III. LEGAL ARGUMENT

The False Claims Act ("FCA") was enacted to combat fraud against the federal government. In enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (citation omitted). The FCA imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).

The Defendants fraudulent activities, as set forth with particularity in the Amended Complaint, have resulted in extensive financial loss to the Government.

> **I. The United States Supreme Court's Decision in *Azar v. Allina Health Services* Does Not Apply to the Case at Hand.**

The Defendant's Motion to Dismiss relies heavily on *Azar v. Allina Health Services* , 139 S. Ct. 1804 (2019), for its position that Plaintiff cannot establish liability premised on sub regulatory guidance not subject to notice and comment rulemaking. Defendant's position is an attempt to distract the Court's attention from what is actually plead in Plaintiff's Amended Complaint. Defendant's Motion to Dismiss attempts to create a requirement that there must be a violation of sub-regulatory guidance to prove a violation of the FCA. There is no such requirement. The Plaintiff's Amended Complaint does not rely on sub-regulatory guidance to support its claims that a provider cannot submit a claim to Medicare for a service it did not provide, or submit a claim falsely stating that a service took place in a location where it did not actually take place.

To establish a violation of the FCA a Plaintiff must show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel Phalp v. Lincare Holdings, Inc.*, 116 F.Supp.3d 1326, 1344. ((S.D. Fla. 2015)(quoting *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015). "A factually false claim occurs, for example, when a supplier submits a claim that misidentifies the goods supplied or requests reimbursement for goods that it never provided. Simply put, the supplier falsely bills the government for something not received. Courts agree that application of the False Claims Act in factually false cases is 'fairly straightforward'" *Phalp* at 1344-1345 (Internal citations ommitted). As discussed in detail below, Plaintiff's Amended Complaint pleads that Defendant misidentified the location where its services were rendered, and also billed the government for services not provided. These are "fairly straightforward" claims. The other requirements of scienter, materiality, and causing the government to pay out money, are addressed below. Accordingly, *Allina* has no application to the claims herein.

Additionally, *Allina* was decided June 3, 2019. The Complaint in this action was filed on April 29, 2019. The false claims alleged in the Complaint began in 2011. (Compl. ¶ 96). Additionally, *Allina* did not involve a False Claims Act case, nor did it address Medicare Local Coverage Determinations ("LCD"), or whether LCDs set forth substantive legal standards, nor did it address the question of whether a false certification of compliance with an LCD may form the basis of a claim under the FCA.

These issues were raised in two cases, *United States ex rel. Gray v. Mitias Orthopaedics, PLLC*, 2021 WL 79615 (N.D. Miss. 2021); and *United States ex rel., Alt v. Anesthesia Services Assoc. PLLC.*, 2019 WL 7372510 (M.D. Tenn. 2019). Both of these cases involved violations of the False Claims Act, and analyzed the applicability of *Allina* to such cases.

The Court in *Gray* determined that "it strikes this court as being a considerable leap to apply the Supreme Court's 2019 decision in *Allina* not only to FCA actions (which involve their own unique standards), but essentially *retroactively* to FCA actions arising out of claims which were made long before *Allina* was decided." *Gray* at *12. The Defendant, in the case at hand, is also attempting to apply *Allina* retroactively. Further the Court in *Gray* stated:

> "[i]f the evidence in this case suggests that, between 2011 to 2015, defendants knowingly mis-stated that they were administering specific DEA-approved drugs to patients, and that these mis-representations were material based upon payment

approval standards existing at the time, then it is unclear to this court why the Supreme Court's decision in *Allina* should, in effective, serve as a retroactive get-out-of jail free card for them in this case."

*Gray* at *12. Coincidentally, in the case at hand, Defendant's fraudulent practices also began in 2011. Am. Compl. ¶ 122. The *Gray* court agreed with the court's decision in *Alt*, and stated:

In rejecting the motion to dismiss filed in *Alt*, the District Court for the Middle District of Tennessee wrote that:

*Allina* did not concern LCDs and certainly did not establish that all LCDs set forth substantive legal standards, nor did it address the question of whether a false certification of compliance with an LCD may form the basis of a claim under the FCA. Moreover, neither party here has actually briefed the question of whether the particular LCDs at issue should be considered to establish substantive legal standards, nor have the parties addressed the question of whether *Allina* has any application at all in the context of a case asserting FCA claims, as opposed to a case specifically contesting the denial of Medicare claims for reimbursement. At this juncture, the court does not read *Allina* to support dismissal of any claims asserted in this case.

*Gray* at *10 - *11 (citing *Alt*, 2019 WL 7372510 at *15).

For the above reasons *Allina* is not applicable to the case at hand.

### I. VirtuOx falsely represents to federal and state Pavors that its location of services for IDTF services is California rather than their actual location in Florida.

Defendant is claiming its IDTF services are being provided in San Francisco, CA, when they are actually being performed in Coral Springs, FL. This is factually false claim. By doing so, they are reimbursed by Medicare at a heightened rate of reimbursement, than had they identified the actual location of service of Coral Springs, FL. Am. Compl. ¶¶ 99-102, and 114-121. This false representation renders the claims false, in violation of the FCA. These are material violations of the FCA, because had Medicare been aware that the services were not being rendered in San Francisco, Medicare would have obviously not reimbursed Defendant at the San Francisco higher reimbursement rate.

To establish a violation of the FCA a Plaintiff must show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel Phalp v. Lincare Holdings, Inc.*, 116 F.Supp.3d 1326, 1344. ((S.D. Fla. 2015)(quoting *Urquilla-Diaz v. Kaplan*

*Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015). "A factually false claim occurs, for example, when a supplier . . . submits a claim that misidentifies the goods supplied." *Phalp* at 1344-1345.

Plaintiff's Amended Complaint pleads the requirements of a false statement or fraudulent conduct as follows. As explained in the Amended Complaint, the overnight pulse oximetry test was performed by Defendant, on a family friend of the Relator's, who lives in Topeka, Kansas. Am. Compl. ¶¶ 170 – 179, and Exhibit 29 p. 3 to the Amended Complaint is the actual VirtuOx "Pulse Oximetry – Summary Report" for this patient. (Exhibit 1 hereto). As can be seen on the top right of the report, the "IDTF Upload Date was 07/19/2019", and the address of the facility is "5850 Coral Ridge Drive, Suite 304, Coral Springs, Florida 33076". There is nothing on the report about San Francisco, CA, yet as set forth in of the Amended Complaint, the Relator confirmed with Medicare, that the Defendant listed San Francisco, CA as the location of service for this testing, and Medicare reimbursed Defendant the heightened San Francisco, CA, reimbursement rate. Am. Compl. ¶¶ 170 – 179.

In addition to this specific claim, Plaintiff's Amended Complaint set forth evidence of tens of thousands of other false claims submitted to Medicare. Am. Compl. ¶¶ 99-102, and 114-121, Exhibits 13-17.

The above is direct evidence that satisfies Rule 9(b)'s heightened pleading standard, that Defendant is submitting claims to Medicare that falsely state that the testing was performed in San Francisco, CA, when the testing was actually performed in Coral Springs, FL.

In addition, Defendant's San Francisco, CA location does not even qualify as an IDTF pursuant to the Medicare requirements. Exhibit 12 to the Amended Complaint is the Department of Health and Human Services Centers For Medicare and Medicaid Services, Independent Diagnostic Testing Facility (IDTF) Fact Sheet. It addresses the statutory requirements related to an IDTF, as established by 42 CFR § 410.33, which is cited throughout the document. (Exhibit 2 hereto). This "Fact Sheet" sets forth the seventeen requirements that an IDTF must meet to qualify as an IDTF, pursuant to 42 CFR § 410.33(g). If a facility does not meet **even one** of these requirements, then it does not qualify as an IDTF. *See* 42 CFR § 410.33(h)(emphasis added) (Exhibit 2 hereto). As Defendant's San Francisco facility does not meet all of these requirements, it does not qualify as an IDTF, and Defendant cannot claim this facility as their location of service.

As stated in paragraph 110 of the Amended Complaint, Medicare requirement number 5 is that the IDTF:

> Maintain a primary business phone under the name of the designated business. The primary business phone must be located at the designated site of the business, or within the home office of the mobile IDTF units. The telephone number or toll free numbers must be available in a local directory and through directory assistance. IDTFs may not use "call forwarding" or an answering service as their primary method of receiving calls from beneficiaries during posted operating hours.

As discussed in the Amended Complaint, Defendant does not meet this requirement. Am. Compl. ¶¶ 108 – 113. Plaintiff contacted Medicare and was informed of the San Francisco phone number Defendant submitted to Medicare. Defendant determined through extensive attempts to reach that number that it was not a functional phone number, and clearly not a primary business number that patients, physicians or DME company representatives could have ever used to get in touch with Defendant. Am. Compl. ¶¶ 108-113. According to Medicare/IDTF requirement number 5, this number must be the "primary method of receiving calls from beneficiaries during posted operating hours". As stated in the Amended Complaint, Plaintiff has determined that this phone number fails to satisfy the IDTF requirement for a primary phone. *Id.*

Accordingly, Defendant's San Francisco location does not meet the Medicare requirements to be an IDTF, and cannot be its location of service. As such, Defendant's claim that its IDTF services are being rendered in San Francisco, CA is factually false.

Plaintiff's Amended Complaint shows that the falsity was made with scienter. For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard." § 3729(b). *Phalp* at 1357. As alleged, Defendant is submitting claims to the government with the false statement that the services were not rendered in San Francisco, CA. Am. Compl. ¶ 114-121, and Exhibit 13. In 2016 alone, Defendant submitted 131,803 false claims to Medicare. Am. Compl. ¶¶ 114, and Exhibit 13. It would be nonsensical to suggest that the claims were submitted without Defendant's actual knowledge that it was not rendering the IDTF services in San Francisco, FL.

Plaintiff's Amended Complaint shows how the falsity was material to the government paying the Defendant for these services that were not rendered in San Francisco, CA, and caused the government to pay the heightened reimbursement rate for these services. "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b). *Phalp* at FN22. Plaintiff's Amended Complaint has set forth how Defendant was submitting claims for payment to Medicare for services it claimed were

rendered in San Francisco, CA, which were in fact rendered in Coral Springs, FL, and how Medicare was "caused" to pay for these claims. Am. Compl. ¶¶ 114-121, and Exhibits 13 and 29. The false claim that a service was rendered in San Francisco, CA, would naturally tend to influence the government to pay the false claim with a location of service of San Francisco, CA. Medicare would not have paid the false claim at the higher reimbursement rate of San Francisco, CA, had they known the Defendant performed the services in Coral Springs, FL.

Based on the above, Plaintiff's Amended Complaint meets the requirements of pleading a violation of the FCA, and Defendant's Motion to Dismiss should be denied.

Plaintiff has also adequately plead a False Claims Act violation under a false certification theory. Plaintiff has alleged facts that show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz*, 780 F.3d 1039, 1052 (11th Cir. 2015). Defendant upon enrolling with Medicare through CMS-855B, has contractually agreed to abide by Medicare's various program instructions, with regard to billing Medicare for services claimed to have been rendered.

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of claim by Medicare is conditioned upon the claim and the underlying transaction complying with such law, regulations, and program instructions.

Am. Compl. ¶ 51. (Exhibit 3 hereto). When Defendant submitted this enrollment, as all providers are required to do, they specifically agreed to abide by Medicare's law, regulations, and program instructions. The above Medicare guidelines are such regulations and instructions. Defendant further acknowledges the materiality of complying with such requirements by certifying their understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transactions complying with such laws, regulation, and program instructions.

The false statements and fraudulent course of conduct, as discussed above, were plead with particularity. Scienter is clear as Defendant surely has knowledge that it is falsely certifying that its San Francisco, CA location meets the Medicare IDTF requirements as discussed above. Plaintiff's claims establish that Defendant had the requisite scienter when making its false certifications and engaged in a fraudulent course of conduct as detailed above.

Furthermore, the Defendant's fraudulent representations were material to Medicare's decision to pay the claims. Medicare would clearly not have enrolled Defendant's San Francisco, CA location, and would therefore have not reimbursed Defendant at the higher San Francisco rate, had it known that Defendant did not meet the Medicare requirements for an IDTF. 42 CFR 410.33(h) states that:

> If an IDTF fails to meet one or more of the standards in paragraph (g) of this section at the time of enrollment, its enrollment will be denied. CMS will revoke a supplier's billing privileges if an IDTF is found not to meet the standards in paragraph (g) or (b)(1) of this section.

(Exhibit 2). Accordingly, due to Defendant's falsity, Medicare paid Defendant's claims at a higher rate than had Defendant not falsely certified that its California location met the Medicare requirements for an IDTF.

Plaintiff's Amended Complaint sets forth with particularity the evidence of Defendant's false claims, and provides an actual false claim submitted by Defendant to Medicare for payment. In addition to this specific claim, Plaintiff's Amended Complaint details tens of thousands of other false claims that were submitted to Medicare by Defendant with a San Francisco location of service, rather than where the services were actually rendered in Coral Springs, FL. Am. Compl. ¶¶ 99 – 105; 115 – 118; and 167-169.

Plaintiff has plead the fraudulent activity of the Defendants with particularity, and has detailed specific false claims that were submitted to Medicare by Defendant and reimbursed. As such, Defendant's Motion to Dismiss should be denied.

## II. <u>VirtuOx is Billing Medicare For a Service it is Not Actually Providing</u>

As set forth with particularity in Plaintiff's Amended Complaint, when Defendant performs an overnight oximetry test on a patient (billing code 94762), it regularly also bills for a spot check of the patients' oximetry levels, that it did not actually perform. This is a factually false claim. There is no separate spot check test performed to obtain this information. Only an overnight pulse oximetry test (code 94762) is actually being performed.

To establish a violation of the FCA a Plaintiff must show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel Phalp v. Lincare Holdings, Inc.*, 116 F.Supp.3d 1326, 1344. ((S.D. Fla. 2015)(quoting *Urquilla-Diaz v. Kaplan*

*Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015). "A factually false claim occurs, for example, when a supplier . . . bills the government for something not received." *Phalp* at 1344-1345.

Plaintiff's Amended Complaint pleads the requirement of a false statement or fraudulent conduct as follows. It is important to consider that the patient self-administers this test. The patient puts the pulse oximeter on his/her finger and then goes to bed. It is one test. However the Defendant bills both the overnight oximetry test (94762) as well as a spot check (94760). Am. Compl. ¶¶ 170-179, and Exhibit 29, p. 3 (attached as Exhibit 1 hereto). The Amended Complaint sets forth clear evidence of this false billing. Exhibit 29, p. 3, to the Amended Complaint is an actual VirtuOx "Pulse Oximetry – Summary Report". As explained in paragraphs 170 - 179 of the Amended Complaint, the overnight pulse oximetry test was performed by Defendant, on a family friend of the Relator's, who lives in Topeka, Kansas. This report of the oximetry testing states: "Test Condition: Overnight on Room Air". Am. Compl. Exhibit 29 p. 3 (attached hereto as Exhibit 1). There is nothing on this report that mentions a spot check being performed. Yet, as confirmed by the Plaintiff, and set forth in the Amended Complaint, Defendant billed Medicare for both an overnight pulse oximetry test **and** a spot check. Am. Compl. ¶¶ 170 – 179. The spot check was never performed.

Additionally, the "Overnight Oximetry Order Form" which was Exhibit 29 p.1, to the Am. Comp., shows that the ordering physician never even ordered a spot check to be performed. This order form is the prescription for VirtuOx to perform testing. It is Defendant's "Overnight Oximetry Order Form", which is signed by the ordering physician (redacted), and dated "6/11/18". Under "<u>Diagnostic Orders</u>: Awake Oximetry CPT 94760 & Overnight Oximetry CPT 94762: immediately and repeat in 30/60/90/other _____ to validate oxygen settings.", there is nothing checked to indicate that the physician ordered a spot check. Am. Compl. Exhibit 29 p. 1 (attached hereto as Exhibit 1). There is no language regarding a spot check test.

Plaintiff's Amended Complaint shows that the falsity was made with scienter. For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard." § 3729(b). *Phalp* at 1357. As alleged, Defendant is billing for services it is simply not providing, and did so approximately 20,855 times in 2016 alone. Am. Compl. ¶ 116-117, and Exhibit 13. It would be nonsensical to suggest that this falsity was made without Defendant's actual knowledge of its actions.

Plaintiff's Amended Complaint shows how the falsity was material to the government paying the Defendant for the services that were never rendered, and caused the government to pay for the services never actually rendered. "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b). *Phalp* at FN22. Plaintiff's Amended Complaint has set forth how Defendant was submitting claims for payment to Medicare for services it never rendered, and how Medicare was "caused" to pay for these claims. Am. Compl. ¶ 116-117, 123-132, 170-179, and Exhibits 13 and 29. The claim for a service never actually provided would naturally tend to influence the government to pay the false claim. Medicare would not have paid the false claim had they known the Defendant never actually performed the service.

Based on the above, Plaintiff's Amended Complaint meets the requirements for pleading a violation of the FCA, and Defendant's Motion to Dismiss should be denied.

In addition to the clear evidence of the Defendant submitting factually false claims to Medicare for services not rendered, the Defendant has also falsely certified compliance with Medicare requirements.

Defendant upon enrolling with Medicare through CMS-855B, has contractually agreed to abide by Medicare's various program instructions, which would include LCDs, with regard to billing Medicare for services claimed to have been rendered.

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of claim by Medicare is conditioned upon the claim and the underlying transaction complying with such law, regulations, and program instructions.

Am. Compl. ¶ 51. (Exhibit 3 hereto). When Defendant submitted this enrollment, as all providers are required to do, they specifically agreed to abide by Medicare's law, regulations, and program instructions. The above CMS guidelines are such regulations and instructions. Defendant further acknowledges the materiality of complying with such requirements by certifying their understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transactions complying with such laws, regulation, and program instructions.

LCD L29236, attached as Exhibit 3 to the Am. Compl., provides the definitions for the oximetry codes at issue in this case:

94760: NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION, SINGLE DETERMINATION, and
94762: NONINVASIVE EAR OR PULSE OXIMETRY FOR OXYGEN SATURATION; BY CONTINUOUS OVERNIGHT MONITORING (SEPARATE PROCEDURE).

As the clear language in the definition sets forth, a Single Determination is a single check of a patient's oxygen levels for a certain moment in time. Separate Procedure means the test is performed separately from any other procedure, such as 94760. As set forth in the Amended Complaint, this is not how the Defendant is performing and billing for this testing. LCD L28296 specifically states under **Utilization Guidelines** billing codes 94760 and 94762**:**

> **Only one number of services per day** will be allowed for testing at a reasonable frequency and if medically necessary regardless of whether the patient is sitting, standing, or lying, with or without exercise or oxygen use, unless medical necessity can be demonstrated for additional needs

(Exhibit 4 hereto, Emphasis added) [2]. Defendant bills Medicare for both 94760 and 94762, performed on the same day. Am. Compl. Exhibit 29, p. 3 (attached hereto as Exhibit 1).

The Medicare Claims Processing Manual: Chapter 35: Independent Diagnostic Testing Facilities (IDTF) provides that IDTF services performed on or after March 15, 1999, will be paid under the physician fee schedule. (Exhibit 5)[3]. Federal Register Vol. 65, No. 70, provides that spot checks (94760) have a "T" status code associated with them. (Exhibit 6). A "T" status code provides that a provider will only be paid if there are no other services provided under the physician fee schedule billed on the same day by the same provider. (Exhibit 7)[4].

---

[2] LCD L28296, is attached to Defendant's own website at https://virtuox.net/Services/OximetryTesting. (Bottom of page includes this LCD as a download for overnight oximetry). The Plaintiff requests that the Court take judicial notice of this document pursuant to F.R.E. Rule 201 as it is a Medicare publication, and cannot be subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

[3] The Plaintiff requests that the Court take judicial notice of this document pursuant to F.R.E. Rule 201 as it is a Medicare publication, and cannot be subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

[4] The Plaintiff requests that the Court take judicial notice of this document pursuant to F.R.E. Rule 201 as it is a Medicare publication, and cannot be subject to reasonable dispute because

As can be seen from the VirtuOx Pulse Oximetry – Summary Report discussed above (Am. Compl. Exhibit 29 p. 3), the patient started her testing on 6/20/2018 at 1:15:44 AM. She ended her testing on the same day on 6/20/2018 at 8:39:40 AM. Yet Defendant billed both an overnight oximetry test and a spot check for the same day of service in direct violation of Medicare billing requirements.

The clear conclusion is that Defendant is simply billing this additional code so that it can collect an additional reimbursement from Medicare. In 2016 alone, as provided in Plaintiff's Amended Complaint, Defendant billed Medicare this spot check code 20,855 times. Am. Compl. ¶¶ 116-117, and Am. Compl. Exhibits 13, 17, and 18.

In this case, Defendant has falsely certified that it will comply with all of Medicare's requirements. The Amended Complaint has plead with particularity the elements of a FCA case with regard to the factually false claims submitted, as well as the claims submitted with false certifications. As such, the Defendant's Motion to Dismiss should be denied.

## III. Defendant is Marketing and Selling a Medical Device For an Off-Label Use While Falsely Stating the Device is FDA Approved for Home Use Without Clinical Supervision

The Defendant's Motion to Dismiss relies in part on *U.S., ex rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993, 999 (C.D. Cal. 2015). This case is distinguishable from the case at hand. *Modglin* focused in part on whether a physician who uses a medical device for an off-label use, and bills Medicare for it, is making a false claim under the FCA. That is not what the case at hand addresses. The Defendant is marketing a medical device for an off-label use, without disclosing that the use is in fact off-label. Am. Compl. ¶ 135, and Ex. 22. If a medical device is used for a purpose other than that for which it has obtained PMA approval, the usage is "off-label." *U.S., ex rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993, 999 (C.D. Cal. 2015) (quoting *Carson v. Depuy Spine, Inc.*, 365 Fed.Appx. 812, 815 (9th Cir.2010) (Unpub.Disp.)) ("Drugs and medical devices are approved or cleared by the FDA for marketing with labels describing the uses and the patient conditions which have been reviewed in the approval or clearance process. Any use by a physician which differs from the use described in the label or from the patient conditions described in the label is called 'off-label' "). *Id.* See also Am. Compl. ¶¶ 53 – 68.

---

it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

As set forth in the Amended Complaint, the capnograph marketed for sale to DMEs by the Defendant is only FDA approved for: "The Vital Signs Monitor is adaptable to adult and pediatric usage in a **hospital environment** and is intended to be used **only under regular supervision of clinical personnel**." (Emphasis added). Am. Compl. ¶ 137 and Ex. 25.  The Defendant is marketing to its DME customers that the capnograph is FDA approved for at home use **without clinical supervision**, which is an off-label use. Am. Compl. Exhibits. 22, 23 and 24.[5]

The process begins when a physician submits an order for a patient to receive capnography. The patient obtains the capnograph from the DME and takes it home. Am. Compl. ¶ 136, and Exhibits 23 and 24. Based on the fact that the Defendant is marketing the device for home use, neither the DME, the patient, or the ordering physician, are aware that its capnograph is not approved for at home, unsupervised use, by the patient. The test is performed at home **without clinical supervision**, which is a use not FDA approved. Am. Compl. ¶ 141, and Exhibit 24. The DME transmits the data to Defendant, that interprets the data. The Defendant then bills Medicare for the capnography testing which was performed at home by the patient, **without clinical supervision**, knowing that this is an off-label use. Am. Compl. ¶ 142.

The issue is not whether a physician or health care practitioner is using a device for an off-label use. The FDCA explicitly protects physicians' ability to prescribe devices for off-label use. *Modglin* at 999 (citing 21 U.S.C. § 396). The FDA does, however, expressly prohibit manufacturers from **marketing** a PMA-approved device for an off-label use. *Modglin* at 999 (citing 21 U.S.C. § 331) (proscribing, *inter alia*, "[t]he introduction . . . into interstate commerce of any . . . device . . . that is adulterated or misbranded").

Defendant is marketing and otherwise promoting a capnograph that tests oximetry and carbon dioxide levels, for use **without clinical supervision**, that has not been FDA approved for that use, which is therefore an off-label use. Am. Compl. ¶ 134.

Plaintiff's Amended Complaint sets forth with particularity the false marketing efforts of the Defendant. Am. Compl. ¶¶ 135 – 136, and Exhibits 22, 23, and 24. Plaintiff's Amended

---

[5] Footnote 8 to Defendant's Motion to Dismiss asserts that Plaintiff's claim fails because of the public disclosure bar, due to Plaintiff's use of the Defendant's own website marketing materials to support her claim. This assertion is misleading. It is true that Defendant's website markets the capnograph for a use that is not FDA approved, but the website does not attach the FDA letter setting forth the actual indication for use (hospital setting under clinical supervision), nor does it state on the website that the use Defendant is promoting it for is not FDA approved.

Complaint sets forth with particularity the FDA approval status of the capnograph at issue, including the indication for use of the device. Am. Compl. ¶ 137, and Exhibit 25. Further it sets forth how Medicare is in the position of not only paying for the interpretation of the data collected by these non-FDA approved devices, but also of paying for home oxygen therapy or non-invasive ventilation for patients that were qualified in error by the non-FDA approved devices. Am. Compl. Exhibit 26.

As discussed in previous sections of this response, the Defendant certified compliance with Medicare laws, regulations, and program instructions when it enrolled in the Medicare program. CMS-855B. Medicare pays only for medical tests that are reasonable and necessary for the diagnosis or treatment of a patient. *See* 42 U.S.C. § 1395y(a)(1)(A). "Rather, to be reimbursable, a **device** must (1) have FDA approval/clearance, (2) be "**reasonable** and **necessary**," *Int'l Rehab. Sci. Inc. v. Sebelius*, 688 F.3d 994, 997, 1002 (9th Cir. 2012), and (3) meet any other pertinent regulations, HHS, ***Medicare Benefit Policy Manual***, ch. 14 § 10." *Dan Abrams Co. LLC v. Medtronic Inc.*, No. 19-56377, 2021 WL 1235845, at *1. As there is no FDA approval for Defendants capnograph to be used for at home testing without clinical supervision, Defendant's claims to Medicare are not reasonable and necessary. Accordingly, they are falsely certifying that they are in compliance with Medicare laws.

By submitting claims under these circumstances, Defendant is knowingly submitting false claims to Medicare for capnography testing. Accordingly, Defendant's Motion to Dismiss should be denied.

### D. Defendant Is Giving DME Companies Pulse Oximeters at no Cost, Or At A Greatly Reduced Cost, As An Inducement To Refer Business

Plaintiff's Amended Complaint sets forth in detail the process of how a patient is prescribed pulse oximetry testing by her physician, how the DME company receives the prescription, and then supplies the patient with a pulse oximeter owned by the DME. Am. Compl. ¶¶ 1-4. Further, how the patient then takes the device home, performs the overnight oximetry test, and then has the DME company transmit the data to the IDTF. Am. Compl. ¶¶ 5 – 7. Another scenario is that the IDTF itself owns the pulse oximeter, and ships it directly to the patient, rather than the DME providing the device to the patient. Am. Compl. ¶ 95.

In the first scenario the DME owns the device. In the second scenario, the IDTF owns the device. Defendant's Motion to Dismiss relies on Transmittal 166 for the position that "CMS does

not intend to regulate the ownership of either the testing unit or the technology used to transmit test results." However, that statement simply addresses that either the DME or the IDTF can own the device being provided to the patient. It does not address the issue of **how** the DME came to own the device/testing unit. The statement does not suggest that the Defendant is permitted to provide the DME with equipment free of charge in exchange for referrals. Medicare may not be concerned with whether the patient is provided with a device owned by either the DME, or the IDTF, but the False Claims Act prohibits the IDTF from giving a free device to a DME in exchange for referrals. That is what is specifically plead in the Amended Complaint.

Specific examples are provided of Plaintiff's communications with individuals between 2016 and 2019, who confirmed that Defendant was providing free pulse oximeters in exchange for referrals. Am. Compl. ¶¶ 182 – 185. In 2016, Plaintiff spoke with a medical sales manager for a large DME with approximately fifty locations who switched virtually all of the company's IDTF work to Defendant due to receiving free pulse oximeters. Am. Compl. ¶ 182. The claims submitted to the government for payment resulting from Defendant's illegal inducements represent a false claim for payment in violation of the Federal False Claims Act. Am. Compl. ¶ 196.

The Amended Complaint also details how the free pulse oximeter provided by Defendant is a large financial benefit to the DME to refer its IDTF business to Defendant. Am. Compl. ¶¶ 159-163.

By submitting claims under these circumstances, Defendant is knowingly submitting false claims to Medicare which were tainted by the kickbacks. Accordingly, Defendant's Motion to Dismiss should be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Plaintiff's First Amended Complaint should be denied in its entirety.

Dated: June 4, 2021

Respectfully submitted,

Laurence S. Litow (FL Bar No.: 0328758)
Andrew G. Melling (*admitted pro hac vice*)
Burr & Forman, LLP
Las Olas Centre II
350 East Las Olas Blvd., Suite 1440
Ft. Lauderdale, FL 33301
954-414-6200
954-414-6201 (Fax)
lslitow@burr.com

s/*Laurence S. Litow*
Laurence S. Litow
Attorneys for Relator, Amber Watt

### Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, and served via CM/ECF on all counsel of record this 4th day of June, 2021.

s/*Laurence S. Litow*
Laurence S. Litow